**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| IN RE ELANCO ANIMAL HEALTH INCORPORATED SECURITIES LITIGATION | Case No. 1:24-cv-02912-BAH |
| THIS DOCUMENT RELATES TO: | <u>CLASS ACTION</u> |
| ALL ACTIONS | AMENDED CLASS ACTION COMPLAINT |

**TABLE OF CONTENTS**

I. SUMMARY OF THE ACTION ........................................................................................ 1

II. JURISDICTION AND VENUE ...................................................................................... 4

III. PARTIES ....................................................................................................................... 5

    A.    Lead Plaintiffs ....................................................................................................... 5

    B.    Defendants ............................................................................................................ 5

IV. DEFENDANTS' FRAUDULENT SCHEME ................................................................. 7

    A.    Background ............................................................................................................ 7

    B.    Defendants' Innovation-Focused Strategy ........................................................... 8

    C.    The FDA Approval Process for New Animal Drugs ............................................ 9

    D.    Defendants Tout Zenrelia as a Central Element of the Company's Prospects ..... 11

        1.    *The Canine Dermatology Market* ............................................................. 11

        2.    *Defendants Seek to Break into the Canine Dermatology Market with Zenrelia* ................................................................................... 12

        3.    *The Company Conducts a Vaccine Response Study for Its Zenrelia Submission to the FDA* ............................................ 13

    E.    The Company Touts Progress Towards FDA Approval of Zenrelia, and Sales Expectations Post-Approval ................................................................................. 17

    F.    Defendants Reveal That Zenrelia Is Delayed and An Expected Black Box Warning Regarding Safety Issues .......................................................................... 19

    G.    Relevant Post-Class Period Events ...................................................................... 21

V. CLASS PERIOD MISREPRESENTATIONS ................................................................ 26

    A.    May 9, 2023: Q1 2023 Earnings Call (#1-2) ........................................................ 26

    B.    June 1, 2023: Stifel Jaws and Paws Conference (#3) ........................................... 27

    C.    June 12, 2023: Goldman Sachs Global Healthcare Conference (#4).................... 28

    D.    August 7, 2023: Q2 2023 Earnings Call (#5) ....................................................... 29

    E.    September 11, 2023: Morgan Stanley Global Healthcare Conference (#6) ......... 30

    F.    November 7, 2023: Q3 2023 Earnings Press Release (#7)................................... 30

G.    November 29, 2023: Evercore ISI HealthCONx Conference (#8) ....................... 31

H.    January 9, 2024: J.P. Morgan Healthcare Conference (#9-10) ............................ 32

I.    January 18, 2024: Defendant Simmons Appears on *Mad Money* (#11) ............... 33

J.    February 7, 2024: Defendant Simmons Appears on *Floor Talk with Judy Shaw* (#12) ................................................................................... 34

K.    February 26, 2024: FY 2023 Press Release and Earnings Call (#13-16) ............. 35

L.    February 29, 2024: Bank of America Securities Animal Health Summit (#17)... 37

M.    March 4, 2024: TD Cowen Health Care Conference (#18) .................................. 38

N.    March 12, 2024: Barclays Global Healthcare Conference (#19) .......................... 38

O.    May 8, 2024: Q1 2024 Earnings Call (#20-25) .................................................... 39

P.    May 29, 2024: Stifel Jaws and Paws Conference (#26) ....................................... 43

Q.    June 11, 2024: Goldman Sachs Global Healthcare Conference (#27-29) ............ 44

VI.   THE TRUTH IS REVEALED ....................................................................................... 46

VII.  ADDITIONAL ALLEGATIONS OF SCIENTER ....................................................... 47

A.    The Individual Defendants' Statements Establish That They Closely Followed the Approval Process for Zenrelia ......................................................... 47

B.    The Defendants' Knowledge of the Company's Preparation to Launch Zenrelia ...................................................................................................... 49

C.    The Zenrelia Response Study, Which Raised Both Animal Safety and Public Health Concerns, Was Completed Before the Class Period ...................... 51

D.    Information from a Former Elanco Employee Further Establishes Scienter ........ 53

E.    Zenrelia Constituted a Core Operation of Elanco ................................................ 55

VIII. CLASS ACTION ALLEGATIONS ................................................................................ 55

IX.   COUNTS ......................................................................................................................... 58

PRAYER FOR RELIEF ............................................................................................................. 60

DEMAND FOR TRIAL BY JURY ............................................................................................ 61

This is a federal securities class action brought on behalf of purchasers of common stock of Elanco Animal Health Incorporated ("Elanco" or the "Company") between May 9, 2023 and June 26, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants'[1] violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5.

Court-appointed Co-Lead Plaintiffs Harold Garson ("Garson") and Joseph Barpar ("Barpar", and together with Garson, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters, based upon investigation by counsel, including, among other things, review and analysis of public filings made by the Company with the United States ("US") Securities and Exchange Commission ("SEC"); review and analysis of press releases and other publications disseminated by the Defendants; review and analysis of news articles and conference call transcripts; review and analysis of other publicly available information concerning Defendants; review and analysis of other publicly available information; and information from a former Elanco employee. Lead Plaintiffs believe that substantial additional evidentiary support will support their allegations after a reasonable opportunity for discovery.[2]

## I.     <u>SUMMARY OF THE ACTION</u>

1.      Elanco is an animal health company that develops, manufactures, and markets products to treat and prevent disease in pets and farm animals. After it became a separate public company following its spin-off from Eli Lilly and Company ("Lilly"), Elanco has taken steps to

---

[1]   The Defendants are Elanco Animal Health Incorporated, Jeffrey N. Simmons, and Todd S. Young.

[2]   Emphases herein are added unless otherwise noted.

1

place a greater priority on its Pet Health business. Further, after facing headwinds during COVID-19, the Company turned to a strategy heavily focused on "innovation" – that is, bringing new products to market.

2.      Before marketing or selling an animal drug in the US, Elanco must secure FDA approval by establishing that the drug is safe and effective, among another things. During the Class Period, Defendants repeatedly represented that Elanco was on a path to secure approval from the US Food and Drug Administration ("FDA") for "three *blockbuster* products in the *first half of 2024*," including Zenrelia, a purported "safe, highly effective, and convenient once-daily oral" pharmaceutical for canine dermatology. Defendants further represented that the commercial launches of Zenrelia would follow in Q3 2024 (i.e., between July 1, 2024, and September 30, 2024).[3]

3.      Investors were kept in the dark regarding the details of the Z submission process. However, Defendants assured the market regarding the progress of the Zenrelia submission. On May 9, 2023, the first day of the Class Period, Defendant Jeffrey N. Simmons, the Company's Chief Executive Officer ("CEO"), responded to an analyst's question about the timing and progress of the Zenrelia regulatory submissions by saying that they were "very confident" in "the quality of the package[]" the Company had submitted to the FDA, and in the "[d]ialogue with the regulators." As the Class Period progressed, Defendants told the market that they had submitted "*high-quality packages* and we've got a *predictable regulatory path*," that they had "*really good dialog [sic] regarding all of the information in those packages* with the FDA*,"* and that "***if there's anything significant that changes, we'll share that***."

---

[3]   Elanco uses a fiscal year ending on December 31, with the first quarter of each fiscal year ("Q1") ending on March 30, the second quarter ("Q2") ending on June 30, the third quarter ("Q3") ending on September 30, and the fourth quarter ("Q4") ending on December 31.

2

4. Defendants did not share with investors, however, that the Company had conducted a study that revealed a material risk to (1) securing FDA approval of Zenrelia during the first half of 2024 and (2) the sales, margins, growth rate, and profitability of Zenrelia.

5. Specifically, unbeknownst to investors, a vaccine response study of Zenrelia that the Company conducted and then submitted to the FDA identified serious safety and public health issues with Zenrelia. During the study, two dogs had to be euthanized, others suffered severe health problems, and others demonstrated inadequate responses to vaccines, including a rabies vaccine. This study was completed on March 13, 2023, two months *before* the start of the Class Period.

6. During the Class Period, Defendants did not disclose this information, despite the substantial risks it posed to the timing of the regulatory approval and launch of, and commercial prospects for, Zenrelia. Rather, Defendants told the market that there was "*no change at all*" regarding the approval process for Zenrelia, that it "continue[d] to have a path to first half [2024] approval" and a commercial launch in Q3 2024. Defendants also emphasized that Zenrelia would be *positively* differentiated from competing products (even though its major competitors did not present the safety issues identified by the vaccine response response) and would have "*higher* margins" and a "*faster* growth rate[]" to "drive gross margin and operating profit higher," despite the likelihood that the safety issues revealed by the vaccine response study would inhibit the margins and growth rate for Zenrelia.

7. On May 8, 2024, in connection with releasing financial results for Q1 2024, Defendants told investors that there was a "slight[]" delay in securing FDA approval for "these blockbuster products," specifically mentioning Zenrelia, but there was no cause for concern. Simmons reassured investors that the only circumstances that had changed were that the FDA had approved sections of the submissions. "Simply, though, the back-and-forth interactions have taken

3

slightly more time than when we estimated this path to first-half approval," Simmons explained. All that remained was a "final 60-day administrative review," which would push final approval into Q3 2024, and Defendants were "pleased with the progress" of the submissions. Defendants reiterated that, despite the slight regulatory delay, Zenrelia would still launch in Q3 2024. Defendant Todd S. Young, the Company's Chief Financial Officer ("CFO"), noted that "[t]he teams are preparing from training the sales force to preparing marketing materials to be ready to go," with Simmons adding that "the marketing is well underway."

8. However, on June 27, 2024 – the second to last business day of the first half of 2024 – Defendants disclosed that the FDA had *not* yet approved the Zenrelia label and, moreover, that the FDA had indicated that the Zenrelia label would include a "boxed warning on safety" based on the outcome of the vaccine response study, the existence of which Defendants disclosed for the first time. A boxed warning is also referred to as a "black box warning" because it appears on a label surrounded by a black box to draw attention to it.

9. Defendants acknowledged that this boxed warning was likely to slow the adoption of Zenrelia in the US and limit the number of expected treatment days (i.e., the number of days Zenrelia can safely be administered) by 25%, which would depress Zenrelia revenues. Moreover, Defendants revealed that, as a result of the concealed safety issue, FDA approval of Zenrelia was not expected until late in Q3 2024, pushing the commercial launch at least to Q4 2024.

10. Analysts and investors reacted with alarm. Elanco's stock price nosedived *20.53%* on June 27, 2024, wiping out over $1.8 *billion* in market capitalization and injuring the Company's investors. This action seeks to recover those losses on behalf of the proposed Class.

## II.    JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27(c) of the Exchange Act, 15 U.S.C. § 78aa(c). Defendants conduct business in this Judicial District. The Company's common stock trades on the New York Stock Exchange ("NYSE"). Per the Company's most recent annual report, filed with the SEC on February 25, 2025, there were 494,613,940 shares of Elanco common stock outstanding as of February 20, 2025. Accordingly, there are presumably hundreds, if not thousands, of investors in Elanco common stock located within the US, some of whom undoubtedly reside in this Judicial District. In addition, Lead Plaintiff Barpar resides in this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Lead Plaintiffs

15.     Lead Plaintiffs acquired Elanco common stock at artificially inflated prices during the Class Period, as set forth in their previously filed Certifications (ECF No. 13-5), and were damaged upon the disclosure of the true facts and the materialization of the risks concealed and misrepresented by Defendants.

### B.     Defendants

16.     Defendant Elanco is incorporated in Indiana with principal executive offices located at 2500 Innovation Way, Greenfield, Indiana 46140. The Company's common stock trades under the ticker symbol "ELAN" on the NYSE.

17.    Defendant Jeffrey N. Simmons ("Simmons") has served as Elanco's President and CEO since July 2018, when Lilly announced that it intended to spin off its Elanco Animal Health division as a separate company. Prior to that, Simmons was Senior Vice President and President of the Elanco division at Lilly from 2008 to 2018. Simmons served in other roles in the Elanco division prior to being appointed President, including Executive Director for US and Global Research & Development. Simmons has served as a director on Elanco's Board of Directors ("Board") since September 2018, and is a member of the Finance, Strategy and Oversight Committee of the Board. Simmons has also served as a member of the Company's internal management Executive Committee since before the Class Period; the other members of that committee report to him.

