**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| IN RE ELANCO ANIMAL HEALTH INCORPORATED SECURITIES LITIGATION | Case No. 1:24-cv-02912-BAH |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: | **HEARING REQUESTED** |
| ALL ACTIONS | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO**
**<u>DISMISS THE AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

    A.    Elanco Develops Zenrelia to Treat Pruritis as Part of its Pivot to
Innovation ................................................................................................... 3

    B.    Elanco's Two-Year Vaccine Study Concludes That It Is Not Safe to
Administer Vaccines in Dogs Receiving Zenrelia ....................................... 4

    C.    Elanco Submits Zenrelia to the FDA for Approval .................................... 5

    D.    During the Class Period, Defendants Make Exclusively Positive
Statements About Zenrelia's Differentiation, While Concealing
the Adverse Results of the Vaccine Study *Negatively*
Differentiating Zenrelia ............................................................................... 6

    E.    During the Class Period, Defendants Reassure Investors Concerning
Zenrelia's Commercial Prospects Despite Knowing That the Adverse
Results of the Vaccine Study Materially Dimmed Those Prospects .......... 7

    F.    Defendants Reveal the Vaccine Study's Negative Results to Investors ..... 8

LEGAL STANDARDS ............................................................................................................ 9

ARGUMENT ........................................................................................................................... 9

    I.    Defendants Misapply the Doctrines of Incorporation-By-Reference
and Judicial Notice ...................................................................................... 9

    II.    Defendants' "Chart" (Dkt. #37-4) Should be Stricken or Disregarded ................ 12

    III.    The FAC Adequately Alleges a Section 10(b) Claim ........................................... 14

        A.    The FAC Adequately Pleads Falsity ........................................................ 14

            1.    Defendants' Class Period Statements Misled Investors By
Concealing the Vaccine Study's Adverse Results. ....................... 14

            2.    Defendants' Misleading Statements Were Not Puffery ................ 19

            3.    The PSLRA Safe-Harbor For Forward-Looking Statements
Does Not Protect Defendants' Misleading Statements ................ 22

i

        4.      Defendants' Misleading Statements Are Actionable Even if
Deemed Statements of Opinion. ....................................................... 25

    B.    The FAC Adequately Pleads a Strong Inference of Scienter.................... 26

IV.    The FAC Adequately Pleads a Section 20(a) Claim............................................. 30

CONCLUSION................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Arnlund v. Deloitte & Touche LLP*,
  199 F. Supp. 2d 461 (E.D. Va. 2002) ...................................................................................27

*Baum v. Harman Int'l Indus., Inc.*,
  575 F.Supp.3d 289 (D. Conn. 2021)....................................................................................23

*Burt v. Maasberg*,
  2014 WL 1291834 (D. Md. Mar. 28, 2014)..........................................................................14

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
  496 F. Supp. 3d 952 (E.D. Va. 2020) .......................................................................15, 20, 29

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).................................................................................................10

*Chapman v. Fennec Pharms., Inc.*,
  No. 1:20CV812, 2021 WL 7209981 (M.D.N.C. Dec. 16, 2021)............................................17

*Cheng Jiangchen v. Rentech, Inc.*,
  No. CV 17-1490-GW(FFMX), 2017 WL 10363990 (C.D. Cal. Nov. 20, 2017) ....................13

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021)....................................................................................................29

*Covey v. Assessor of Ohio Cnty.*,
  777 F.3d 186 (4th Cir. 2015) .................................................................................................9

*Dunn v. Borta*,
  369 F.3d 421 (4th Cir. 2004) ...............................................................................................20

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) .................................................................................................9

*Emps'. Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v.
  MacroGenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ...........................................................................................17, 21

*Epstein v. World Acceptance Corp.*,
  2015 WL 2365701 (D.S.C. May 18, 2015)...........................................................................14

*Goines v. Valley Cmty. Servs. Bd.*,
  822 F.3d 159 (4th Cir. 2016) ...............................................................................................10

*Hawes v. Argo Blockchain plc*,
  No. 23-CV-7305 (CM), 2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024)...................................21

*In re 2U, Inc. Sec. Class Action*,
    No. CV TDC-19-3455, 2021 WL 3418841 (D. Md. Aug. 5, 2021) ...........................22, 24, 26

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................................22

*In re Constellation Energy Grp., Inc., Sec. Litig.*,
    738 F. Supp. 2d 614 (D. Md. 2010)....................................................................................23

*In re Conventry Healthcare, Inc. Sec. Litig.*,
    No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011) ...........................28, 29

*In re DXC Tech. Co. Sec. Litig.*,
    No. 118CV01599AJTMSN, 2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd*,
    19 F.4th 601 (4th Cir. 2021) ...............................................................................................28

*In re ECOtality, Inc. Sec. Litig.*,
    No. 13-03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014).........................................11

*In re Emergent BioSolutions Inc. Sec. Litig.*,
    No. CV DLB-21-955, 2023 WL 5671608 (D. Md. Sept. 1, 2023)..............................15, 19, 29

*In re Genworth Fin. Inc. Sec. Litig.*,
    103 F. Supp. 3d 759 (E.D. Va. 2015) ............................................................... *passim*

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
    No. 3:21CV444 (DJN), 2023 WL 5538218 (E.D. Va. Aug. 28, 2023) ...................................24

*In re Massey Energy Co. Sec. Litig.*,
    883 F. Supp. 2d 597 (S.D.W. Va. 2012)..............................................................................20

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..................................................................................................28

*In re Talis Biomedical Sec. Litig.*,
    No. 22-CV-00105-SI, 2023 WL 3167844 (N.D. Cal. Apr. 28, 2023) ....................................13

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)..................................................................................21

*Karri v. Oclaro, Inc.*,
    No. 18-CV-03435-JD, 2020 WL 5982097 (N.D. Cal. Oct. 8, 2020)......................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .......................................................................................10, 12

iv

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ...............................................................14, 29

*Leacock v. IonQ, Inc.*,
    No. CV DLB-22-1306, 2024 WL 3360647 (D. Md. July 10, 2024), *aff'd*, 134
    F.4th 153 (4th Cir. 2025) ...............................................................................10

*Lefkoe v. Jos. A. Bank Clothiers*,
    No. CIV WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007) ...........................22, 24

*Levon v. CorMedix Inc.*,
    No. CV 21-14020 (JXN) (CLW), 2025 WL 1810207 (D.N.J. June 30, 2025)......10, 22, 24, 28

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999) ...............................................................................21

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)................................................................................ 1, 15, 16

*McIntyre v. Pedder*,
    No. 3:12-CV-00213-MOC, 2015 WL 5039431 (W.D.N.C. Aug. 26, 2015)......................11, 12

*Ollila v. Babcock & Wilson Enters., Inc.*,
    No. 3:17-CV-109, 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ...........................20, 24, 25, 26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................25

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
    551 F.3d 305 (4th Cir. 2009) ...............................................................................26

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024)................................................................................29

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...............................................................................14, 15, 19

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) ................................................................ *passim*

*Sohovich v. Avalara, Inc.*,
    No. 24-1646, 2025 WL 957895 (9th Cir. Mar. 31, 2025)........................................................23

*Tchatchou v. India Globalization Cap. Inc.*,
    No. CV PWG-18-3396, 2021 WL 307415 (D. Md. Jan. 29, 2021)........................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)................................................................................ *passim*

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ...................................................................2, 11, 27, 30

**Rules**

Local Rule 105.1 ...................................................................................................13

Local Rule 105.3 ...................................................................................................13

## PRELIMINARY STATEMENT[1]

Plaintiffs' allegations of securities fraud are based on the adverse vaccine study results that Elanco submitted to the FDA as part of Zenrelia's approval package, but concealed from Elanco investors throughout the Class Period. Defendants argue that Elanco had no duty to disclose the vaccine study results, but ignore a bedrock principle in the Fourth Circuit—when an executive makes "statements giving a positive impression of [a] company's prospects," the failure to disclose related adverse information is an actionable omission where the omitted facts, if disclosed, would significantly alter the "total mix" of information made available to investors. *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 518-20 (D. Md. 2022) (citing three Fourth Circuit decisions).