18.    Defendant Todd S. Young ("Young") has served as Elanco's Executive Vice President and CFO since joining the Company in November 2018. Prior to that, Young was Executive Vice President and CFO at ACADIA Pharmaceuticals, Inc., from August 2016 to October 2018. Young has been a member of the Company's Executive Committee since he joined the Company.

19.    Defendants Simmons and Young are collectively referred to herein as the "Individual Defendants."

20.    The Individual Defendants possessed the power and authority to control the contents of Elanco's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Elanco's SEC filings, press releases, and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions at Elanco, and their access to material information available to them but not to the public,

6

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

21.     Elanco and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Background

22.     Elanco is an animal health company that develops, manufactures, and markets products for pets and farm animals. The Company began as the Elanco Animal Health division of Lilly, which announced in July 2018 that it intended to spin off Elanco as a separate public company. The initial public offering of Elanco's common stock took place in September 2018.

23.     Elanco's products fall into two primary categories: (1) Pet Health, and (2) Farm Animal. Prior to the spin-off from Lilly, Elanco was focused on its Farm Animal business. After the spin-off, Elanco took steps to increase the proportion of Pet Health products in its "portfolio mix." In 2020, Elanco acquired Bayer Animal Health, which had a portfolio primarily of pet health products. In 2021, it acquired KindredBio in order to, among other things, "advance[] our opportunities to access the fast-growing pet dermatology market."

24.     As a result, Pet Health contributed an increasing share of revenues. In 2019, Pet Health accounted for 37% of Elanco's revenues. In 2020, it increased to 41%. In 2021, 49% of the Company's revenues came from its Pet Health business. During the Class Period, Elanco's Pet Health portfolio was focused on parasiticides, vaccines and therapeutics (to treat pain, dermatological conditions, and osteoarthritis, among other conditions).

25.     Prior to the Class Period, Elanco faced significant headwinds. The Company reported a 3% decline in constant currency revenue[4] from 2021 to 2022, including a 5% decline in the Pet Health business, which Defendants attributed to, inter alia, COVID-19 lockdowns in China, supply chain disruptions, and economic slowdowns in the US and Europe.

### B.     Defendants' Innovation-Focused Strategy

26.     On the heels of lackluster results in 2021 and 2022, Defendants' strategy for future growth was heavily focused on innovation, i.e., developing or acquiring, and then launching, new products. Zenrelia was a pillar of this strategy. On June 16, 2021, Defendant Simmons spoke on a conference call with analysts to announce the acquisition of KindredBio and other new product initiatives. During the call, Aaron L. Schacht, Elanco's Executive Vice President for Innovation, Regulatory & Business Development at the time, explained that, among these initiatives, Elanco was "progressing an oral JAK inhibitor called ilunocitinib with a similar profile to the market incumbent."[5] Zenrelia is the brand name for ilunocitinib.[6] Schacht further explained that "*[p]ivotal studies* are underway in both the U.S. and the EU," and "we are targeting 2022 for initial technical section submissions likely in the latter part of the year [i.e., Q4 2022]."

27.     When presenting the Company's financial results for 2022, Defendants touted their innovation strategy. Defendants emphasized that, in Q4 2022 (i.e., between October 1, 2022, and December 31, 2022), the Company submitted its initial New Animal Drug Application ("NADA") to the FDA for regulatory approval of that "JAK inhibitor" (i.e., Zenrelia) to control atopic

---

[4]     This is a non-GAAP measure that, the Company said, represents revenue growth excluding the impact of foreign exchange rates.

[5]     "JAK" refers to Janus kinase, a family of enzymes. JAK inhibitors are immunosuppressants that inhibit the activity of one or more Janus kinase enzymes in order to reduce inflammation.

[6]     *See* https://en.wikipedia.org/wiki/Ilunocitinib.

dermatitis and pruritus (itching) associated with allergic dermatitis. Defendants told investors that the Company was "[p]reparing for a historic innovation launch window in '23 and '24," highlighting the anticipated approval of Zenrelia in the first half of 2024. Defendants claimed that Zenrelia was a potential "blockbuster" product, which Defendants indicated meant over $100 million in annual sales.

28.    As Simmons said in the Company's Q1 2023 earnings call on May 9, 2023, "[w]hile we expect macro factors to persist, Elanco is making the necessary disciplined decisions to stabilize the business *and progress our innovation pipeline*." Defendant Simmons acknowledged that competently executing this strategy was critical, stating on September 11, 2023, that "[w]e're an execution story over the next 12 months to drive a lot of value."

29.    During the Class Period, Defendants consistently touted their innovation pipeline, and Zenrelia in particular. For instance, Simmons told analysts on September 11, 2023, that innovation would drive the Company's growth:

> So three to four nice products driving growth with three blockbusters that I can say today, right now, even since our earnings call are all we believe the FDA has what they need set up on the Animal Drug User Fee Act that *we'll be progressing towards a path for three blockbuster products in the first half of 2024*.
>
> *That's what will drive that inflection point to really drive increased growth and margins*. *Those being* a broad spectrum parasiticide, Credelio Quattro, *a differentiated JAK inhibitor [i.e., Zenrelia] and atopic dermatitis and a $1.3 billion derm marke*t, and Bovaer, a new market where it's actually methane reduction in cattle so we can come back and talk about. *So that's the innovation.* More we can talk through. *That'll be the big driver and probably our most historical year ever, in our 70th year around innovation*.

### C.    The FDA Approval Process for New Animal Drugs

30.    The Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 321, et seq.) prohibits the introduction into interstate commerce of new animal drugs that are not the subject of an approved NADA. In the US, the Center for Veterinary Medicine ("CVM"), a division of the FDA, regulates

9

animal drugs and evaluates applications for approval of such drugs, including NADAs as well as applications for generic animal drugs, which are subject to an abbreviated process. To secure approval of a NADA, the sponsor of the application must demonstrate that the product is safe, effective, and produced by a consistent method of manufacture. A NADA must be signed by the applicant or by an authorized attorney, agent, or official.

31.     There are five major technical sections of a NADA: (1) target animal safety; (2) effectiveness; (3) human food safety; (4) chemistry, manufacturing, and controls ("CMC"); and (5) environmental impact. With respect to the target animal safety section, the sponsor of the NADA must show that the drug is safe to the target animal species (i.e., the species that the drug will be used in) when it is used according to the label. This involves establishing a margin of safety by testing the drug at higher-than-labeled doses for a longer-than-labeled time period.

32.     There are also two minor technical sections of a NADA: (1) "All Other Information," which includes all information about the drug that the sponsor did not submit as part of the major technical sections, and (2) labeling, which addresses all necessary information to use the drug safely and effectively and the risks associated with the drug. All sections, including the "major" and "minor" sections, must receive CVM approval prior to product launch.

33.     By regulation, after a filed application has been evaluated, CVM will provide written comment on any apparent deficiencies. CVM strongly encourages "open and early communication between the drug sponsor and CVM." The NADA evaluation process generally involves numerous communications between the sponsor and CVM. Defendants' statements make clear that this was true for the Company's Zenrelia submission. Defendant Simmons told investors on June 12, 2023, that it was a "rolling" process with "*constant* dialogue" between the Company and CVM, a theme he returned to throughout the Class Period.

10

**D.      Defendants Tout Zenrelia as a Central Element of the Company's Prospects**

*1.      The Canine Dermatology Market*

34.     In 2013, the FDA approved the first veterinary JAK inhibitor, oclacitinib (brand name: Apoquel) to treat pruritus associated with allergic dermatitis and the control of atopic dermatitis in dogs. At the time, most treatments for these conditions had broad effects in the target animal, including side effects. For instance, steroids may be used to treat allergic dermatitis, but they present a risk of substantial side effects, including pancreatitis, diabetes, and muscle wasting. By contrast, Apoquel (like Zenrelia) specifically targets JAK enzymes. Apoquel selectively inhibits the JAK 1 enzyme, which is integral to the signaling pathway resulting in itching and inflammation.

35.     Apoquel is sold by Zoetis, Inc. ("Zoetis" or "ZTS"), one of Elanco's primary competitors. After an early experience program, Zoetis fully launched Apoquel in the US and other countries in January 2014. Zoetis saw its companion animal[7] sales increase 4% in 2014 over the prior year, and then another 14% in 2015; it attributed these results to, *inter alia*, Apoquel.

36.     Apoquel was the "incumbent" when Elanco was developing Zenrelia. In 2021, Zoetis received approval in the European Union and the United Kingdom for a chewable version of Apoquel, with other markets following the next year. In 2022, Apoquel was Zoetis's second top-selling product, contributing approximately 10% of its 2022 revenues of over $8 billion. Apoquel Chewable was approved in the US in 2023. That year, Apoquel again contributed approximately 10% of Zoetis's revenues, which were over $8.5 billion in 2023.

---

[7]   As used by Zoetis, "companion animals" are dogs, cats, and horses.

2.      *Defendants Seek to Break into the Canine Dermatology Market with Zenrelia*

37.     Defendants were eager to break into the canine dermatology market and compete with Zoetis. Simmons and Young frequently told analysts, as Young stated on November 29, 2023, that "the number one reason pet owners go into the vet is because of the itching dog." And, before the Class Period, Elanco had only one canine dermatology product that was far behind the competition. Young acknowledged this during the Class Period when emphasizing the prospects for Zenrelia, stating that, at that point, "we're not in the dermatology space in a big way. We've got one product that gets used a lot when dogs aren't responsive to the other ones." In other words, the Company's sole canine dermatology was neither a first-line nor even a second-line product; it was primarily used only after multiple other competing products provided ineffective. Defendants wanted a first-line product.

38.     During the Class Period, on November 29, 2023, Simmons emphasized that "with Zenrelia, that's [a] JAK inhibitor[,] [t]here'll be competition in the derm space that Zoetis has not had," and that "we're excited to broaden our total portfolio for the vet clinic by having a derm product for the first time to compete."

39.     Furthermore, Defendants acknowledged that the success of Zenrelia would affect the rest of the Company's Pet Health portfolio because having a full complement of products, particularly to treat dermatitis, helped to drive revenue. Simmons referred to this as a "portfolio advantage," as he stated on June 12, 2023, while discussing Zenrelia:

> ***You look at a derm market that's [the] number one reason pet owners go to the vet is because of a derm problem***. The dog is self-diagnosed in [sic] itself with the itching is that that [sic] continues to be a market where people are looking for alternatives. There's also portfolio plays to[o], where today, ***maybe a competitor that has all of those has a little bit of a portfolio advantage***, [we']ll be coming with a portfolio advantage or to be a lot more competitive as we've got a leading pain portfolio, one of the widest parasiticide portfolios, ***derm will be an additive***

*impact to our portfolio, which will be a big part of the competitiveness going into this market*.

40.     Even more emphatically, Simmons told investors on September 11, 2023, that

The other aspect I think is derm has been that one category as you look at the major players because you don't have it, going into whether it's corporate vets or going into the offering to the marketplace. *You got to have para, you got to have pain, you got to have therapy and bios. But without derm, you've had some loss of leverage*. We'll be, we think, one of two companies now that have that portfolio that will also play in the ramp rate and the share taking in this marketplace as well.

41.     Defendant Young also pointed out that this was due, in part, to the fact that veterinarians receive incentives such as rebates and volume discounts from animal health companies when they purchase more product. For instance, on November 29, 2023, Young stated that:

*The more you buy from us, the better your rebates and pricing is. We've been at a competitive disadvantage on that by not having a dermatology product*. And so, because the number one reason pet owners go into the vet is because of the itching dog, *that always gave Zoetis a leg up and that the vet was always buying more from Zoetis from the start because of that derm portfolio. This is where having a complete portfolio solution with us having a derm product is going to be really helpful because it changes that dynamic*.