Here, Defendants made numerous positive statements during the Class Period concerning Zenrelia's differentiation and contribution to Elanco's revenue and margins, but knowingly failed to disclose related adverse information that contradicted those statements—i.e., vaccine study results about which Defendants were aware since March 13, 2023 showing that "*it is not safe* to administer vaccines in dogs concurrently receiving Zenrelia." (¶50; Dkt. #37-38 at 29). That deliberate (or at least reckless) nondisclosure was a material omission that rendered statements about Zenrelia during the Class Period misleading "by saying one thing and holding back another," and concealing "critical qualifying information." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).

Defendants also contend that Plaintiffs fail to plead a strong inference of scienter. But Plaintiffs need *not* show that the inference of scienter is irrefutable (*i.e.*, "of the 'smoking-gun' genre"), or even "the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues &*

---

[1] "¶_" are references to the Amended Class Action Complaint (Dkt. #29) ("FAC"), "DB" are references to Defendants' brief (Dkt. #37-1), and "Point" are references to the Argument section of this brief. All emphases are added, and quotations and internal citations omitted, unless otherwise noted.

1

*Rts., Ltd.*, 551 U.S. 308, 324 (2007). Instead, Plaintiffs need only show that "the malicious inference is at least as compelling as any opposing innocent inference." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).

Plaintiffs meet that standard. *First*, on a June 16, 2021 conference call, Defendant Jeffrey Simmons introduced Aaron Schacht, Elanco's Executive Vice President, who disclosed that "[p]ivotal studies are underway" with respect to Zenrelia. Those studies plausibly included the vaccine study that had commenced less than two months earlier on April 20, 2021, and thus Simmons was aware of the vaccine study. *Second*, the Class Period statements by Defendants Simmons and Todd Young indicate that they closely monitored the FDA approval process, including the contents of the "package" that Elanco submitted to the FDA, which concededly included the vaccine study. *Third*, Simmons and Young made their misleading statements on multiple conference calls and in multiple presentations with specificity, thus indicating that they had personal knowledge about the topics they discussed; otherwise, they could not have spoken so "confidently" about those topics. *Fourth*, while confidential witness FE-1 left Elanco in early 2022 before the Class Period started, FE-1 was still employed by Elanco while the vaccine study was underway, and thus competent to explain how adverse study results were communicated to Simmons and Young. *Fifth*, Zenrelia was a "core operation" given its centrality to Elanco's innovation strategy, as Defendants repeatedly explained. Considered holistically, these allegations plead a strong inference of scienter at least as compelling as any opposing innocent inference. *See Tellabs*, 551 U.S. at 326 ("court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

2

## FACTUAL BACKGROUND

### A.    Elanco Develops Zenrelia to Treat Pruritis as Part of its Pivot to Innovation

Elanco manufactures and markets pharmaceuticals for pets and farm animals. (¶22). Over time, Elanco has increased the proportion of pet health drugs in its portfolio from 37% of revenues in 2019 to 49% of revenues in 2021. (¶24). In 2021, Elanco began executing a strategy to produce growth through "innovation," i.e., developing and launching new drugs that could develop into "blockbusters," which Defendants defined as annual sales exceeding $100 million. (¶¶26-27; *see also* ¶28 ("Elanco is making the necessary disciplined decisions to stabilize the business and *progress our innovation pipeline.*"); ¶99 ("Our innovation pipeline remains on track, with potential blockbuster products."); ¶112 (defining blockbuster as annual sales of over $100 million)).

One of the pet health conditions that Elanco targeted for a new "blockbuster" drug was pruritis, an itching condition that afflicts dogs. (¶27). As both Defendants Simmons and Young advised analysts, the "number one reason" a pet owner goes to the vet is to treat an itching dog. (¶¶151, 160). For many years, the "incumbent" treatment for pruritis has been a drug known as Apoquel. (¶¶34-36). Launched in 2014, Apoquel sales surpassed $850 million in 2023. (¶36). Apoquel and Zenrelia are what is known as JAK inhibitors that reduce inflammation by inhibiting the activity of enzymes that trigger the itching reaction. (¶¶26 n.5, 34).

On a conference call on June 21, 2021, Defendant Simmons introduced Aaron Schacht, a senior Elanco executive, who announced that Elanco was "progressing an oral JAK inhibitor called ilunocitinib with a similar profile to the market incumbent [i.e., Apoquel]," and that "[p]ivotal studies are underway" to support an FDA submission for drug approval in Q4 2022. (¶177). A slide presented on the call touted Elanco's JAK inhibitor—i.e., Zenrelia—as a "blockbuster." (*Id.*). Thereafter, throughout the Class Period, Defendants continually identified Zenrelia as a "blockbuster" that would help Elanco break into the growing, $1.2-$1.5 billion market to treat

pruritis, and thereby boost Elanco's revenue and margins. (¶¶29, 94, 109, 113, 117, 120).

B.    Elanco's Two-Year Vaccine Study Concludes That It Is Not Safe to Administer Vaccines in Dogs Receiving Zenrelia

One of the studies already underway with respect to Zenrelia as of June 2021 was a vaccine study commenced on April 20, 2021 to evaluate how Zenrelia affects the response to various canine vaccinations. (¶43; Dkt. #37-38 at 26). Sixteen dogs were divided into two groups with half the dogs receiving Zenrelia, and half the dogs receiving a placebo. (¶44; Dkt. #37-38 at 26). Vaccines for rabies and other canine diseases were then administered to both groups. (¶45; Dkt. #37-38 at 26-27). The study found that, beyond adverse reactions requiring euthanization of two dogs in the Zenrelia group, 4 out of the 6 dogs remaining in the Zenrelia group failed to achieve adequate immune responses to the rabies and canine distemper vaccines; in contrast, the dogs in the placebo group experienced far stronger immune responses. (¶¶45-48; Dkt. #37-38 at 27-29).

While the vaccine study was already underway, FE-1—a former Elanco employee holding increasingly senior positions in research and development—was employed by Elanco until Q1 2022 (i.e., January-March 2022). (¶183). FE-1 was involved in early drug development, and thus had knowledge regarding Elanco's practices regarding such development, including how study results were communicated to senior management. (*Id.*). FE-1 reported that Elanco used software that triggered alerts whenever any unexpected developments occurred with respect to a particular drug so that all employees with responsibilities for that drug would become aware of the problem. (¶186). FE-1 further explained that the project head for each drug would then communicate the results "up the food chain." (¶187). FE-1 added that Elanco's CEO and CFO (i.e., Simmons and Young) had a "whole platoon around them and their whole business is making sure they are exposed" to information regarding drug development. (*Id.*). According to FE-1, "[w]hen there is an unexpected development that has a material impact, it is reported to that team," who then inform

4

the CEO and CFO. (*Id.*). Based on FE-1's explanation of how Elanco's drug development and reporting protocols worked while the vaccine study was underway, there is a strong inference that Defendants Simmons and Young became aware of the negative results of the vaccine study as such results were identified.

The vaccine study was completed on March 13, 2023. (Dkt. #37-38 at 26). Based on the adverse outcomes above, the study concluded that "***it is not safe* to administer vaccines in dogs concurrently receiving Zenrelia***." (¶50; Dkt. #37-38 at 29). The study also observed that the "failure of 4 out of 6 dogs to mount an adequate serologic response to the killed rabies vaccine also raises a public health concern, given the serious zoonotic nature of rabies virus infections." (*Id.*). "Zoonotic" means that rabies can spread from dogs to humans. (¶50).

Although the vaccine study concluded on March 13, 2023—before the start of the Class Period on May 9, 2023—Defendants never disclosed the study's adverse results to analysts or investors. Instead, as discussed below, Defendants made exclusively *positive* statements about Zenrelia during the Class Period, thereby misleading investors about Zenrelia's safety (which was a key differentiating attribute).