 3.     *The Company Conducts a Vaccine Response Study for Its Zenrelia Submission to the FDA*

42.     As noted above, Defendants initially submitted Zenrelia to the FDA for approval in Q4 2022 (i.e., between October 1, 2022, and December 31, 2022). During the submission process, the Company conducted field studies to demonstrate that Zenrelia is effective at its intended use of controlling atopic dermatitis and pruritus associated with allergic dermatitis in dogs. As Zenrelia is an immunosuppressant, even before submitting the NADA for Zenrelia to the FDA, the Company also conducted a vaccine response study to evaluate how Zenrelia affects the response to vaccination. Details regarding this vaccine response study were made public by the FDA *after* the Class Period in a Freedom of Information ("FOI") Summary. Defendants did not disclose

13

anything about the vaccine response study, not even its existence, during the Class Period.

43.     As noted above, on the June 16, 2021 conference call with analysts, Mr. Schacht made reference to *"[p]ivotal studies . . . underway"* with respect to Zenrelia. One of the Zenrelia studies underway at that time was the vaccine response study, which started less than two months earlier, and ran from April 20, 2021, to March 13, 2023. This vaccine response study had the critical objective of evaluating the safety and effect of Zenrelia on response to vaccination when orally administered once daily in vaccine naïve (i.e., not previously vaccinated) 10-month-old beagle dogs, prior to and following primary vaccination, at three times (3X) the maximum exposure dose of 0.8 mg/kg, or 2.4 mg/kg, for 89 days. 3X dosing is a standard exposure level for studies of this nature.

44.     In the study, sixteen vaccine-naïve beagle dogs, approximately ten months old, that were raised in a biosecure facility were transported to a separate biosecure facility at which the study was conducted. Four of these dogs received a 3X dose of Zenrelia for 89 days; the other four comprised a control group that received a placebo. General health observations were conducted daily during this 89-day period, and twice daily thereafter. Following the initial 89-day period, there followed an 84-day recovery period during which no drug (either Zenrelia or a placebo) was administered. The study also included veterinary physical examinations, detailed clinical observations, and the taking of samples for hematology, serum chemistry, and urinalysis, as well as serum antigen titer analysis to detect and measure the amount of certain antibodies in each dog.

45.     On day 28, a modified live virus (MLV) vaccine containing canine distemper virus (CDV), canine parvovirus (CPV), canine adenovirus-2 (CAV2), and canine parainfluenza virus (CPiV) was administered to all sixteen dogs. The study design called for a second administration of this MLV vaccine, as well as a single administration of the killed rabies virus (RV) vaccine, to

be conducted on day 56. However, this was delayed to day 60 due to the suboptimal health of the dogs administered Zenrelia; these dogs showed clinical signs of *Cystoisospora canis* (*C. canis*) infection secondary to Zenrelia-induced immunosuppression. *C. canis* is a parasite that causes an intestinal tract infection in dogs. While not usually serious or life-threatening, it is generally more severe, and potentially fatal, in puppies and/or dogs with weakened immune systems.

46.    Further, two dogs in the Zenrelia group developed serious adverse reactions, namely vaccine-induced adenoviral hepatitis and pancreatitis in one dog, and infectious enteritis (inflammation of the small intestine) that potentially contributed to an intussusception (where one part of an intestine slides into an adjacent part, creating an obstruction) in another. These two dogs were *euthanized* on days 52 and 54, before the second administration of the MLV vaccine and single administration of the rabies vaccine.

47.    During the course of the study, the dogs that received Zenrelia were observed to have poor body condition, pale mucous membranes, lethargy, diarrhea, emesis, weight loss, decreased appetite, and depression, potentially due to a clinical *C. canis* infection. Seven of the eight dogs that received Zenrelia were diagnosed with *C. canis*, while *no* dogs in the control group were diagnosed with *C. canis*.

48.    In addition to these adverse reactions, the dogs that received Zenrelia did not achieve adequate immune responses to the vaccines they received. Four of the six remaining (i.e., surviving) dogs in the Zenrelia group failed to achieve an adequate immune response to the rabies vaccine on day 88; one and three of those four dogs failed to achieve an adequate response on days 116 and 172, respectively. By contrast, only one dog in the control group failed to achieve an adequate immune response to the rabies vaccine, on days 116 and 172. In addition, while all dogs in the control group achieved an adequate response to the canine distemper virus (CDV)

15

vaccination, one of the remaining six dogs in the Zenrelia group failed to achieve an adequate response on days 88 and 172.

49.    Defendants did not disclose the existence, let alone the results, of the vaccine response study during the Class Period. Before market hours on the day after the Class Period, they disclosed only that "we expect the U.S. label will include a boxed warning on safety based on the outcome of a trial with unvaccinated dogs dosed at 3x the label dose." This was the first time that Defendants publicly disclosed the existence of the vaccine response study. Investors did not learn any further details about the vaccine response study until the FDA issued the FOI Summary on September 19, 2024.

50.    As the FOI Summary stated, "[t]his study demonstrates that it is ***not safe*** to administer vaccines in dogs concurrently receiving Zenrelia." The FOI Summary noted that, in addition to the risks to dogs concurrently receiving Zenrelia and vaccines, the fact that four out of six dogs in the Zenrelia group failed to achieve an adequate response to the rabies vaccine "raises a public health concern," given that rabies is zoonotic, meaning it can spread from dogs to humans.

51.    Thus, the FOI Summary concluded, "[d]ue to the risks in immunocompromised animals of vaccine-induced disease associated with MLV vaccines and inadequate immune response to any vaccine, Zenrelia™ should be discontinued at least 28 days to 3 months prior to vaccination and should not be administered for at least 28 days after any vaccination."

52.    The results of the vaccine response study, and the boxed warning based on those results, created a material risk that veterinarians and dog owners would avoid using Zenrelia, and that, as a result, the Company would have to increase its Zenrelia marketing in order to penetrate the market. Further, even in cases where Zenrelia was prescribed, the label warning to discontinue Zenrelia for at least 28 days to 3 months prior to vaccination, and at least 28 days after, would

16

reduce the amount of Zenrelia used, and thus reduce revenues.

53.    Defendants did not disclose any of these facts to investors during the Class Period.

**E.    The Company Touts Progress Towards FDA Approval of Zenrelia, and Sales Expectations Post-Approval**

54.    When presenting Q4 and full year 2022 results on February 21, 2023, Defendants touted that the Company had made its initial regulatory submission to the FDA for Zenrelia in Q4 2022, and that they expected to secure full approval in the first half of 2024, with a commercial launch in Q3 2024.

55.    In every earnings call during the Class Period, as well as when Defendants appeared at other investor events, analysts pressed for information regarding the progress of the Zenrelia submission. In the Q1 2023 earnings call on May 9, 2023, Simmons assured investors that the process was "progressing as planned." Seeking more detail, analyst asked if the "timeline" that Defendants highlighted, for approval in the first half of 2024, was "still on track" for "the three companion animal blockbuster products in 2024 to the parasiticide and the derm launches," referring, inter alia, to Zenrelia.[8] Defendants assured investors that, for these "blockbusters"—meaning products with over $100 million in annual sales—they were confident in "the quality of the packages" they had submitted to the FDA, as well as "[t]he dialogue with the regulators." Defendants did not disclose the Zenrelia vaccine response study, which had ended eight weeks before, which identified significant safety risks to dogs and to public health, and thus posed material risks to the Company's ability to secure approval of Zenrelia in the first half of 2024 and to the product's commercial prospects.

---

[8]    In addition to Zenrelia, the Company was also pursuing approval of and Credelio Quattro, a combination product to treat fleas, ticks, and worms in dogs, as well as a monoclonal antibody for canine dermatology to detect Interleukin-31 (IL-31), a cytokine involved in the sensation of itching.

56.     In addition, as a result of the safety and public health issues identified by the vaccine response study, the Company faced the likelihood that that it would need to incur (1) additional marketing expenses to convince veterinarians and dog owners to use Zenrelia, despite the safety warning, given that the primary competing product (i.e., Apoquel) had no boxed warning on safety, and (2) research and development expenses to generate additional data in support of an attempt to convince the FDA to remove or modify the boxed warning.

57.     Thus, the results of the vaccine response study posed a material risk of reducing Zenrelia revenues, while simultaneously increasing expenses, thus reducing the Company's profitability and margins. During the Class Period, Defendants did not disclose any of these risks to investors.

58.     Defendants continued to conceal these facts throughout the Class Period. During a healthcare investor conference on June 12, 2023, Defendant Simmons was asked about the potential for "feedback or updates . . . from the FDA" regarding the Zenrelia submission. Characterizing it as a "blockbuster product[]," Simmons reassured investors that "we've had good constructive dialogue [with the FDA], *high-quality packages* and we've got a *predictable regulatory path*."

59.     Further, Defendants told investors that the Zenrelia launch would produce "*higher margins*" and "*faster growth rates*," despite the fact that the safety issues evidenced by the Zenrelia vaccine response study would *slow* the adoption curve, and even though the Company was already incurring manufacturing costs (a component of margin) to produce Zenrelia. Indeed, Defendant Simmons emphasized on May 8, 2024, referring to Zenrelia, that "[w]e have product that is manufactured, that is ready." In addition, of course, the safety issues identified by the vaccine response study would also necessitate increased marketing and sales expenses to overcome the

reluctance of veterinarians and dog owners to adopt Zenrelia despite those safety issues, as well as increased R&D costs to attempt to convince the FDA to modify or remove the black box warning, further eroding Zenrelia's profitability.

60.    As the Class Period progressed, analysts continued to focus on the regulatory approval process for Zenrelia. On January 9, 2024, an analyst asked whether there was "any update on the regulatory front of how the applications are progressing." Defendant Simmons responded that there was "*no new real news here[,] [a]nd that's good news*."

61.    The outcome of the FDA approval processes was critical to investors. A Morgan Stanley analyst reported published on May 7, 2024, a day before the Company's earnings call regarding Q1 2024 results, stated that "[a]ny update on its now late 1H approvals will *dictate* the stock reaction." It continued "with no approvals in hand ahead of the conference call, it will inevitably put management on the spot to provide a level of context around its progress with the FDA and the feasibility of its previously proposed 2H launch timing. While we continue to view these products will ultimately get approved, *the timing and label details remain key variables*."

62.    In the earnings call the next day, May 8, 2024, Defendants sought to reassure investors. Though they conceded that they now expected only the *technical* sections of the Zenrelia submission to be approved by the end of Q2 2024, with no full approval until Q3 2024, they claimed to "have increased certainty in the expected approval timing for . . . Zenrelia." Critically, per a corporate deck that Defendants Simmons and Young walked analysts through, "*peak sales expectations [were] intact*" for Zenrelia, indicating that nothing had changed that might endanger its commercial prospects, despite the results of the Zenrelia vaccine response study.

F.    **Defendants Reveal That Zenrelia Is Delayed and An Expected Black Box Warning Regarding Safety Issues**

63.    On June 27, 2024, before the market opened, Defendants issued a press release

19

disclosing a delay in the commercial launch for Zenrelia, and that Zenrelia's label was expected to include a black box warning regarding safety, which would inhibit adoption of Zenrelia.

64.    Defendants disclosed that:

For Zenrelia, the company has received confirmation from FDA that all major technical sections (Effectiveness, Safety and Chemistry, Manufacturing, and Controls (CMC)) are complete as of late June. *For the Labeling minor technical section, earlier this week the Company aligned with FDA on the language and expects to receive the completion letter by mid-July*. The 60-day final administrative review will follow, *placing expected approval late in the third quarter of 2024. The company now anticipates a U.S. launch for Zenrelia in the fourth quarter of 2024.*

65.    Thus, the technical sections of the Company's FDA submission for Zenrelia were not approved before the end of June, as Defendants had indicated on May 8, 2024, and the commercial launch timeline for Zenrelia was delayed to the fourth quarter, rather than the third quarter as Defendants claimed on May 8, 2024.

66.    Moreover, Defendants also disclosed that "*we expect the U.S. label will include a boxed warning on safety* based on the outcome of a trial with unvaccinated dogs dosed at 3x the label dose," and that "we believe *this warning will slow the product adoption curve in the U.S. and initially limit the number of expected treatment days by approximately 25%*."