### C.    Elanco Submits Zenrelia to the FDA for Approval

In late 2022, while the vaccine study was still underway, Elanco submitted Zenrelia to the FDA for approval via a New Animal Drug Application ("NADA"). (¶27). A NADA consists of multiple sections, including a "target animal safety" section that must demonstrate that the applicable drug is safe for the animal species to which it will be administered. (¶31). All NADAs are evaluated by the Center for Veterinary Medicine ("CVM") of the FDA. (¶30). As Defendant Simmons repeatedly explained, the NADA approval process involved rolling iterative submissions. (¶¶91, 106, 120, 146). Thus, as Simmons confirmed, after the vaccine study was completed, it was added to the "package" submitted to the FDA. (¶178; *see also* Dkt. #37-35 at 5

5

(as part of the "package," "we completed what is called a vaccine response study."). Further, as Simmons also repeatedly explained, the approval process entailed constant "dialogue" with the CVM. (¶¶91, 106, 120, 123, 126, 133, 146). Consequently, Defendants were well aware of the status of the NADA for Zenrelia, including the vaccine study results included in the "package."

> **D.**     **During the Class Period, Defendants Make Exclusively Positive Statements About Zenrelia's Differentiation, While Concealing the Adverse Results of the Vaccine Study *Negatively* Differentiating Zenrelia**

Because Apoquel was already so entrenched in the market, analysts repeatedly asked Defendants how Elanco would "differentiate" Zenrelia from Apoquel, *including with respect to safety*. (¶96 ("And then what about differentiation? How should we think about it? You mentioned effectiveness … as being one area that could be addressed. *It could also be safety, particularly with the JAK in terms of what shows up in Apoquel*"); ¶132 ("is there any upside to a delayed filing, maybe a strong label, maybe a more differentiated label with more data?"); ¶153 ("when it comes to … that differentiation piece … could you maybe just kind of like talk about what that means and … [the] level of confidence in the differentiation that you're bringing to market.").

In response, Defendants specified three bases for differentiation—"efficacy, <u>safety</u>, or administration." (¶97). Thereafter, Defendants spoke *positively* throughout the Class Period about Zenrelia's "differentiation." (¶29 ("*we'll be progressing towards a path for three blockbuster products in the first half of 2024. That's what will drive that inflection point to really drive increased growth and margins. Those being … a <u>differentiated</u> JAK inhibitor* [i.e., Zenrelia] and atopic dermatitis a $1.3 billion derm market"); ¶99 ("*Our innovation pipeline remains on track, with potential blockbuster products ... and our <u>differentiated</u> JAK inhibitor for canine dermatology, which upon approval will be known as Zenrelia*"); ¶117 ("Why do people take pets to the [vet]? The top reason is an itching dog. It's a $1.2 billion dollar market, growing double digit, and vets don't have a lot of alternatives. *We're bringing Zenrelia, a JAK1 inhibitor*, it's a

*differentiated asset entering that market.*"); ¶120 ("On the late-stage pipeline, our three *differentiated assets* - Credelio Quattro, *Zenrelia*, and Bovaer are all progressing with the FDA."); ¶126 ("*Our confidence in the differentiation remains. These are great assets.*"); ¶138 ("We continue to expect to bring *differentiated* products to the market [including Zenrelia], with revenue contribution expected from all three new products in the second half of 2024."); ¶144 ("Zenrelia is our JAK inhibitor targeting the control of pruritis and atopic dermatitis in dogs at least 12 months of age. *We remain confident this product will be differentiated from the current market option.* Our market research shows clear interest and desire for additional options *as we will continue to prioritize the optimization of the label to provide the most meaningful differentiation.*"); ¶146 ("*What hasn't changed is we continue to expect the products to be differentiated versus the current offering [i.e., Apoquel].*"); ¶151 ("We're going to be the second company to bring a JAK to the market and we're excited about _positive_ *differentiation* that we think will allow us to penetrate the market in a reasonable way.").

As discussed below, the above statements were rendered misleading by Defendants' failure to disclose that, based on the vaccine study's results, Zenrelia was *negatively* differentiated with respect to safety (one of the three differentiating attributes).

### E.    During the Class Period, Defendants Reassure Investors Concerning Zenrelia's Commercial Prospects Despite Knowing of the Adverse Results of the Vaccine Study

Throughout the Class Period, Defendants touted Zenrelia's anticipated contributions to Elanco's revenue and margins. (¶94 ("With respect to Credelio Quattro, *as well as the JAK inhibitor* [i.e., Zenrelia] *we expect those to be higher margins at the start.*"); ¶109 ("the new products that we've been talking about as they scale, *that has real value to margin from the positive mix component. So overall, we expect to continue to drive gross margin and operating profit higher over the next few years as we launch these big blockbuster products.*"); ¶113 ("[T]hese major

7

blockbusters *are higher margins, in big markets, faster growth rates, much higher mix. That's going to create a lot more EBITDA*."); ¶119 ("We remain encouraged by our three late-stage pipeline products under regulatory review that have a path toward approval in the first half of 2024 and *would be additive to our topline expectations in the second half of the year*."); (¶148) (slide presented indicating that "peak sales expectations [are] intact" for Zenrelia).

As discussed below, the above statements were rendered misleading by Defendants' failure to disclose the vaccine study's adverse results, which would diminish Zenrelia's sales expectations, and reduce margins because of increased marketing spend.

**F.      Defendants Reveal the Vaccine Study's Negative Results to Investors**

On June 27, 2024, before the markets opened, Defendants issued a press release announcing that—based on the vaccine study's adverse results—Zenrelia's label would include a black box warning regarding safety that would "slow the product adoption curve in the U.S. and initially limit the number of expected treatment days by approximately 25%." (¶¶63, 66, 162). On the news, Elanco's stock price fell 20.5%, thus evidencing the materiality of the disclosure. (¶68).

On August 8, 2024, Simmons conceded that the black box warning would sharply increase marketing spend for Zenrelia due to the need to further educate vets concerning Zenrelia. (¶76 & n.9 (conceding that Elanco would be increasing the resources in sales force, the training, and knowledge and opinion leaders for Zenrelia).

On September 19, 2024, the FDA released the contents of the black box warning advising that "Zenrelia should be discontinued at least 28 days to 3 months prior to vaccination and should not be administered for at least 28 days after any vaccination." (¶72). This warning was reinforced with a "Dear Veterinarian" letter advising vets that (i) "the FDA concluded that *it is not safe to administer vaccines in dogs concurrently receiving Zenrelia*," (ii) "the failure of treated dogs to mount an adequate immune response to the killed rabies vaccine raises a public health concern,

8

given the serious zoonotic risk of rabies," and (iii) to mitigate the foregoing risk, Zenrelia should be withheld "for at least 28 days to 3 months before vaccination and for at least 28 days afterward."(¶¶73-74).

To evade the consequences of the black box warning and the FDA's communications with vets, Defendants made false and misleading claims about the safety and effectiveness of Zenrelia, and the vaccine study's results, on Elanco websites and in Elanco marketing materials, as detailed in a scathing letter from the FDA to Defendant Simmons dated January 28, 2025. (¶¶78-79). Among the alleged violations was a failure to include information on websites and in brochures about the "inadequate immune response to any vaccines." (¶79, third and fourth bullet).[2]

## LEGAL STANDARDS

On a 12(b)(6) motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). The Court may not draw inferences Defendants' favor. *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 189, 192, 195 (4th Cir. 2015) (reversing dismissal because inferences drawn in defendant's favor).

## ARGUMENT

### I.     Defendants Misapply the Doctrines of Incorporation-By-Reference and Judicial Notice

In a footnote, Defendants ask the Court to consider thirty-seven exhibits in connection with their motion to dismiss based on the doctrines of judicial notice and incorporation-by-reference.

---

[2] Defendants claim that "Elanco promptly responded to the [FDA's] letter and addressed the FDA's concerns without any adverse consequences," but do not cite any document. (DB at 9 n.5). Having failed to cite a document, Defendants may not sandbag Plaintiffs by citing such a source in their reply. Moreover, even were Defendants to cite such a source, it would be impermissible for the Court to consider it on a motion to dismiss to contradict the well-plead allegations in the Complaint. *See* discussion *infra* at Point I in the Argument.