67.    Analysts reacted gloomily to this news. For instance, regarding the surprise boxed warning for Zenrelia, a Barclays analyst report noted that "[w]e can understand that Veterinarians are likely to be reluctant to adopt Zenrelia into their practice meaningfully owing to the warning. . . . We factor these into our thoughts as *we lower our Zenrelia revenue expectations by 50% across 2024-2027E* (lowering FY27 Zenrelia revenues from $100M to $50M)." Barclays further observed that "the box warning is likely to provide an extended period of competitive advantage for ZTS' Apoquel, which currently dominates 95% of the market for Dermatology. This also extends the window for ZTS to drive conversion to Apoquel Chewables." A William Blair

analyst report concluded that "[w]hile moving the product forward is a positive, *we believe the update on a label warning pushes Zenrelia updates to a net negative*."

68.     The Company's stock price nosedived, falling 20.59%, or $3.70 per share, from its June 26, 2024 closing price, to close at $14.27 per share on June 27, 2024. This was directly attributed to Defendants' disclosures regarding Zenrelia. *Investor's Business Daily* reported that "Elanco stock plummeted Thursday after the company announced a . . . delay[] and a surprise box warning for its new eczema treatment for dogs." *Business Insider* reported that the Company's stock was "tumbling as the company released updates to the expected FDA approval timeline[] for Zenrelia."

**G.     Relevant Post-Class Period Events**

69.     In the Company's next earnings release and earnings call, both on August 8, 2024, Zenrelia was addressed at length. The earnings release, issued before the market opened on August 8, 2024, disclosed that:

> For Zenrelia, . . . the company confirmed in its late June update that it received confirmation from the FDA that all major technical sections (Effectiveness, Safety and Chemistry, Manufacturing, and Controls (CMC)) were complete and shared expectations of a box warning in the label. As of late July, all minor sections including Labeling, are complete with the FDA and the final 60-day administrative window is underway. The company expects to receive final FDA approval late in September, with launch in early October. Additionally, the company received approval in Brazil in the second quarter, with expected launch in the fourth quarter of 2024.

70.     During the earnings call, analysts peppered Defendants with questions about Zenrelia, seeking further details that Defendants were holding back, particularly concerning the boxed warning for Zenrelia and the trial on which the warning was based. However, Defendants rebuffed these inquiries, with Defendant Simmons stating that "[w]e will limit specific comments on the label and data packages until full approval of the product," and that "after the approval, we anticipate holding a comprehensive investor call where . . . we'll share this study, other studies

21

and label details."

71.    Defendant Simmons downplayed the black box warning, telling concerned analysts that a label is merely to "provid[e] guidance to the veterinarians to assure appropriate use." Analysts were unconvinced. In response to Simmons, one analyst stated, "Jeff, if I may, *I feel like we're putting less of an emphasis on black box than we should be*. Am I hearing – because I know you're very confident in the launch profile and everything else, *but ultimately, the incumbents have been on the market for a while, and they don't have a black box*."

72.    The exact details of the black box warning were not revealed until September 19, 2024. On that day, the FDA approved Zenrelia for use in the US, and released the final language of the mandatory black box warning, which appears on the Zenrelia box as follows:

WARNING: VACCINE-INDUCED DISEASE AND INADEQUATE IMMUNE RESPONSE TO VACCINES

Based on results of the vaccine response study, dogs receiving Zenrelia are at risk of fatal vaccine-induced disease from modified live virus vaccines and inadequate immune response to any vaccine. Discontinue Zenrelia for at least 28 days to 3 months prior to vaccination and withhold Zenrelia for at least 28 days after vaccination (see Warnings and Target Animal Safety).

73.    The FDA also issued a "Dear Veterinarian" letter instructing veterinarians to "read the entire package insert, *including the boxed warning describing the risk of vaccine-induced disease and inadequate immune response to vaccine*s." The FDA's letter stated that

> *[b]ased on data* from a vaccine response study, the FDA concluded that *it is not safe to administer vaccines in dogs that are concurrently receiving Zenrelia*. In the study, dogs receiving 2.4 mg/kg/day of Zenrelia (3X the maximum exposure dose) experienced drug-induced immunosuppression, which resulted in fatal vaccine-induced adenoviral hepatitis and pancreatitis in one dog; infectious enteritis that potentially contributed to a fatal intussusception in one dog; and an inadequate immune response to canine distemper and rabies vaccinations in one (of six) and four (of six) dogs, respectively.

74.    The letter further stated that

*[i]n addition to the animal safety concerns, **the failure of treated dogs to mount an adequate immune response to the killed rabies vaccine raises a public health concern, given the serious zoonotic risk of rabies. These animal and public health concerns can be mitigated by withholding Zenrelia for at least 28 days to 3 months before vaccination and for at least 28 days afterward*** and by making sure a dog is up to date on vaccinations before starting treatment.*

75.    The letter noted that the 28-day to 3-month time period to discontinue Zenrelia before vaccination was "based on data from the vaccine response study that showed evidence of recovery from drug-induced immunosuppression 27 to 83 days after stopping Zenrelia." Further, the letter stated that a 3-month "washout" period for immunosuppressants before vaccination is supported by veterinary and human vaccination guidelines, and the 28-day time period to withhold Zenrelia after vaccination is based on published and unpublished data on the duration of viral shedding after administration of a modified live virus vaccine.

76.    Defendants conceded that the boxed warning would necessitate additional investment in the marketing of Zenrelia. Simmons told analysts on an August 8, 2024 earnings call that "[w]e expect ***this label language will slow the initial product adoption curve in the US as we believe it will require focused veterinary education on the product***," and that, in light of the Zenrelia boxed warning, "we'll be increasing the resources[] . . . in . . . sales force, the training, and the KOLs"[9] in an attempt to "bring an accelerated approach to education" regarding the label. In response to an analyst asking, "how has your launch plan on Zenrelia changed following the black box warning development," Simmons stated, "[l]et me start by the first thing that we know will happen is we're going to increase share of voice. We're going to have ***a lot more marketing and attention, this is going to be one of the most expansive launches ever***," before listing several "things that we've done to adjust" the Zenrelia launch plan.

---

[9]    "KOLs" are "knowledge and opinion leaders" thought to have influence in the market at issue.

77.    Analysts recognized that conducting such an "expansive launch[]" would affect the Company's profitability, with one asking during the August 8, 2024 call: "[n]ow, we believe Zenrelia's price is going to be lower, maybe you need to make more investments to explain the label. When we think about these new blockbusters, do we still think gross profit dollar accretive in 2025 or more neutral?" Young acknowledged that "we're making investments behind [Zenrelia, Credelio Quattro, and Bovaer] here in the second half where those will be **not accretive to EBITDA in the second half given the investments**."

78.    Notably, as per recent FDA correspondence, Defendants sought to evade the consequences of the black box warning by making false or misleading claims and representations about the safety and effectiveness of Zenrelia, and the results of the vaccine response study, in Elanco's marketing materials. In a letter addressed to Defendant Simmons and dated January 28, 2025, the FDA stated:

> The U.S. Food and Drug Administration (FDA) has reviewed your promotional communications for Zenrelia (ilunocitinib tablets) including your veterinarian product website, the consumer directed website, your Product Brochure and Itch Tracker, which is linked on both websites, and a slide deck titled "Reach for Zen: New Relief for Dogs with Atopic Dermatitis" and noted **false or misleading claims and representations about the safety and effectiveness of Zenrelia**. These promotional communications misbrand Zenrelia within the meaning of the Federal Food, Drug, and Cosmetic Act (FD&C Act). FD&C Act section 502(a) [21 U.S.C. 352(a)] and section 502(n) [21 U.S.C. 352(n)]; see also section 201(n) [21 USC 321(n)]. It is a prohibited act to distribute a misbranded product in interstate commerce. FD&C Act section 301(a) [21 U.S.C. 331(a)]. This violation is especially concerning from a public health perspective because the misleading promotional communications create a misleading impression regarding the safety and effectiveness of Zenrelia, which is a recently-approved veterinary drug in the Janus Kinase (JAK) inhibitor drug class.[10]

79.    This letter went on to identify several misleading claims made by Elanco, including:

---

[10]    *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/elanco-animal-health-695170-01282025.

- Elanco's consumer-directed website and page one of the Product Brochure and Itch Tracker (a promotional document) for Zenrelia stated that Zenrelia should be withheld "for a time period before and after vaccination," rather than the specific time period of at least 28 days to 3 months prior to vaccination and at least 28 days after vaccination;

- Elanco's consumer-directed website and page one of the Product Brochure and Itch Tracker for Zenrelia omitted to specify that the risk of fatal vaccine-induced disease involves "modified live virus vaccines," which was misleading because "the fatal vaccine-induced disease occurred after administration of a MLV DHPP vaccination, *a core vaccination for all dogs*;"

- The Safety section of the Zenrelia veterinarian website contained only the statements "Read the entire package insert before using this drug, including the Boxed Warning" and "In clinical trials, the most observed adverse events were vomiting, diarrhea, and lethargy," *without mention of fatal vaccine-induced disease from MLV vaccines or inadequate immune response to any vaccines*;

- Another section of the Zenrelia veterinarian website addressed safety data *without including information about the risk of fatal vaccine-induced disease from MLV vaccines or inadequate immune response to any vaccines*, as well as safety information from the Warnings section of the PI like monitoring for the development of infections, the risk of decreased hematocrit, hemoglobin, and/or red blood cell count, and the risk of new neoplastic conditions;

- *Elanco's product Detailer (another promotional document) claimed that "Results of multiple other studies demonstrate very similar safety profiles between Zenrelia and Apoquel," which the FDA found may be misleading because Zenrelia prescribing information ("PI") has a boxed warning* regarding the risk of fatal vaccine-induced disease from modified live vaccines and inadequate immune response to any vaccine as well as additional warning language regarding the risk of progressive or persistently decreased hematocrit, hemoglobin, and/or red blood cell count without a corresponding increase in absolute reticulocyte count, *while the Apoquel PI does not*.

80.    The letter directed Defendant Simmons to respond in writing to explain the Company's plan to discontinue use of promotional communications containing these false and misleading representations and warned that "[f]ailure to adequately address this matter may lead to legal action, including without limitation, seizure, and injunction."

25

## V.   CLASS PERIOD MISREPRESENTATIONS

### A.   May 9, 2023: Q1 2023 Earnings Call (#1-2)[11]

81.   On May 9, 2023, less than three months after the completion of the vaccine response study on March 13, 2023, the Company held an earnings call regarding its Q1 2023 results. Defendants Simmons and Young spoke on behalf of the Company.

82.   During his introductory scripted remarks, Defendant Simmons stated that "[e]ach of our potential blockbusters is *progressing as planned* with a path towards approval by the first half of 2024," referring to, inter alia, Zenrelia.

83.   This statement (#1) was false and misleading because it represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding "as planned", without disclosing that the Zenrelia vaccine response study completed on March 13, 2023, after the initial Zenrelia submission in Q4 2022, identified significant safety and public health issues that the Company did not "plan."

84.   Later in the call, an analyst asked:

*As you think about the three companion animal blockbuster products in 2024 to* the parasiticide and *the derm launches, is the timeline still on track? Has there been any changes there?* Is there any possibility of expediting those launches? *And how are you thinking about your conversations with the FDA, just given delays across certain competitor products with the FDA specifically?*

85.   Defendant Simmons's response began:

Thanks, Erin. *It's the right question to ask relative to the timing. What I would say is kind of, as we step back and look at the pipeline position, I'd say the following things*. And as I mentioned, we're controlling what we can control. First, I think quality of the team, what Ellen has done with her and her team, the quality of our regulatory team. *Second is the quality of the packages, which we're very confident in. The dialogue with the regulators*. I can point to proof points. Three approvals here recently: parvo, USDA; Adtab, EU; and Varenzin, FDA[;] I think

---

11   This Amended Complaint uses numbers 1 through 29 to identify each alleged false statement in chronological order.

the track record and recent success is an example of this team and what they're capable of.