(DB at 4 n.1). Several of those Exhibits, however, should either be stricken or disregarded because they do not meet the requirements for consideration under either doctrine.

"A document is incorporated into the complaint by reference if it is 'integral to *and* explicitly relied on in the complaint' *and* if the plaintiffs do not challenge its authenticity." *Leacock v. IonQ, Inc.*, No. CV DLB-22-1306, 2024 WL 3360647, at *12 n.8 (D. Md. July 10, 2024), *aff'd*, 134 F.4th 153 (4th Cir. 2025). A "document is integral to the complaint where the complaint relies *heavily* upon its terms and effect." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002)).

Here, Exhibits (i) 3 (Dkt. #37-6), (ii) 4 (Dkt. #37-7), (iii) 14 (Dkt. #37-17), (iv) 34 (Dkt. #37-37), and (v) 38 (Dkt. #37-41) are not referenced at all in the AC. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1007 (9th Cir. 2018) ("the Complaint does not reference or identify this press release at all.").[3] And while Exhibit 37 (Dkt. #37-40) is cited as support for an ancillary fact (¶13), that fleeting reference is "not enough to incorporate [that] document[], wholesale, into the complaint." *Goines*, 822 F.3d at 166.[4]

Further, to the extent the Court considers any of the other Exhibits referenced in the Complaint, "it is *inappropriate* to treat the contents of [those] document[s] as true," to the extent that Plaintiffs cite those documents "for purposes other than the truthfulness of the document[s]." *Goines*, 822 F.3d at 167; *see also Khoja*, 899 F.3d at 1003, 1014 ("improper to assume the truth

---

[3] Exhibit 14 is a presentation from the J.P. Morgan Healthcare Conference on January 9, 2024. While the Complaint cites the transcript from that conference (¶¶105, 108-09), which Defendants submit as Exhibit 13 (Dkt. #37-16), the Complaint does not cite the presentation submitted as Exhibit 14.

[4] Defendants' reliance on Exhibits 34 and 38 is also improper because the question is not whether Zenrelia achieved success after the Class Period despite the vaccine study's adverse outcomes, but whether in light of the vaccine study's adverse outcomes, Plaintiffs adequately allege that Defendants made materially misleading statements during the Class Period with scienter. *See Levon v. CorMedix Inc.*, No. CV 21-14020 (JXN) (CLW), 2025 WL 1810207, at *7 (D.N.J. June 30, 2025) ("Defendants' argument that ROVI later passed inspection is irrelevant at the pleading stage, where the question is whether the Complaint supports a strong inference of scienter at the time of the alleged misstatements.").

of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint" since the "incorporation-by-reference doctrine does not override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage."). Thus, to the extent Plaintiffs cite documents for purposes of identifying false and misleading statements made by Defendants during the Class Period rather than for the truth of those documents (¶¶81-161), it would be improper to treat the contents of those documents as true. *See In re ECOtality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 WL 4634280, at *3 n.2 (N.D. Cal. Sept. 16, 2014) ("were the Court to assume the truth of all documents incorporated by reference into the CAC, that would mean assuming the truth of all of Defendants' allegedly false or misleading statements. That cannot be the intended result of the cases Defendants cite, or it would be impossible ever to successfully plead a fraud claim.").[5]

The same principles apply to the judicial notice doctrine—"the content of a noticed document may not be used to contradict well-pleaded allegations in the complaint," and instead must be construed "in the light most favorable to the plaintiffs." *Tchatchou v. India Globalization Cap. Inc.*, No. CV PWG-18-3396, 2021 WL 307415, at *5 (D. Md. Jan. 29, 2021); *see also Zak*, 780 F.3d at 607 (court may not consider contents of a public record as an established fact and as evidence contradicting the complaint); *McIntyre v. Pedder*, No. 3:12-CV-00213-MOC, 2015 WL 5039431, at *7 (W.D.N.C. Aug. 26, 2015) ("Should the court consider such relevant facts from the public record, however, the court is required to construe them in the light most favorable to the plaintiffs."). These principles apply with even greater force to documents such as SEC filings and call transcripts that set forth Defendants' own assertions, since "it is these very filings which have

---

[5] Likewise, the Court should not accept as true the assertion in the William Blair analyst report (Dkt. #37-33 at 1) that a "box-label warning on Zenrelia" was not "previously expected." If anything, Defendants' awareness of the vaccine study's adverse results makes it reasonable to infer that a black box warning was expected.

11

led [plaintiffs] to bring their action based on misrepresentation, false statements, and lack of full disclosure." *McIntyre*, 2015 WL 5039431, at *6. "[T]he value or weight the court should afford any of [the] statements [in these documents] cannot be determined until such statements have been vetted through the discovery process." *Id.*; *see also Khoja*, 899 F.3d at 1006 (defendant "improperly asked the district court to engage in fact-finding in the course of deciding the sufficiency of the Complaint.").

In sum, Defendants' voluminous exhibits perfectly illustrate the need for courts to guard against the "temptation [of defendants] to pile on numerous documents to their motion[] to dismiss to undermine the complaint," and "unscrupulous use of extrinsic documents to resolve competing theories against the complaint," thereby risking "premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.* at 998. "This risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard." *Id*.

## II.    Defendants' "Chart" (Dkt. #37-4) Should be Stricken or Disregarded

In support of their Motion, Defendants submitted a ten-page chart listing the challenged statements in the FAC. Dkt. #37-4. The chart copies and pastes each of the challenged statements in the FAC into the chart, and then purports to provide the "reasons" why each is not actionable. But for many of the challenged statements listed in the chart, there is no corresponding argument in Defendants' brief. Effectively, Defendants conclusorily assert that these statements are inactionable for the reasons provided simply because they say so.

For instance, the brief identifies five paragraphs in the FAC containing challenged statements purportedly protected by the PSLRA's safe harbor for forward-looking statements. DB at 19 (citing ¶¶88, 94, 117, 123, 154). A footnote (DB at 19 n.14) then directs the Court to the chart, which purports to extend this argument to *twenty-three* additional statements in the FAC (*see* Dkt. #37-4 (conclusorily asserting that the false statements in ¶¶82, 85, 91, 97, 99, 103, 106,

109, 112, 113, 116, 119, 120, 129, 136, 138, 140, 142, 144, 146, 148, 151, and 157 are "Forward-Looking")). But there is no argument in the brief explaining why any of the additional challenged statements in those paragraphs are forward-looking. (DB at 19-22).

Likewise, the brief identifies seven paragraphs in the FAC containing challenged statements purportedly inactionable as opinions. DB at 23 (citing ¶¶123, 142, 85, 133, 129, 144, 103). A footnote (DB at 23 n.17) then directs the Court to the chart, which purports to extend this argument to *twenty-four* additional statements in the FAC (*see* Dkt. #37-4 (conclusorily asserting that the false statements in ¶¶82, 88, 91, 94, 97, 99, 106, 109, 112, 113, 116, 117, 119, 120, 126, 136, 138, 140, 146, 148, 151, 154, 157, and 160 are "Opinions")). But there is no argument in the brief explaining why any of the additional challenged statements in those paragraphs are opinions. (DB at 22-25).

Because Defendants' chart does not summarize arguments already made in the brief, and instead asserts that numerous statements are inactionable for the specified reasons *without any corresponding argument in the brief*, the chart violates the Court's Local Rules. Those Rules provide that the reasoning and authorities supporting an opposition to a motion shall be set forth in a memorandum (L.R. 105.1), and that such memoranda are limited to thirty pages unless otherwise ordered (L.R. 105.3). Here, Defendants use the chart to add "arguments" outside the brief, thereby exceeding the page limits in the Local Rules. As such the Court should either strike or disregard the chart. *See In re Talis Biomedical Sec. Litig.*, No. 22-CV-00105-SI, 2023 WL 3167844, at *1 n.1 (N.D. Cal. Apr. 28, 2023) (disregarding chart at Dkt. #107-10 entitled "Summary of Statements Challenged Under Section 11 of the Securities Act of 1933" because it "improperly contain[ed] legal argument that is required to be in defendants' motion"); *Cheng Jiangchen v. Rentech, Inc.*, No. CV 17-1490-GW(FFMX), 2017 WL 10363990, at *4 (C.D. Cal.