86.     These statements (#2) were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding positively, without disclosing that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

**B.      June 1, 2023: Stifel Jaws and Paws Conference (#3)**

87.     On June 1, 2023, Defendant Young appeared on behalf of the Company at the Stifel Jaws and Paws Conference. During that conference, a Stifel analyst asked Young:

> And so, ***let me push a little bit there***, Todd, because it is perfect segue, that's literally what I had in front of me. So, I think investors are getting excited, right? I mean, you put up a good quarter, you raised, you talked about cash flow getting better in 2024 then 2023. As some of these initiatives get behind you, that frees up your ability to pay down debt, and then you got all these new products. ***But the confidence that these products,*** Bovaer, atopic derm, ***JAK,*** monoclonal, the triple, ***all get approved in 1H 2024 when just like when you look back at what's recently taken place***, [B]I, it's taken much longer for them to get NexGard Plus. Even Zoetis, it took them longer to get Librela. ***Maybe try to communicate to the investors why you have that level of confidence on those four getting across the goal line in 1H 2024 where, with the agency, some of these things just seem to be taking long***.

88.     In response, Defendant Young stated:

> Well, we can't control the agencies. ***What we can control is the quality of our package, the quality of the data. We're having good interactions with the agencies.*** We've seen Bexacat get approved earlier than we expected. We've seen our parvovirus get approved conditionally, but still approved generally in the timeframe we expected. It was probably a month late. So, we've got – Zorbium got approved a little faster . . . got conditional approval a little faster. So, there are products that we have that are getting approved inside our timelines, or a little quicker, understanding there's some other ones out in the industry that have had delays. So, we've been clear to say ***we've got a path to first half approval***, doesn't mean it's a guaranteed first half approval. But ***right now, we're still on that path based off Ellen's team and the milestones they're hitting***. ***If that changes, we'll update you and the rest of the Street on timelines.***

89.    These statements were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding positively, and that this was based on the "package[s]" and "data" submitted by the Company, without disclosing that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

**C.    June 12, 2023: Goldman Sachs Global Healthcare Conference (#4)**

90.    On June 12, 2023, Defendant Simmons appeared on behalf of the Company at the Goldman Sachs Global Healthcare Conference. During that conference, a Goldman Sachs analyst asked:

> On the innovation revenue, so you have a 2025 target for $600 million to $700 million. Based on the guidance for this year, that implies about an incremental $400 million over that period. You highlighted three large pet health products and Bovaer that are yet to get approval on launch. *I guess when you think about, now that the products are filed, is there feedback or updates that you expect to get from the FDA between now and that your kind of goal for approval in the first half of 2024? And then, are there updates the investors should expect from the company during that period?*

91.    In response, Defendant Simmons stated:

> So first of all, just from a high level, is all the products we're talking about are FDA products, with one exception, and that is the parvo product. The monoclonal antibodies that are approved to the USDA. So the Animal Drug User Fee Act, it's based off from PDUFA, it's called ADUFA. It's based on really with the FDA on average from the submission kind of period till approval. There's ranges in here. There's three major submissions: efficacy, safety and CMNC [sic]. It's about a year. So, these are rolling iterative submissions and it's rolling in iterative and constant dialogue. *I would say that we've had good constructive dialogue, high-quality packages and we've got a predictable regulatory path. And that's what said that we've got a path to first half 2024.*

92.    These statements were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding positively, without disclosing that the Zenrelia vaccine response study completed on March 13,

2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

> **D.    August 7, 2023: Q2 2023 Earnings Call (#5)**

93.    On August 7, 2023, the Company held an earnings call regarding its Q2 2023 results. Defendants Simmons and Young spoke on behalf of the Company. During that call, an analyst asked:

> [M]aybe you can talk a little bit about when you have some of these new product launches in the first half of 2024, what are your expectations maybe around control launch periods? Is that should we be factoring in a little bit of a period where you ramp sales more so than normal? And then, on the other side of that, how does the manufacturing side look? When can they start to be kind of margin-accretive?

94.    In response, Defendant Simmons stated in pertinent part:

> With respect to margin, again, we feel very good about the margin prospects [i]n all of these products over time. But clearly, as you ramp sales and get to higher levels, we get better economies of scale on those.

> With respect to Credelio Quattro, ***as well as the JAK inhibitor, we expect those to be higher margins at the start.*** With respect to Bovaer, given that significant pull-forward of approval versus when we acquired it, it means we're going to have third-party contract manufacturing supply that will be at a higher margin and thus, less accretive to our overall portfolio than the Pet Health products. But, overall, we're looking forward to getting these approved, getting them launched, and they'll be the big drivers over the next few years to increase margins, increase free cash flow and drive EBITDA higher.

95.    These statements were false and misleading because they indicated that Zenrelia would produce "higher margins at the start," while omitting to disclose that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to slow the adoption curve for Zenrelia and thus reduce the margin for Zenrelia sales, particularly at "the start."

E.      **September 11, 2023: Morgan Stanley Global Healthcare Conference (#6)**

96.     On September 11, 2023, Defendant Simmons appeared on behalf of the Company at the Morgan Stanley Global Healthcare Conference. During that conference, a Goldman Sachs analyst asked: "And then what about differentiation? How should we think about it? You mentioned effectiveness, for instance, as being one area that could be addressed. It could also be safety, particularly with the JAK in terms of what shows up in Apoquel and then also on the IL-31."

97.     Defendant Simmons's response began:

> Yeah. So we've talked about the differentiation in our parasiticide. I'll come to that in a minute. *We've not given the specifics on our differentiation for competitive reasons until we get a little closer. But differentiation in our market either comes back to efficacy, safety, or administration. And again, I think this market opens up to that.*

98.     These statements were false and misleading because, while acknowledging that "differentiation" includes safety, Defendants were concealing the safety issues shown by the Zenrelia vaccine response study completed on March 13, 2023, not just "for competitive reasons" but in order not to alarm investors.

F.      **November 7, 2023: Q3 2023 Earnings Press Release (#7)**

99.     On November 7, 2023, the Company issued a press release during pre-market hours announcing the Company's Q3 2023 results, which it also filed with the SEC as an exhibit to a Form 8-K. The press release quoted Defendant Simmons follows:

> *Our innovation pipeline remains on track, with potential blockbuster products. . . and our differentiated JAK inhibitor for canine dermatology, which upon approval will be known as Zenrelia, . . . on a path toward U.S. approval in the first half of 2024.* We are also investing in important commercial capabilities and expanded share of voice to drive our current portfolio and expected launches in 2024.

100. These statements were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding positively, without disclosing that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

**G.      November 29, 2023: Evercore ISI HealthCONx Conference (#8)**

101. On November 29, 2023, Defendant Young appeared on behalf of the Company at the Evercore ISI HealthCONx Conference.

102. During the conference, an Evercore analyst asked: "I think if you look at Zoetis' Apoquel label, around 68% or 70% response rates with that JAK. I mean, is it so entrenched by this point such that when you – when Elanco's JAK comes to market, it'll be used second line you feel like[.]"

103. In response, Defendant Young stated:

> Again*, I think we believe we can very much get first line*. It will obviously vary by vet. The question then becomes, all right, there's a lot of dogs that don't respond, right? 32% is not an insignificant amount. And then you get into, well, if dogs are responding better to our product, well, then maybe the vet decides, well, let me go with that one because the hard to treat dogs have been responding better. I don't know that that'll be the case. That's obviously what we're hoping, is that we're responding to the higher level and that you get that kind of just efficacy benefit, but that will play out in the marketplace. But we're excited to get the product.

104. These statements were false and misleading because they indicated that the Company could position Zenrelia as a first-line treatment for atopic dermatitis and pruritus associated with allergic dermatitis, despite the significant safety and public health concerns identified by the Zenrelia vaccine response study completed on March 13, 2023, which were likely to cause veterinarians and dog owners to decline to use Zenrelia in favor of competing products.

31

**H.    January 9, 2024: J.P. Morgan Healthcare Conference (#9-10)**

105.    On January 9, 2024, Defendants Simmons and Young both appeared on behalf of the Company at the J.P. Morgan Healthcare Conference. During the conference, a J.P. Morgan analyst asked:

New launches, obviously going to be a big, big focus for the company as you go through this year. Maybe just the latest around timing and confidence on some of these approvals. *So I guess any update on the regulatory front of how the applications are progressing, any requests for additional data?* I'm just trying to get a sense of like how confident are you on the first half approval timelines?

106.    In response, Defendant Simmons stated:

Yes. So we've said – I back up and say as I mentioned just now, through 20 – *through 70 years and we've got 10 blockbusters, we are now looking at 6 in the making between the two that we have approved and through 2025*. So we're sitting here, I think, with a historical significant innovation. Yes, *the three that are submitted are under the FDA*, two of them are under ADUFA. *So as we look at them, no new real news here. And that's good news*. I mean, we have said it's rolling, it's iterative, the submissions are in. We're working on the regulatory side with them. *It's a proactive and productive dialogue.* So I think that's all moving forward. Again, we see a path to approval for these products in the first half of 2024.

107.    These statements (#9) were false and misleading because they represented that there was "no . . . news" regarding the Zenrelia submission, which was "good news," despite the bad news of the significant safety and public health concerns identified by the Zenrelia vaccine response study completed on March 13, 2023.

108.    Later in the conference, the same analyst asked:

On the gross margins. Just where can we think about gross margins going from here? I guess, is there anything from a manufacturing optimization that still needs to be done or just where are the opportunities? Is it mix that drives margins up here? I'm just trying to get a sense of where that…?

(Ellipsis in original.)

109.    In response, Defendant Young stated:

Certainly. As a general matter, we've got the near-term headwinds from slowing down the manufacturing plants. We said that's sort of 140 basis points to 170 basis points of headwind in 2024. That's offset by continuing to take positive price. We've committed to constant currency sales growth with the existing portfolio. As we leverage greater sales, that is also a positive for our margin. ***And then the new products that we've been talking about as they scale, that has real value to margin from the positive mix component***. ***So overall, we expect to continue to drive gross margin and operating profit higher over the next few years as we launch these big blockbuster products***. We know big products in big profitable spaces like US cattle and US pet add real value to the bottom line.

110.    These statements (#10) were false and misleading because they indicated that Zenrelia, one of "the new products," would produce higher margins and profits as it scaled, while omitting to disclose that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health concerns that were likely to slow the scaling of Zenrelia sales and inhibit any margin and profit increase.

I.    **January 18, 2024: Defendant Simmons Appears on** *Mad Money* **(#11)**

111.    On January 18, 2024, Defendant Simmons appeared on the CNBC television show *Mad Money*, hosed by Jim Cramer, to discuss the Company's performance and prospects.

112.    Defendants Simmons stated: "This is our 70th year but I would say ***the most exciting pipeline***. We're bringing ***six blockbusters*** over the next two years." Cramer then asked Simmons to "describe what a blockbuster means to people," to which Simmons answered, "a blockbuster in animal health can be over $100 million, in major markets."

113.    Later in the program, Simmons emphasized that "these major blockbusters are ***higher margins***, in big markets, ***faster growth rates***, much higher mix. That's going to create a lot more EBITDA." Simmons made clear that these "major blockbusters" included Zenrelia, stating: "Right now in Elanco, back to the priority, six major blockbusters. . . . First . . . entry into the auto, you know, immune kind of market, excuse me, the derm market. That's going to be critical." This referred to Zenrelia.

114.    These statements were false and misleading because they characterized Zenrelia as a "blockbuster" that was part of "the most exciting pipeline" and would have "higher margins" and "faster growth rates," while omitting to disclose that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that that were likely to slow the "growth rate[]" for Zenrelia and reduce its margins.

**J.       February 7, 2024: Defendant Simmons Appears on *Floor Talk with Judy Shaw* (#12)**

115.    On February 7, 2024, Defendant Simmons appeared on *Floor Talk with Judy Shaw*, a program on NYSE TV, a media content channel of the NYSE. During the program, the host, Judy Shaw, asked Simmons, "So tell me, how is Elanco approaching 2024 and what are the key components to your growth strategy?"