13

Nov. 20, 2017) (striking chart consolidating allegedly false and misleading statements because it "allows Defendants to make further arguments in violation [of the page limits] of [a] Local Rule.").

## III.    The FAC Adequately Alleges a Section 10(b) Claim

To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018). Here, Defendants challenge only the first two of these elements: falsity and scienter.

The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Burt v. Maasberg*, 2014 WL 1291834, at *13 (D. Md. Mar. 28, 2014). Plaintiffs have done so here. (¶¶81-161).

### A.    The FAC Adequately Pleads Falsity

Under the PSLRA, a plaintiff need not "*prove* the falsity of the alleged misrepresentations at the pleading stage." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015). Instead, when a plaintiff alleges "sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element." *Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015). "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken*, 155 F. Supp. 3d at 601.

#### 1.    Defendants' Class Period Statements Misled Investors By Concealing the Vaccine Study's Adverse Results.

Defendants argue that Elanco had no duty to disclose the vaccine study results. (DB at 13). But in the Fourth Circuit, when an executive makes "statements giving a positive impression of

14

the company's prospects," the failure to disclose related adverse information is an actionable omission where the omitted facts, if disclosed, would significantly alter the "total mix" of information made available to investors. *Sinnathurai*, 645 F. Supp. 3d, at 518-20 (citing three Fourth Circuit decisions). That is, once a party speaks on a topic, they have an obligation to tell the whole truth. *Singer*, 883 F.3d at 442; *accord Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020) (*Singer* requires a company to tell "the whole, material truth about a topic if it chooses to speak about it."); *see also Macquarie*, 601 U.S. at 263 (omission renders a statement misleading when the statement "say[s] one thing and hold[s] back another," and conceals "critical qualifying information."); *In re Emergent BioSolutions Inc. Sec. Litig.*, No. CV DLB-21-955, 2023 WL 5671608, at *13 (D. Md. Sept. 1, 2023) (plaintiffs alleged a misleading omission based on statements asserting that facility could rapidly manufacture vaccines in large quantities, but concealing problems at facility that jeopardized large-scale manufacturing).

Here, Defendants' failure to disclose the vaccine study's adverse results rendered three types of Class Period statements misleading: the statement that there was "no real news here" ("News Statement"), the statements about how Elanco would differentiate Zenrelia from Apoquel ("Differentiation Statements") (*see* Factual Background §D), and statements about the extent to which Zenrelia would boost Elanco's revenue and margins ("Revenue/Margin Statements") (*see* Factual Background §E).

### *News Statement*

On January 9, 2024, at the J.P. Morgan Healthcare Conference, an analyst asked for an "update on the regulatory front." (¶105). Defendant Simmons responded: "the three [which included Zenrelia] that are submitted under the FDA … ***no real news here. And that's good news***." (¶106). The statement "no real news here [and] that's good news" was plainly misleading because

15

of the failure to disclose the vaccine study, which concluded that it is not safe to administer vaccines to dogs taking Zenrelia, was concededly submitted to the FDA as part of Zenrelia's "package" (¶178), and was plainly *very bad news*. Not surprisingly, because the News Statement is so black-and-white, Defendants do not challenge it anywhere in their brief as puffery, forward-looking, or an opinion.

### *Differentiation Statements*

After analysts inquired about how Zenrelia would be differentiated from Apoquel (¶96), Defendants specified three bases for differentiation, including "safety." (¶97). Thereafter, Defendants chose to speak positively about Zenrelia's "differentiation" throughout the Class Period. (Factual Background §D). The Differentiation Statements, however, failed to disclose that the vaccine study's adverse results *negatively* differentiated Zenrelia as to safety. (*See* ¶50 (vaccine study concluded as of March 2023 that "***it is not safe* to administer vaccines in dogs concurrently receiving Zenrelia**.")). Defendants thus failed to tell the "whole truth"—they continually expressed confidence about Zenrelia's differentiation (*e.g.*, ¶126 ("*Our confidence in the differentiation remains. These are great assets.*"); ¶144 ("*We remain confident [Zenrelia] will be differentiated from the current market option*"); ¶151 ("we're excited about [Zenrelia's] *positive* differentiation"), but concealed "critical qualifying information"—i.e., the vaccine study's adverse outcomes—that *negatively* differentiated Zenrelia as to safety. *See Macquarie*, 601 U.S. at 263.

Defendants contend that they declined to make any "*specific* representations" about differentiation until FDA approval for "competitive reasons." (DB at 6). Not so. Defendants concede that Simmons specified "safety" as one of the three attributes for differentiating Zenrelia from Apoquel. (*Id.*). Moreover, as shown, in the Fourth Circuit, an omission is actionable even in the absence of a specific false statement, if the omission concerns adverse information that renders

16

statements conveying a positive impression misleading. *Sinnathurai*, 645 F. Supp. 3d at 518. Here, the Differentiation Statements conveyed a positive impression about Zenrelia's differentiation. (e.g., ¶29 ("*we'll be progressing towards a path for three blockbuster products ... to really drive increased growth and margins. Those being … a differentiated JAK inhibitor* [i.e., Zenrelia]"); ¶97 ("*differentiation in our market either comes back to efficacy, safety, or administration*"); ¶126 ("*Our confidence in the differentiation remains. These are great assets.*"); ¶151 ("we're excited about *positive differentiation*"). Defendants, however, concealed the vaccine study's adverse results *negatively* differentiating Zenrelia with respect to the safety attribute, thereby creating the false impression that no such adverse information existed.[6]

Finally, Defendants' excuse for not providing more specifics concerning differentiation—"competitive reasons" (DB at 6)—was a red herring. Instead, Defendants failed to disclose more specifics because they did not want investors to know that, based on the vaccine study's adverse results, Zenrelia was *negatively* differentiated on the safety attribute. But once the FDA added a black box warning to Zenrelia because of the vaccine study's results, and the "cat was out of the bag," Defendants confirmed that Zenrelia was only "positively differentiated for effectiveness and convenience," but negatively differentiated with respect to "safety." (¶162).

---

[6] Defendants cite authorities purportedly rejecting the proposition that adverse information like the vaccine study results must be disclosed (DB at 15), but they are inapt. In *Emps'. Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369 (4th Cir. 2023), the Fourth Circuit held that defendants were not obligated to disclose a graph that was allegedly inconsistent with positive statements concerning certain data but only because the "graph was not a fact contrary to Defendants' positive statements." *Id.* at 385. Here, in contrast, the vaccine study's adverse results concerning safety was sharply inconsistent with the rosy picture that Defendants painted during the Class Period concerning Zenrelia's differentiation (of which one of the attributes was "safety").

In *Chapman v. Fennec Pharms., Inc.*, No. 1:20CV812, 2021 WL 7209981 (M.D.N.C. Dec. 16, 2021), the statements about commercial readiness to launch "did not contain enough substantive information to trigger [an] obligation to disclose the bad facts that could have prevented or delayed [the] launch." *Id.* at *10. Here, in contrast, Defendants specified that "safety" was one of three attributes that could differentiate Zenrelia, and then made unambiguously positive statements about Zenrelia's prospects for differentiation throughout the Class Period without disclosing that data *negatively* differentiating Zenrelia with respect to safety had already emerged no later than March 2023 from the vaccine study.

17

### *Revenue/Margin Statements*

Throughout the Class Period, Defendants made positive statements about Zenrelia's anticipated contributions to Elanco's revenue and margins. (Factual Background §E). But given Defendants' awareness of the vaccine study's negative results (*see* Factual Background §§B-C *supra*), the Revenue/Margin Statements were knowingly false, or at least reckless, since the vaccine study's conclusion that "*it is not safe to administer vaccines in dogs concurrently receiving Zenrelia*" would obviously negatively impact Zenrelia sales, and reduce margins by compelling Elanco to spend significantly higher sums on marketing to vets. Indeed, after the news broke that the vaccine study's adverse results had caused the CVM to add a "black box" warning to Zenrelia's label (¶162), one analyst reduced Zenrelia's revenue expectations *by 50%* across 2024-2027E (¶67), and Defendants admitted that marketing expenses would rise dramatically to support increased "veterinary education." (¶76).