116.    In his response, Defendant Simmons stated, in relevant part, "[w]e're looking at probably the ***most exciting pipeline***. ***Six blockbusters, that's over 100 million in animal health, over the next two years we're bringing to market***." Defendant Simmons was referring to, *inter alia*, Zenrelia, as he shortly made clear in the segment.

117.    Ms. Shaw asked Simmons, "[s]o, you have been talking about innovation and your pipeline. ***Tell me about the blockbusters you've been talking about for the first half of the year***." In response, Defendant Simmons stated, "Yeah, so pets and farm animal. ***Four on the pet side***, two on the farm animal." After discussing a treatment for canine parvovirus, Simmons stated:

> The other one's one of the fastest growing markets, derm. Why do people take pets to the market [sic]? The top reason is an itching dog. It's a $1.2 billion dollar market, growing double digit, and vets don't have a lot of alternatives. ***We're bringing Zenrelia, a JAK1 inhibitor, it's a differentiated asset entering that market***. ***We've got a path for an FDA approval the first half of this year***.

118.    These statements were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding

34

positively, without disclosing that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

**K.**   **February 26, 2024: FY 2023 Press Release and Earnings Call (#13-16)**

119.   On February 26, 2024, Elanco issued a press release announcing the Company's Q4 and full year 2023 results. The press release quoted Defendant Simmons as stating (#13), in relevant part:

> As we look at 2024, we expect our existing portfolio to deliver constant currency revenue growth of 1% to 3%, with both pet health and farm animal expected to contribute to growth. ***We remain encouraged by our three late-stage pipeline products under regulatory review that have a path toward approval in the first half of 2024 and would be additive to our topline expectations in the second half of the year***. Continuing our efforts to improve efficiency, today we announced a strategic restructuring to continue the shift of our investments into more significant value creation areas. We are investing to enhance our launch efforts, prioritizing cash flow improvements and meaningfully reducing leverage, from both our improving free cash flow and the expected sale of our aqua business. We believe that the investments we are making in 2024 will provide the foundation to enable sustained revenue growth over the medium and long term.

120.   Also on February 26, 2024, Elanco hosted an earnings call with investors and analysts to discuss the Company's Q4 2023 results. During the scripted portion of this call, Defendant Simmons stated (#14), in relevant part:

> ***On the late-stage pipeline, our three differentiated assets*** - Credelio Quattro, ***Zenrelia***, and Bovaer are all progressing with the FDA. As we've shared previously, the regulatory process is rolling and iterative at this stage, and ***we are in ongoing productive dialog with the FDA's Center for Veterinary Medicine. These three potential blockbusters continue to have a path towards [U.S.] approval in the first half of 2024***.

121.   These statements (#13-14) were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related dialogue with the FDA, was proceeding positively, without disclosing that the Zenrelia vaccine response study completed on

March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

122. In addition, during the call, an analyst asked:

But my thought was that the ADUFA date for Zenrelia was in February. And Jeff, can you discuss any high-level thoughts on what still remains to get done after any interaction with the agency? Do you have increased conviction with Zenrelia in 1H 2024 approval timeline?

123. Defendant Simmons responded, in relevant part:

*[N]o update today on [the] Zenrelia timeline. We continue really with no change in terms of just a very productive dialog with the FDA*. We believe that *market adoption, as we know, will be driven on value and execution*. But again, *the dialogue with the FDA is going well. No change. When there is change, of course, we'll be announcing approval, and if there's any change to that, we'll let you know.* So, no – *no change at all*.

124. These statements (#15) were false and misleading because they represented that there was "no change" in the approval process for Zenrelia, while omitting to disclose (1) the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to affect the timing and outcome of the Company's Zenrelia submission to the FDA.

125. Near the end of the call, an analyst asked:

[O]n the FDA conversations that you guys are having, I guess as you get closer to an approval here in first half 2024 that you're reiterating, I think maybe I would have expected you could give a little bit more confidence or a little narrowing of the timeframe. So, one, am I over-reading that? Is there anything going on in conversations? Do you guys feel more confident as you're going through these discussions?

126. In response, Defendant Simmons stated, in relevant part: "*I wouldn't read into anything. Our confidence remains. Our confidence in the differentiation remains*. These are great assets. Our regulatory team is doing a great job, and *we're in a very proactive productive dialogue with the CVM, and we'll update you if anything does change*."

36

127. These statements (#16) were false and misleading because they represented that there was no change in the approval process for Zenrelia or regarding the differentiation of Zenrelia , while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to affect the timing and outcome of the Company's Zenrelia submission to the FDA, as well as the differentiation of Zenrelia in the marketplace.

**L.        February 29, 2024: Bank of America Securities Animal Health Summit (#17)**

128. On February 29, 2024, Defendant Young attended the Bank of America Securities Animal Health Summit on behalf of the Company. During the event, an analyst asked,

> 2024 is a major year for you, expected to be a major year for you. We've been waiting for a lot of this innovation for a long time. You've got Zenrelia, Credelio Quattro, Bovaer, at this point in the game, sort of how much confidence do you have in that first half approval timing and the launch timing after that? Because we are essentially in March, we're two months through the year, so you're just getting closer and closer. So, what's your thought process on where we stand now?

129. In response, Defendant Young stated, in pertinent part:

> As I think we've tried to represent here for a while, *we feel good about our path to first half approval. We've put in packages that we feel the FDA can very much approve. And we're having really good dialog regarding all of the information in those packages with the FDA*. It's regular dialog. This isn't, put something in and wait six months. It's regular. *Good interaction to make sure we're tracking*. And overall, we understand the focus from the investor side on the timing and the launches. And I assure you we have just as much focus internally to do that, given, how important it is to our total portfolios and the growth we're going to deliver this year.

130. These statements were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related "dialog" and "interaction" with the FDA, was proceeding positively, without disclosing that the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

**M.      March 4, 2024: TD Cowen Health Care Conference (#18)**

131.    On March 4, 2024, Defendant Simmons attended the TD Cowen Health Care Conference on behalf of the Company.

132.    During the conference, an analyst asked: "So moving to the new launches, could you provide an update on the regulatory status of these products? And then in your experience, what are the most common reasons filings could be delayed? And then just is there any upside to a delayed filing, maybe a strong label, maybe a more differentiated label with more data?"

133.    In response, Defendant Simmons stated in relevant part:

> But if I talk specifically about those assets in the US with the FDA, *I think we're in a productive, proactive dialogue*. There is an Animal Drug User Fee Act where there's steps. But in these final phases, it's very rolling, it's very iterative. And what we say is *if there's anything significant that changes, we'll share that. So we're still in that stage*.

134.    These statements were false and misleading because they represented that the Company's FDA submission for Zenrelia, and the related "dialogue" with the FDA, was proceeding positively, and that nothing "significant" had changed, without disclosing that something *very significant* had changed, as the Zenrelia vaccine response study completed on March 13, 2023, identified significant safety and public health issues that were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA, and the commercial prospects for Zenrelia.

**N.      March 12, 2024: Barclays Global Healthcare Conference (#19)**

135.    On March 12, Defendant Young attended the Barclays Global Healthcare Conference on behalf of the Company.

136.    In response to a question about the Company's innovation pipeline, Defendant Young stated: "Yeah. All three products we *continue to have a path to first half approval*. We've

said contribution to revenue growth would be second half. So, *no change on that communication*."

137.    These statements were false and misleading because they represented they represented that there was "no change" regarding the approval process for Zenrelia, while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

**O.    May 8, 2024: Q1 2024 Earnings Call (#20-25)**

138.    On May 8, 2024, before the market opened Elanco issued a press release announcing its Q1 2024 results, which it also filed with the SEC as an attachment to a Form 8-K. The press release quoted Defendant Simmons as stating:

> *We are encouraged by the strong progress of our late-stage pipeline*, which has advanced significantly over the last several months. Based on our dialogue with the FDA and the status of packages submitted, *we have increased certainty in the expected approval timing for [. . .] Zenrelia™* and Credelio Quattro™. We continue to expect to bring differentiated products to the market, with revenue contribution expected from all three new products in the second half of 2024.

139.    These statements (#20) were false and misleading because they represented that the approval process for Zenrelia had made "strong progress," while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA.

140.    The press release also stated:

> *For Zenrelia,* a JAK Inhibitor targeting control of pruritus and atopic dermatitis in dogs, the company believes the FDA has all data necessary to complete its review. *All technical sections, including the label, are expected to be approved before the end of June*. Full approval is expected in the third quarter after an expected 60-day administrative review period. Additionally, Zenrelia has been submitted in nine

additional markets, including the EU, UK, Australia, Canada and Japan, with international approvals expected to begin in late 2024.

141.    These statements (#21) were false and misleading because they reassured investors regarding regulatory approval of the Zenrelia label while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA, particularly with respect to the label.

142.    That same day, Elanco hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results. During the scripted portion of the call, Defendant Simmons stated:

> [B]oth ***Zenrelia*** and Credelio Quattro ***have progressed since February, and we believe the FDA has all the data necessary to complete its review of these products. For both products, we expect that all technical sections, including labels, will be approved by the FDA before the end of June***. After the approval of all technical sections, each new animal drug application, or NADA, undergoes an expected 60-day final administrator review, putting our full approval expectations in Q3.

143.    These statements (#22) were false and misleading because they represented that the Company's submission for Zenrelia had "progressed" towards approval of, inter alia, the label, while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to negatively affect the timing and outcome of the Company's Zenrelia submission to the FDA, particularly with respect to the label.

144.    Also during the scripted portion of the call, Defendant Simmons stated:

> Now, a little more on each product specifically. ***Zenrelia*** is our JAK inhibitor targeting the control of pruritis and atopic dermatitis in dogs at least 12 months of age. ***We remain confident this product will be differentiated from the current market option.*** Our market research shows clear interest and desire for additional options as ***we will continue to prioritize the optimization of the label to provide the most meaningful differentiation***. We expect to have a very efficient approval to launch window targeting product in the market before the end of the third quarter.

40

Additionally, we expect approval for Zenrelia in several international markets starting late in 2024, our fastest globalization effort ever.

145.    These statements (#23) were false and misleading because they represented that Zenrelia would be positively and meaningfully differentiated from competing products based on its label, without disclosing the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which were likely to negatively affect (1) the differentiation of Zenrelia "from the current market option," meaning Apoquel, which did not have a black box warning, and (2) the "optimization" of the Zenrelia label, which was likely to reflect the concerns identified by the vaccine response study.

146.    In addition, during the Q&A portion of the call, in response to an analyst question regarding the Company's "conversations with the FDA" and the timing of the Zenrelia submission (as well as submissions for two other products), Defendant Simmons stated:

First, *we are very pleased with the progress we've made in these key assets since February. Actually, a lot of progress has happened*, and that's driven our increased certainty as we move closer to the end of this approval process. Yes, the dialogue with the FDA has been rolling and iterative. *We've been in a productive engagement with them . . . .* It's been fair, constructive, frequent. And really, over the last several months, we've been responding to the questions from the agency, which is very common. I believe the Animal Drug User Fee Act, or ADUFA is working specific[ally] on these assets, it's been constructive.

*So what's changed and what has not changed since February? What has changed is many sections and subsections of these submissions have been approved, both products have progressed. Simply, though, the back-and-forth interactions have taken slightly more time than we estimated this path to first-half approval. Thus, we're now moving the final 60 day administrative review into the third quarter*. And I think, importantly, we have increased certainty in the timing from all of this interaction that you mentioned.

*I think it's also important to say what hasn't changed. What hasn't changed is we continue to expect the products to be differentiated versus the current offering. We still expect all technical inspections, including the label, to be approved in the first half or by the end of June. And we expect that the revenue contribution is still expected in this second half for these two products, as well as Bovaer.* Again,

41

importantly, we believe the FDA has what they need for the approvals and the launch planning, to your question on that, and the marketing is well underway.

147.    These statements (#24) were false and misleading because they represented that the Company's submission for Zenrelia had made "a lot of progress" and that the *only* changes were that "many sections and subsections of the[] submission[] ha[d] been approved" and that the "product[] ha[d] progressed," while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified.