Defendants argue that Plaintiffs' allegations rest on hindsight because there are no allegations that "Defendants knew that a warning label or other adverse consequences would result from the study." (DB at 16). But Defendants knew (or were reckless in not knowing) about the vaccine study's adverse results concerning safety as early as March 2023, and—given the serious public health concern posed by the inadequate immune response to the rabies vaccine—it is implausible that Defendants would not have foreseen that the vaccine study's negative results would lead to marketing restrictions. Indeed, having known (or being reckless in not knowing) about the vaccine study's adverse results concerning safety, Defendants could not have legitimately believed that the FDA would permit Elanco to freely market—without restrictions— a drug that could cause rabies transmission from dogs to humans. (*See* ¶74 ("the failure of treated dogs to mount an adequate immune response to the killed rabies vaccine raises a public health

18

concern, given the serious zoonotic risk of rabies."). Indeed, as Elanco's Veterinarian and Dermatology Medical Strategic Lead, Mara Tugel, acknowledged on September 20, 2024, "[r]abies is the primary public health concern when you think about veterinary medicine. (¶180). *See Emergent*, 2023 WL 5671608, at *20-21 (fraud by hindsight argument failed where plaintiffs alleged that defendants knew about the problems at key manufacturing facility).

Defendants also assert that they "*expressly* warned of the *precise* risks that Plaintiffs allege was concealed." (DB at 15). Not at all—the risk disclosures that Defendants cite were generic, and in the Fourth Circuit, a "generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Singer*, 883 F.3d at 442. In other words, a company cannot disclose "the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Id.*; *accord Emergent*, 2023 WL 5671608, at *17-19 (general risk disclosures insufficient where defendant failed "to disclose risks that actually materialized"). Here, Defendants already knew *before* the start of the Class Period that it was "not safe to administer vaccines in dogs concurrently receiving Zenrelia," and thus the risks disclosed had already materialized. In particular, what had materialized was that Zenrelia would be unsafe for dogs receiving the rabies vaccine, which posed a public health risk since rabies can be transmitted from dogs to humans.

### 2.    Defendants' Misleading Statements Were Not Puffery

Defendants claim the Differentiation Statements and Revenue/Margin Statements are inactionable puffery. (DB at 18-19). Statements are inactionable puffery, however, only when containing vague language that cannot be proven true or false. *Emergent*, 2023 WL 5671608, at *16. When a company makes "specific statements" about product attributes that "could be proven true or false," the statements are not puffery. *Id.* at *17 ("specific statements about the Bayview

19

facility's layout and capacity … could be proven true or false and cross the line from puffery into material statements."); *see also Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) (statements that can be proven true or false are not puffery); *Cambridge*, 496 F. Supp. 3d at 964 (same) *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D.W. Va. 2012) (same).

Moreover, the bar for dismissing based on puffery is high—"even if some statements may appear to be puffery, that is not enough; while courts may determine on a motion to dismiss that a given statement constitutes puffery, it should only do so if "*no relief could be granted under any set of facts*." *Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-CV-109, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018). The bar is high because the reason that puffery is inactionable is because it is immaterial (*Sinnathurai*, 645 F. Supp. 3d at 514), and materiality is "an inherently fact-specific finding," and thus "assessments of materiality are in most cases peculiarly ones for the trier of fact" (*In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019)). Therefore, "[r]esolving a question of materiality against the plaintiff at the motion to dismiss stage is inappropriate unless no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Id.*

Here, under the standards above, the Differentiation Statements and the Revenue/Margin Statements were clearly not puffery. Preliminarily, Defendants do not argue anywhere in their *brief* that (i) the Differentiation Statements in paragraphs 97, 117, 120 and 126 of the FAC, or (ii) the Revenue/Margin Statements in paragraphs 94, 113 and 148 of the FAC, are inactionable puffery. Instead, the chart at Dkt. #37-4 sets forth conclusory assertions with respect to these paragraphs.

At any rate, none of the Differentiation Statements in the FAC are puffery because whether Zenrelia was positively differentiated from Apoquel on any of the three relevant attributes— efficacy, safety, or administration—was a factual question that could be proven true or false.

20

Indeed, the whole point of the vaccine study was to evaluate whether Zenrelia could be positively differentiated with respect to safety by evaluating how Zenrelia affects the response to various canine vaccinations (¶43; Dkt. #37-38 at 26). The study concluded that "***it is not safe to administer vaccines in dogs concurrently receiving Zenrelia***" (¶50; Dkt. #37-38 at 29), thus establishing that Zenrelia was *negatively* differentiated with respect to safety.[7] That analysts asked specifically about the differentiation of Zenrelia confirms that the issue was material. (¶96).

The Revenue/Margin Statement in paragraph 109 of the FAC challenged in Defendants' brief as puffery could also be demonstrated as true or false. Paragraph 109 referenced the statement that "we expect to continue to *drive gross margin and operating profit higher* over the next few years as we launch these big blockbuster products," which was proven false once the vaccine study's adverse results were revealed. As Defendants admitted, the "black box" warning added to Zenrelia's label as a result of the vaccine study (¶162) would cause marketing expenses to rise sharply in order to support increased "veterinary education" (¶76), thus proving false the statement

---

[7] The Differentiation Statement in paragraph 151 of the FAC—"we're excited about positive differentiation"— is not puffery under Fourth Circuit precedent. While *MacroGenics* held that "positive" and "excited" are textbook examples of puffery (61 F.4th at 386), the Fourth Circuit has also held that whether a statement is puffery is context dependent, and the key test is whether the content of the statement is "factual," i.e., capable of being proved true or false. *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (observing that in appropriate contexts words like "high value" and "fair" were not puffery). Here, the context differs from the context in *MacroGenics* for two reasons. *First*, the focus here is *not* on the optimism conveyed by the word "excited," but on the word "positive," which modifies differentiation. *Second*, the issue with the word "positive" is not that it falsely conveyed optimism, but that it misled investors by conveying a false impression about the true state of affairs; namely, that Zenrelia was *negatively* differentiated with respect to safety based on the vaccine study. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 222 (S.D.N.Y. 2022) (statements that may be puffery in one context are not puffery in a context where the aim is to convey to investors "the true state of affairs at the Company."). Further, whether Zenrelia was *positively* differentiated at the time that the statement in paragraph 151 was made was a factual question that could be proven true or false, and had already been proven false by the vaccine study with respect to the safety attribute. Thus, based on context, the statement identified in paragraph 151 of the FAC was not puffery.

Likewise, in context, the statements in paragraphs 126, 144 and 146 expressing confidence in Zenrelia's differentiation were not puffery because they were made against the backdrop of analyst inquiries into how Elanco would differentiate Zenrelia from Apoquel. *See Hawes v. Argo Blockchain plc*, No. 23-CV-7305 (CM), 2024 WL 4451967, at *12 (S.D.N.Y. Oct. 9, 2024) ("while statements of confidence are ordinarily deemed puffery, a company's statement that it is 'confident of its capacity to meet its anticipated obligations' … can be false or misleading when made against the backdrop of an alleged liquidity crisis.").

that Zenrelia would "drive gross margin and operating profit *higher*." *See In re 2U, Inc. Sec. Class Action*, No. CV TDC-19-3455, 2021 WL 3418841, at \*15-16 (D. Md. Aug. 5, 2021) (statements about margins were not inactionable sales puffery"); *Lefkoe v. Jos. A. Bank Clothiers*, No. CIV WMN-06-1892, 2007 WL 6890353, at \*5 (D. Md. Sept. 10, 2007) (specific statements concerning forecasts of growth in earnings and sales, and confidence in inventory were not puffery).[8]

### 3.     The PSLRA Safe-Harbor For Forward-Looking Statements Does Not Protect Defendants' Misleading Statements

Defendants argue that "[n]early every challenged statement here was forward-looking" (DB at 19), but only press this argument in their brief with respect to just a handful of statements. (*Id.* (citing ¶¶88, 94, 117, 123, 154)). Only two of these—paragraphs 94 and 117—relate to the Revenue/Margin and Differentiation Statements, respectively.