148.    Also on May 8, 2024, the Company published an investor presentation on its website in connection with the Q1 2024 earnings call. Defendants Simmons and Young guided attendees of the call through this presentation. Slide 6, which Defendant Simmons presented, stated that "peak sales expectations [were] intact" for Zenrelia:

**Zenrelia™ and Credelio Quattro™** full approval expected in Q3 2024, peak sales expectations intact

149.    This (#25) was false and misleading because it represented that there was no change to expectations regarding Zenrelia sales, while omitting to disclose the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health concerns it identified, which created a material risk to Zenrelia sales.

P.    **May 29, 2024: Stifel Jaws and Paws Conference (#26)**

150.    On May 29, 2024, Defendant Young attended the Stifel Jaws and Paws Conference on behalf of the Company. During the conference, an analyst asked:

So, in my numbers, if the $400 million is a good metric this year and it grows mid-teens again, my number, you got $460 million next year from that bucket, you've got to be around $150 million from the new class, the 2025. It's just sort of the math and in the construct, maybe we can deconstruct that 2025 class and just start with Zenrelia. $150 million is a big number. ***So, you got to have some confidence that Zenrelia will ramp and ramp effectively. How do we think about the uptake for new dogs versus switchers?*** And we were fortunate to have you at the dinner last night. ***Maybe we should grow in non-responders as well, if you want to talk to that***.

151.    In response, Defendant Young stated in pertinent part:

Overall, we're very excited to bring Zenrelia into the market. It's a JAK inhibitor product as we know, dermatology was not a big market until Zoetis created it with Apoquel and Cytopoint and it's grown to be a $1.5 billion market globally that's continuing to grow. It's the number one reason a pet owner goes into the vet is to address the itching dog. We're going to be the second company to bring a JAK to the market and ***we're excited about positive differentiation that we think will allow us to penetrate the market in a reasonable way. Overall, is that going to be new dogs, is it going to be switchers, is it going to be non-responders? I think we think all of those will be in play with the product we're going to bring, and that's going to be the opportunity to really penetrate the market***.

152.    These statements were false and misleading because they represented that Zenrelia would be positively differentiated from competing products, and that there was a likelihood that veterinarians and dog owners would "switch" dogs to Zenrelia from competing products, even without first trying competing products (i.e., that Zenrelia would be a first-line treatment), without disclosing the significant safety and public health issues identified by the Zenrelia vaccine response study completed on March 13, 2023, and the risks those issues posed to differentiating Zenrelia and persuading veterinarians and dog owners to use Zenrelia as a first-line treatment.

43

**Q.    June 11, 2024: Goldman Sachs Global Healthcare Conference (#27-29)**

153.    On June 11, 2024, Defendant Simmons attended the Goldman Sachs Global Healthcare Conference on behalf of the Company. During the conference, an analyst asked:

And when it comes to, I guess, innovation and that differentiation piece, we talked on the last call about sort of prioritizing kind of optimization of the label, could you maybe just kind of like talk about what that means and maybe as you kind of gotten some of the different technical sections approved, kind of level of confidence in the differentiation that you're bringing to market.

154.    In response, Defendant Simmons stated:

Yes. ***So I think we've probably gone to another level of disclosure of the regulatory process in animal health, given where we are as a company***. And we felt it was necessary, but what I would say is what we're going through is very common. The Animal Drug User Fee Act has been based off from PDUFA. It's the – it's – we're in ADUFA V. So, we've done this for almost 30 years. So, it's very common in the final stages to be in a rolling iterative, back and forth discussion and it's very common to say, hey, we will be always looking at how we can optimize the label relative to the value and the differentiation and that will be a process that we will go through and are going through as we go through these final steps in our approval process. So – and that will be key to overall. And we'll look at those trade-offs back and forth. We're confident in our [sic] as well as with Zenrelia, Credelio Quattro and Zenrelia. And ***we're confident in the package that's based on the science and the data that's in the package***. And we'll look forward to communicating the outcomes as they come forward.

155.    These statements (#27) were false and misleading because (1) they represented that Defendants' "level of disclosure of the regulatory process in animal health" was high, despite the nondisclosure of the Zenrelia vaccine response study completed on March 13, 2023, and the significant safety and public health issues it identified, and (2) they positively portrayed the "science and . . . data" in the Company's Zenrelia submission while omitting to disclose the significant safety and public health issues identified by the Zenrelia vaccine response study.

156.    The analyst immediately followed up, asking:

And I guess as you kind of think about bringing these products to market, ***do you kind of feel like they'll follow the traditional like launch curve that you see where you kind of reach maybe more of a run rate or kind of steady-state growth three or four years into the future? Or is there any reason to believe that like these***

*drugs could be different?* These are obviously like established markets that you're going into, could it be a faster uptake?

157. In response, Defendant Simmons stated, in pertinent part:

But these are major markets and we've got differentiated – we believe, in some cases, best-in-class type products. And we – we're – so we've said, we're going to resource and invest behind these launches like probably never before in Elanco's history. We've brought in know-how, so there'll be no regrets. We'll make the right decisions with the best experience we have. And we've been really practicing a lot of these capabilities over the last two years with some of the launches we've had. *So, I do see a typical kind of archetype and adoption from historical standards*.

158. These statements (#28) were false and misleading because they represented that Zenrelia was expected to have a "typical" market adoption curve, while omitting to disclose the significant safety and public health issues identified by the Zenrelia vaccine response study completed on March 13, 2023, which created a material risk to market adoption of Zenrelia.

159. The analyst immediately followed up again, asking:

And I guess with Zenrelia, you talked about kind of doing the market research, potentially a $2 billion market kind of over time. I guess, what drives it there, because still obviously like would imply significant growth from where we are today? *And then how do you think about kind of the factor that would influence the veterinarian adoption of a product like the Zenrelia and what would influence kind of the consumers' decision to use that product or switch from the product they're currently using?*

160. In response, Defendant Simmons stated:

Yes. So, I think the biggest thing, derm is an exciting, very different market. If you think about derm, it is one – it's probably the only way a dog can self-diagnose, right. An itching dog is the number one reason that they go into the vet clinic. We believe just as you look at the US and our market research, there's another 6 million dogs that are untreated that are out there. So, I think more awareness, more treatments and a growing market is kind of the fundamentals. It's about 60% in the US, 40% in international. And we see growth rates at or above the US internationally. So, we see globalization will be another factor that will drive us to $2 billion. I think the other is it's a market that it's a chronic problem. As an owner of two labs that have itching problems and some products work, some don't work, there's different kind of stages of this problem. And all of these things lead to vets wanting more options. We've never seen a greater than $1 billion market with only two products really in it. So, I think vets want options. They – on most every other

45

category, they want two or three options on their shelves. And most labels don't have – only 65% respond. So, it's set up very nicely for the next generation of innovation and alternative options. So, Elanco is looking at derm as global, as a portfolio approach and we've got multiple things in our pipeline, not just Zenrelia, but any products to follow, starting with an IL-31 in 2025.

161.    These statements (#29) were false and misleading because they purported to identify the factors that would influence adoption of Zenrelia by veterinarians and dog owners, while omitting to disclose the significant safety and public health issues identified by the Zenrelia vaccine response study completed on March 13, 2023, which constituted material factors that would affect such adoption.

## VI.    THE TRUTH IS REVEALED

162.    On June 27, 2024, the Company issued a press release providing an "innovation update." The press release stated, in relevant part:

Elanco [. . .] today announced updates to the expected U.S. Food and Drug Administration (FDA) approval timeline[] for Zenrelia . . . .

*For Zenrelia*, the company has received confirmation from FDA that all major technical sections (Effectiveness, Safety and Chemistry, Manufacturing, and Controls (CMC)) are complete as of late June. *For the Labeling minor technical section, earlier this week the Company aligned with FDA on the language and expects to receive the completion letter by mid-July*. The 60-day final administrative review will follow, placing expected approval late in the third quarter of 2024. *The company now anticipates a U.S. launch for Zenrelia in the fourth quarter of 2024*.

"Elanco continues to view Zenrelia as positively differentiated for effectiveness and convenience, which we believe can address unmet needs in the market. *However, we expect the U.S. label will include a boxed warning on safety based on the outcome of a trial with unvaccinated dogs dosed at 3x the label dose*," said Bobby Modi, Elanco Executive Vice President U.S. Pet Health and Global Digital Transformation. "*While we remain confident in Zenrelia's blockbuster potential, we believe this warning will slow the product adoption curve in the U.S. and initially limit the number of expected treatment days by approximately 25%.* We plan to conduct additional research to support an improved label over time."

163.    This news revealed that Defendants' prior statements were false and misleading because they revealed, inter alia, (1) that the contents of the Company's Zenrelia submission

46

(including the results of the vaccine response study) and the dialogue with the FDA concerning Zenrelia, had not proceeded as represented,  (2) the resulting risks to the timing of regulatory approval and commercial launch of Zenrelia , and (4) the resulting risks to the differentiation, market adoption, and expected sales, profitability, and margins for Zenrelia that were concealed by Defendants.

164.    Further, this news constituted the materialization of the undisclosed risks that the regulatory approval and commercial launch timeline touted by Defendants during the Class Period would be delayed, and the differentiation and resulting commercial prospects for Zenrelia would be inhibited, as a result of the significant safety and public health issues identified by the Zenrelia vaccine response study.

165.    On this news, Elanco's stock price fell $3.69 per share, or 20.53%, to close at $14.27 per share on June 27, 2024, with an extraordinarily high volume of shares being traded. This was a statistically significant decline in the Company's stock price, which fell precipitously even as the S&P 500 increased 0.09% and the Nasdaq Biotechnology Index increased 0.06%.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

166.    A strong inference that Defendants Simmons and Young (and thus the Company) were at least reckless as to the possibility of misleading investors is established by the allegations above as well as those set forth below.

### A.    The Individual Defendants' Statements Establish That They Closely Followed the Approval Process for Zenrelia

167.    Throughout the Class Period, the Individual Defendants spoke repeatedly and in detail regarding the regulatory approval process for Zenrelia, establishing that they closely followed that process and had access to internal information about it.

47

168. On the first day of the Class Period, Defendant Simmons stated that he was "confident" in the "quality of the package[]" submitted to the FDA regarding Zenrelia, as well as the "dialogue with the regulators." Simmons made similar statements reflecting his knowledge of the regulatory process and communications between the Company and the FDA on June 12, 2023, when he told investors that the Company was having ***"good constructive dialogue, high-quality packages and we've got a predictable regulatory path*.**" On August 7, 2023, Simmons touted "the level of quality, the quality of these submissions, the engagement with the regulatory bodies," and stated that "the engagement and capacity has probably never been higher in any time I've seen in Elanco R&D." Simmons also emphasized that day the importance of "Ellen and her team this quarter," referring to Ellen de Brabander, the Executive Vice President of Innovation and Regulatory Affairs at the Company, indicating frequent contact with Ms. de Brabander and her regulatory affairs team. Indeed, Simmons mentioned Ms. de Brabander with respect to the Company's drug pipeline several times during the Class Period. Ms. de Brabander has served on the Company's Executive Committee, along with both Individual Defendants, and reported to Simmons, since before the Class Period.

169. Simmons continued to discuss the Company's communications with the FDA regarding Zenrelia throughout the Class Period. On March 4, 2024, he told investors that those communications were "productive" and "proactive," and noted that the process was "very rolling" and "very iterative" at that stage. On May 8, 2024, Simmons again discussed the Company's dialogue with the FDA, stating that "[i]t's been fair, constructive, frequent. And really, over the last several months, we've been responding to the questions from the agency, which is very common."

170.    Defendant Young also made clear that he was aware of the progress of the approval process. On June 1, 2023, he told investors that Zenrelia were expected to be fully approved in the first half of 2024 "based off Ellen's team and the milestones they're hitting." Young also discussed the Company's communications with the FDA, describing the cadence of the "dialog" as "regular" on February 29, 2024: "This isn't, put something in and wait six months. It's regular. Good interaction to make sure we're tracking." Young further stated that "we understand the focus from the investor side on the timing and the launches. And I assure you *we have just as much focus internally to do that, given, how important it is to our total portfolios and the growth we're going to deliver this yea*r."