Under the PSLRA's safe-harbor provision, statements are protected only if they are forward-looking and are either accompanied by "meaningful cautionary statements," or made without "actual knowledge" of their falsity. *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 787 (E.D. Va. 2015). Based on these elements, none of the Differentiation or Revenue/Margin Statements are protected by the safe harbor for forward-looking statements.

*First*, the Revenue/Margin and Differentiation Statements cannot be protected by the safe harbor because the issue here is not what those statements affirmatively conveyed, but what Defendants failed to disclose that rendered those statements misleading. *Levon v. CorMedix, Inc.*, No. CV 21-14020 (JXN) (CLW), 2025 WL 1810207, at \*6 (D.N.J. June 30, 2025) (the issue is "not what the [forward-looking statements] state, but rather what [they] *fail* to caution.")

---

[8] In *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018), statements regarding "confiden[ce] in these products" and being "on track" for commercial launch did not address regulatory approval and the context, present here, of related misrepresentations reassuring investors the regulatory approval process was "going well" with "no change."

(emphasis in original). Thus, the whole concept of "forward-looking statements" does not apply.

*Second*, a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Genworth*, 103 F. Supp. 3d at 789; *see also In re Constellation Energy Grp., Inc., Sec. Litig.*, 738 F. Supp. 2d 614, 626 (D. Md. 2010) (same). Here, the Differentiation Statements were statements of present fact concerning the state of Zenrelia's differentiation. (e.g., ¶99 ("*our differentiated JAK inhibitor . . . will be known as Zenrelia*"); ¶117 ("*We're bringing Zenrelia, a JAK1 inhibitor, it's a differentiated asset entering that market.*"); ¶126 ("*Our confidence in the differentiation remains.*"); ¶151 ("excited about *positive differentiation*").

The Revenue/Margin Statements are also statements of present fact because rather than providing specific numeric forecasts about the projected amount of Zenrelia sales or margins, they conveyed Defendants' present expectations and beliefs that Zenrelia sales would be additive to revenue, and drive higher margins. (¶94 (expecting "*higher margins*"); ¶109 ("*we expect to continue to drive gross margin and operating profit higher*"); ¶113 ("[T]hese major blockbusters *are higher margins, in big markets, faster growth rates, much higher mix. That's going to create a lot more EBITDA.*"); ¶119 (expecting products "*would be additive to our topline expectations in the second half of the year.*"); ¶148 ("peak sales expectations [are] intact"). *See Sohovich v. Avalara, Inc.*, No. 24-1646, 2025 WL 957895, at *1 (9th Cir. Mar. 31, 2025) (statements of present belief in projections not protected by safe harbor); *Baum v. Harman Int'l Indus., Inc.*, 575 F.Supp.3d 289, 298 (D. Conn. 2021) (same); *Karri v. Oclaro, Inc.*, No. 18-CV-03435-JD, 2020 WL 5982097, at *5 (N.D. Cal. Oct. 8, 2020) (same).

*Third*, to the extent any statements qualify as forward-looking, any accompanying cautionary language was not meaningful because Defendants already knew *before* the start of the

23

Class Period that it was "not safe to administer vaccines in dogs concurrently receiving Zenrelia," and thus the risks disclosed had already materialized. *See 2U*, 2021 WL 3418841, at \*14 ("the only provided warnings referenced risks in broad terms as potential future dangers[,]" failing to disclose risks that were already known, and thus were not meaningful); *Ollila*, 2018 WL 792069, at \*5 ("cautionary language is meaningless if it warns only of risks which have already materialized); *Genworth*, 103 F. Supp. 3d at 790 (cautionary language not meaningful where "defendants know that the potential risks they have identified have in fact already occurred and that the positive statements they are making are false."); *see also Levon*, 2025 WL 1810207, at \*5 ("Boilerplate disclaimers that warn of general risks that accompany investments are not sufficient to immunize a defendant from liability.").

*Fourth*, "the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss." *Lefkoe*, 2007 WL 6890353, at \*5 n.10; *see also In re James River Grp. Holdings, Ltd. Sec. Litig.*, No. 3:21CV444 (DJN), 2023 WL 5538218, at \*16 (E.D. Va. Aug. 28, 2023) ("district courts in the Fourth Circuit have hesitated to rule on the adequacy of cautionary language at the motion to dismiss stage").

*Fifth*, Defendants did not issue any cautionary language at industry conferences (e.g., ¶150) or during media appearances (e.g., ¶111), as they concede. *See* DB at 21 n.16 (arguing that cautionary language was "incorporated into each and every press release, SEC filing, and quarterly earnings call" only).

*Sixth*, based on (i) the software and other protocols employed at Elanco to alert senior management of adverse events affecting drug development, and (ii) the inclusion of the vaccine study in the "package" submitted to the FDA (*see* Factual Background §§B-C *supra*), Defendants had "actual knowledge" that the relevant statements were misleading by virtue of failing to

24

disclose the vaccine study results. Thus, the safe harbor also does not apply for that reason.

### 4.    Defendants' Misleading Statements Are Actionable Even if Deemed Statements of Opinion.

Defendants argue that "nearly all" of their misstatements are non-actionable opinions statements. DB at 22-23. As noted, Defendants' brief develops this argument with respect to only a handful of statements, referring to their improper chart for the remainder. *See* Point II *supra.*

Preliminarily, to the extent the Differentiation and Revenue/Margin Statements are not prefaced by qualifiers such as "we believe" or "we think," and instead convey a sense of certainty, they are not statements of opinion. *See Genworth*, 103 F. Supp. 3d at 779 ("Defendants' statements do not contain the words 'believe' or 'think,' but instead suggest a greater sense of certainty.").

Further, even if the Differentiation and Revenue/Margin Statements are opinions, they are actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). *First*, Plaintiffs adequately allege that Defendants could not have sincerely held the opinion that Zenrelia was positively differentiated, and that Zenrelia would boost sales and margins (with "faster growth rates," ¶113, and "higher margins at the start," ¶94), given their knowledge of the vaccine study's adverse results. (Factual Background §§B-C *supra*); *see Omnicare*, 575 U.S. at 184 (for opinion to be inactionable, speaker must actually hold the stated belief); *Ollila*, 2018 WL 792069, at *6 (statements of opinion actionable under *Omnicare* if "plaintiff alleges that they were not sincerely held").

*Second*, because the vaccine study's adverse results showed that Zenrelia was *negatively* differentiated as to safety—which would foreseeably diminish sales, and reduce margins by compelling Elanco to spend significantly more on marketing (*see* Factual Background §F)—the Differentiation and Revenue/Margin Statements did not "fairly align[] with the information in the [Defendant's] possession at the time" they were made. *Omnicare*, 575 U.S. at 189.

25

*Third*, when making the Differentiation and Revenue/Margin Statements, Defendants failed to disclose the vaccine study's adverse results to investors. *See 2U*, 2021 WL 3418841, at *11 ("An opinion stating a belief may form the basis of a material omission *if the speaker omits facts about the speaker's knowledge concerning a statement of opinion that conflict with what the investor would take from the statement itself*, because a reasonable investor could understand the statement to convey facts about the speaker's basis for holding the opinion."); at *16 ("an opinion statement could be actionable based on a material omission if it … omits material facts about the speaker's "inquiry into or knowledge concerning a statement of opinion."). Had Defendants disclosed the vaccine study's adverse results to investors, they would have understood that Defendants' "expressed, continuing confidence" in Zenrelia's positive differentiation "was misplaced," and that the expectations that Zenrelia would contribute to increased sales and higher margins "were in jeopardy." *Id.* at *11; *see also id.* at *21 ("Plaintiffs have identified specific facts . . . available to [defendants] that in fact provided a reason not to believe in the goals, the omission of which made the opinion statement at issue "misleading to a reasonable person.").