171.    Indeed, Defendant Simmons made clear that he is personally involved in communicating with the Company's regulators, stating on June 12, 2023, that "we've been in close dialogue, *I have myself*," with the Environmental Protection Agency regarding the Company's Seresto flea and tick collar for dogs.

**B.    The Defendants' Knowledge of the Company's Preparation to Launch Zenrelia**

172.    In addition, the Individual Defendants' knowledge of the Company's strategies for the Zenrelia launch reflected the timing and outcome (including labeling) of the FDA approval process, which further establishes their knowledge of that process.

173.    On June 1, 2023, early in the Class Period, Defendant Young noted that, as "[t]he new products are certainly *essential* to us hitting the number," referring to Zenrelia (and two other projects), "*[w]e're very focused on the launches*." After the Class Period, on August 8, 2024, Simons stated that "Bobby Modi in the US pet health commercial organization have an extensive launch plan," referring to Rajeev (Bobby) Modi, the Company's Executive Vice President, US Pet Health and Global Digital Transformation. On September 20, 2024, during an investor call in

49

which the Individual Defendants also spoke on behalf of the Company, Mr. Modi confirmed this, telling analysts that "[w]e've been preparing for [the Zenrelia] launch for a really long time." Mr. Modi has also served on the Company's Executive Committee, reporting to Defendant Simmons, since before the Class Period.

174. The Individual Defendants also frequently discussed the differentiation of Zenrelia from competing products. In addition to price, labeling is a major component of differentiation for these products. Indeed, Defendant Simmons stated that "differentiation in our market either comes back to efficacy, safety, or administration," each of which is a component of the label, and told investors on May 8, 2024, that Defendants were "continu[ing] to prioritize the optimization of the [Zenrelia] label to provide the most meaningful differentiation." Thus, the Individual Defendants' statements reflected their knowledge of the labeling portion of the Zenrelia FDA submission.

175. The Individual Defendants also made clear that the Company had conducted extensive market research before investors learned the concerned facts. On November 29, 2023, in response to a question about the differentiation of Zenrelia, Defendant Young stated, "[w]e've not provided that yet. As we get closer to the launch, we will. But *we're confident it has value in our market research studies*." On February 29, 2024, Defendant Young discussed this research again, stating, in pertinent part:

> I think *we've done focused groups* with small groups of the – under NDA. We've gotten good feedback on that. And again, *that gives us confidence that the differentiation we're talking about has value*. Clearly, we haven't gotten approval yet. We've not launched yet to see how it does respond practically in the marketplace. But overall, *with Zenrelia, we feel like the market research we've done has certainly helped on that front*.

176. Indeed, Defendants indicated that the Company's market research accounted for the black box warning for Zenrelia. Defendant Simmons claimed on August 8, 2024, that "*even*

*with the expected label*, there is strong interest in Zenrelia as a treatment option for canine dermatology."

### C.    The Zenrelia Response Study, Which Raised Both Animal Safety and Public Health Concerns, Was Completed Before the Class Period

177.    The Individual Defendants were aware of the vaccine response study. In a conference call on June 16, 2021, less than two months after the start of the vaccine response study, Elanco presented new acquisitions and initiatives to analysts. During the call, Defendant Simmons introduced Aaron L. Schacht, Elanco's Executive Vice President for Innovation, Regulatory & Business Development at the time. Schacht explained that Elanco was "progressing an oral JAK inhibitor called ilunocitinib [i.e., Zenrelia] with a similar profile to the market incumbent [i.e., Apoquel, from Zoetis]." Schacht further explained that "*[p]ivotal studies are underway* in both the U.S. and the EU," and "we are targeting 2022 for initial technical section submissions likely in the latter part of the year [i.e., Q4 2022]." When speaking, Schacht referenced the following slide disclosing the ilunocitinib studies (see item 1 in slide below):



51

178.    Thus, Simmons was aware of the studies being pursued to advance Zenrelia to a commercial launch. Indeed, on August 8, 2024, Defendant Simmons later acknowledged, that "*as part of any data package*, even a 10-year incumbent, 10 years ago, we completed what is called a vaccine response study." He continued, indicating his knowledge that a 3X dose is a standard exposure level for such studies, "as it sounds, it studies and assesses the dogs' response to the vaccine while receiving three extra label dose of Zenrelia."

179.    The Zenrelia vaccine response study, which began on April 20, 2021, and was completed on March 13, 2023, raised several red flags that Defendants either knew about or were at least reckless in not knowing about given their awareness that the study was underway. For instance, the administration of a second vaccine had to be delayed from day 56 to day 60 of the study "due to [the] suboptimal health of the dogs administered Zenrelia™," including *C. canis* infection, which was diagnosed in *seven of the eight dogs that received Zenrelia*, while *zero dogs in the control group* were diagnosed with *C. Canis*. In the Zenrelia group, one dog "experienced drug-induced immunosuppression, which resulted in fatal vaccine-induced adenoviral hepatitis and pancreatitis," and "infectious enteritis . . . potentially contributed to a fatal intussusception" of another drug in that group. Both of those dogs were euthanized, while no dogs in the control group were euthanized. These developments indicated that it was not safe to administer vaccines in dogs that are concurrently receiving Zenrelia.

180.    Further, as noted above, the majority of the remaining (i.e., non-euthanized) dogs in the Zenrelia group (four of six) failed to achieve an adequate immune response to the rabies vaccine on day 88; and one and three of those four dogs failed to achieve an adequate response on days 116 and 172, respectively. Consistent with the FDA's conclusion that this raised a serious public (i.e., human) health concern given the zoonotic nature of rabies, Mara Tugel, the Company's

52

Veterinarian & Dermatology Medical Strategic Lead, acknowledged during a September 20, 2024 call that "[r]abies is the primary public health concern when you think about veterinary medicine."

181.    Given the Individual Defendants' access to information concerning the FDA submissions for these products, their frequent public statements regarding the "quality" of and "data" in those submissions, and their knowledge of the vaccine response study requirement, there is a strong inference that Defendants were aware of the red flags raised by the Zenrelia vaccine response study and the resulting risks to the regulatory approval and commercial prospects of Zenrelia.

182.    Further, given the "constant dialogue" between Elanco and the FDA regarding the Zenrelia submission, it is implausible that the significant safety and public health issues identified by the vaccine response study were not discussed at length in those communications.

**D.      Information from a Former Elanco Employee Further Establishes Scienter**

183.    A former employee of Elanco, referred to herein as "FE-1," provided additional information that supports a strong inference of scienter. FE-1 worked at Elanco for approximately six years, ending in Q1 2022, in a series of increasingly senior research and development positions, including Senior Director. In these roles, FE-1 was involved in early drug development, i.e., discovering and development ne drug assets for infectious diseases, which were then subject to early-stage testing for proof of concept, efficacy, and safety. As a result, FE-1 has knowledge regarding Elanco's practices regarding drug development, including communicating to senior management about issues arising in such development. Through company meetings to discuss Elanco's portfolio of drugs in development, and through other conversations with colleagues, FE-1 knows that these practices apply broadly, and not just to the specific drugs that FE-1 worked on.

184.    FE-1 stated that it was standard to conduct tests to determine if a drug in development caused any "undesired impacts." For an immunosuppressant like Zenrelia, it would be standard to conduct studies to determine how the drug affected an animal's response to vaccines.

185.    FE-1 stated that, when a trial is conducted and the results are different from what was expected, the employees working on that drug would convene to discuss how to address the issue, and would involve Elanco employees not assigned to that program, or even outside consultants, if needed.

186.    FE-1 further stated that Elanco used software to track the progress of each drug development program. Each such drug was assigned milestones, and any developments that were likely to cause those milestones to be missed would trigger an alert. Because many persons and teams had responsibilities for various aspects of a drug development program, it was critical that any delay or unexpected development in one aspect of the program was communicated to everyone with responsibility for the program. Per FE-1, "if for any reason things are not progressing, it gets picked up in the system" and triggers an alert. FE-1 confirmed that an "unexpected study result" that could have a "significant impact" would trigger such an alert.

187.    FE-1 explained that there was a project head for each drug development program, and they would communicate unexpected results "up the food chain." For a drug development program that had "external visibility," meaning "someone is making commitments and statements outside [Elanco]," it was critical that that person was informed of any unexpected developments. FE-1 explained that the CEO and CFO of Elanco had a "whole platoon around them and their whole business is making sure they are exposed" to information regarding the Company, including drugs and development. "When there is an unexpected development that has a material impact, it is reported to that team," who then inform the CEO and CFO, according to FE-1.

188.     These, standard practices at Elanco indicate that Defendants Simmons and Young were informed of the results of the Zenrelia vaccine response study, which identified significant safety and public health risks, with resulting risks to the timing and outcome of the FDA approval process, and commercial prospects, for Zenrelia.

### E.     Zenrelia Constituted a Core Operation of Elanco

189.     Zenrelia constituted a core operation of Elanco given its central importance to the Company's prospects. As the Individual Defendants repeatedly emphasized, Zenrelia was a purported "blockbuster" and a pillar of Elanco's innovation pipeline, which they said would be the "big driver" of the Company's performance and the reason they characterized 2024 as "probably our most historical year ever." The Individual Defendants further stressed that the "number one reason" that pet owners to veterinarians is because of a dog experiencing itchiness, which Zenrelia is intended to treat, and that having a competitive dermatology product was critical to drive the performance of the Company's entire Pet Health portfolio.

## VIII.   CLASS ACTION ALLEGATIONS

190.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons and entities that purchased shares of the Company's common stock during the Class Period and were damaged thereby.

191.     Excluded from the Class are Defendants, all current and former officers and directors of the Company, their immediate family members, or any entity any Defendant owns or controls (or owned or controlled during the Class Period).

192.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time

and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

193.    Lead Plaintiffs' claims are typical of the claims of Class members as all were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

194.    Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

195.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether Defendants' acts violated the federal securities laws as alleged herein;

- whether Defendants made materially false or misleading statements to the investing public during the Class Period;

- Whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period; and

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the price of the Company's common stock was artificially inflated during the Class Period because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

196.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

197.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- Defendants' omissions and misrepresentations were material;

- The Company's common stock traded in an efficient market;

- The Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;

- The Company's common stock traded on the NYSE and the Company was covered by multiple analysts during the Class Period;

- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Lead Plaintiffs and members of the Class purchased, acquired and/or sold the Company's common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

198.    Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

199.    Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.   COUNTS

### COUNT I

### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Against All Defendants

200.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

201.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other Class members to purchase Elanco common stock at artificially inflated prices.

202.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

204.   During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

205. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the Company's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

206. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for the Company's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

207. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

208. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Securities Exchange Act of 1934
### Against the Individual Defendants

209. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

210. Defendant Simmons was the President and CEO of the Company, as well as a member of its Board and the head of its Executive Committee. Simmons was directly involved in the day-to-day management of the Company, including its communications to investors. Simmons spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those

59

filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

211.    Defendant Young was the CFO of the Company, as well as a member of its Executive Committee. Young was directly involved in the day-to-day management of the Company, including its communications to investors. Young spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, Young had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action is a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable, injunctive, or other further relief as the Court may deem

just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: March 21, 2025

/s/ Daniel S. Sommers
Steven J. Toll (Bar No. 15824)
Daniel S. Sommers (Bar No. 15822)
S. Douglas Bunch
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Avenue N.W.
Suite 800, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Attorneys for Co-Lead Plaintiffs and Liaison
Counsel for the Class*

Jeremy A. Lieberman
(*pro hac vice*)
Jonathan D. Park
(*pro hac vice* application pending)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

*Attorneys for Co-Lead Plaintiffs and Lead
Counsel for the Class*

Joshua E. Fruchter
(*pro hac vice*)
**WOHL & FRUCHTER LLP**
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818

61

Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Additional Counsel for Co-Lead Plaintiffs*