### B.    The FAC Adequately Pleads a Strong Inference of Scienter

Scienter may be alleged by "pleading not only intentional misconduct, but also recklessness." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009). The Fourth Circuit has adopted an approach requiring allegations of scienter to be evaluated "holistically" and afforded "the inferential weight warranted by context and common sense." *Ollila*, 2018 WL 792069, at *2.

Importantly, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Instead, "the reviewing court must [simply] ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter

26

at least as strong as any opposing inference?" *Id.* at 326. "When making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint" and "a plaintiff generally must frame the facts [of the case] without the benefit of discovery." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002).

In *Zak*, the Fourth Circuit found that plaintiffs adequately alleged a "strong inference of intentional or reckless conduct" based on allegations that "material, non-public information known to the defendants about the status of [their] new drug application and required efficacy studies conflicted with the defendants' public statements on those subjects." 780 F.3d at 609. As the Fourth Circuit concluded, the plaintiffs' allegations "permit a strong inference that the defendants either knowingly or recklessly misled investors by failing to disclose critical information" in their possession concerning the drug at issue. *Id.* at 610. Here, as shown, the Individual Defendants knowingly or recklessly failed to disclose the vaccine study's adverse results to investors.

Further supporting a strong inference of scienter are the allegations concerning FE-1, a former Elanco employee who worked at Elanco while the vaccine study was underway. (¶¶43, 183). In a case citing *Zak*, this Court found that a strong inference of scienter was adequately pleaded where allegations established that the adverse information omitted by Defendants "was communicated up to senior management," such as where "the former [] Senior Director of Clinical Operations who was responsible for overseeing the company's U.K. clinical trials, reported that manufacturing issues were generally brought to the attention of Chief Medical Officer Filip Dubovsky, who in turn discussed the issues with [the CEO]" who made alleged misstatements. *Sinnathurai*, 645 F. Supp. 3d at 525. As the Court explained, "[a] demonstration that the relevant information generally flowed to senior company officials making the public statements [via an

27

information chain] provides some evidence of scienter." *Id*. (citing cases supporting allegations of an "information chain" between lower level employees and management as sufficient to plead scienter); *see also Levon*, 2025 WL 1810207, at *8 ("internal reports containing negative data can support scienter when executives make contrary public statements, particularly where confidential witnesses corroborate the executives' access to such information.").

Here, FE-1 described the process by which any test results that were unexpected or indicated a risk or delay for any drug in development was communicated to senior management (¶¶184-87), thus establishing a strong inference that the Individual Defendants were aware of the results of the vaccine study. Defendants argue that FE-1 left Elanco before the Class Period started (DB at 28), but ignore that the relevant time period for purposes of establishing the Individual Defendants' knowledge of the vaccine study's results is between April 20, 2021 and March 13, 2023, when the vaccine study was underway, and FE-1 worked at Elanco during that time period until early 2022. (¶¶43, 183; Dkt. #37-38 at 26); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period information relevant "to confirm what a defendant should have known during the class period").

Defendants also argue that direct interactions between FE-1 and the Individual Defendants is not alleged, but that is not required. *Sinnathurai*, 645 F. Supp. 3d at 526 ("[w]hile the CWs do not allege that they personally provided specific problematic information to [the CEO]," allegations of scienter need not provide "smoking-gun" evidence.") (citing *Tellabs*).[9]

---

[9] While *In re Conventry Healthcare, Inc. Sec. Litig.*, No. 08:09-CV-2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011) declined to find a strong inference of scienter because of an absence of "direct contact" between the confidential witnesses and the individual defendants (*id.* at *6), *Conventry* failed to consider the admonition in *Tellabs* that "smoking gun" evidence is not required to establish a strong inference of scienter. 551 U.S. at 324. Defendants also cite *In re DXC Tech. Co. Sec. Litig.*, No. 118CV01599AJTMSN, 2020 WL 3456129, at *11 n. 11 (E.D. Va. June 2, 2020), *aff'd*, 19 F.4th 601 (4th Cir. 2021) (DB at 28), but *DXC* does not contain any analysis of the issue.

28

Further supporting a strong inference of scienter are the public statements of Simmons and Young during the Class Period on earnings calls and at conferences indicating that they were (i) aware of the contents of the "package" submitted to the FDA (which concededly included the vaccine study results; ¶178), and (ii) closely monitoring the progress and status of the approval process for Zenrelia through "Ellen" (i.e., Ellen de Brabander, Elanco's Executive Vice President of Innovation and Regulatory Affairs, who served on Elanco's Executive Committee with Simmons and Young). (*See* ¶¶85, 88, 129, 168-70). *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9-10 (1st Cir. 2021) (fact that CEO and CFO touted new product on conference calls and at conferences raised a strong inference that they either inquired about the product before promoting it or were reckless in failing to do so, and thus could be charged with knowledge that the product never worked); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024) (specificity of defendants' statements concerning specific topics is strong circumstantial evidence that they were receiving information about those topics, or were reckless in suggesting they did); *Cambridge*, 496 F. Supp. 3d at 967 n.17 ("Since the aim of earnings calls is to inform investors, making false and misleading statements on earnings calls further supports an inference of scienter.").

The "core operations" doctrine also supports a finding of scienter. As Defendants' own authority recognizes, "the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income." *Conventry*, 2011 WL 1230998, at *12; *see also Emergent*, 2023 WL 5671608, at *26 (core operations doctrine relevant to a court's holistic scienter analysis); *Kiken*, 155 F. Supp. 3d at 606 (inference of scienter bolstered when challenged statements concern core operations).

29

Here, Defendants repeatedly characterized Zenrelia as a "blockbuster" (¶¶99, 120) (i.e., generating over $100 million in annual sales; ¶¶112, 116) that would enable Elanco to penetrate the fast growing, $1.2-$1.5 billion market to treat itching dogs. (¶¶117, 151). Indeed, Defendant Young reassured investors that there was regular interaction with the FDA concerning Zenrelia and two other drugs "*given, how important [those drugs are] to our total portfolios and the growth we're going to deliver this year*." (¶170).

Defendants contend that Plaintiffs do not allege a "motive to commit fraud." DB at 27. But motive is *not* required to establish scienter. *See Tellabs*, 551 U.S. at 325 ("absence of a motive allegation is not fatal"); *see also Zak*, 780 F.3d at 607 ("allegations of unusual stock sales are not required to demonstrate a strong inference of scienter in a securities fraud case").

In sum, considered holistically, the allegations here plead a strong inference of scienter at least as compelling as any opposing innocent inferences. *See Tellabs*, 551 U.S. at 326 ("court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

## IV. The FAC Adequately Pleads a Section 20(a) Claim

The Individual Defendants do not dispute that they are "control persons" of the Company. Plaintiffs' Section 20(a) claim thus survives along with Plaintiffs' 10(b) claim. *See Genworth*, 103 F. Supp. 3d at 790-91.

### CONCLUSION

For the forgoing reasons, Defendants' Motion should be denied. But if the Court grants any part of the Motion, Plaintiffs believe that they will be able to address any deficiencies identified by the Court, and therefore respectfully request leave to amend, which should be freely granted. *Franks v. Ross*, 313 F.3d 184, 193 (4th Cir. 2002).

30

Dated: July 16, 2025

Respectfully submitted,

*/s/ Daniel S. Sommers*
Steven J. Toll (Bar No. 15824)
Daniel S. Sommers (Bar No. 15822)
S. Douglas Bunch
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Avenue N.W.
Suite 800, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Attorneys for Co-Lead Plaintiffs and Liaison
Counsel for the Class*

Jeremy A. Lieberman (*pro hac vice*)
Jonathan D. Park (*pro hac vice*)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

*Attorneys for Co-Lead Plaintiffs and Lead
Counsel for the Class*

Joshua E. Fruchter (*pro hac vice*)
**WOHL & FRUCHTER LLP**
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Additional Counsel for Co-Lead Plaintiffs*

31