IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JOSEPH BARPAR ET AL., | * | |
| Plaintiffs, | * | |
| | * | Civil No. 24-2912-BAH |
| v. | * | Related cases: |
| ELANCO ANIMAL HEALTH | | Civil No. 24-3178-BAH |
| INCORPORATED SECURITIES ET AL., | * | Civil No. 25-1357-BAH |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiffs Joseph Barpar ("Barpar") and Harold Garson ("Garson"), individually and on behalf of individuals similarly situated (collectively "Plaintiffs"), brought this putative class action suit against Elanco Animal Health Incorporated Securities ("Elanco"), Jeffrey N. Simmons ("Simmons"), and Todd S. Young ("Young") (collectively "Defendants") alleging violations of § 10(b) of the Securities Exchange Act ("Exchange Act") and SEC Rule 10b-5 (Count I) as well as violations of § 20(a) of the Exchange Act (Count II). *See* ECF 31 (amended complaint).[1] Pending before the Court is Elanco's motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). ECF 37. Plaintiffs filed an opposition, ECF 43, and Defendants filed a reply, ECF 46. Plaintiffs also filed a notice of supplemental authority in support of their

---

[1] The original complaint is docketed at ECF 1. That action was brought on October 7, 2024, by Joseph Barpar alone, but Garson later moved with Barpar for appointment as co-lead plaintiffs of a proposed class. ECF 13. The Court granted that motion on January 3, 2025. ECF 17. This case is related to two consolidated cases (*Hollin v. Kurzius et al.*, 1:24-cv-03178-BAH, and *Dougherty v. Simmons et al.*, 1:25-cv-01357-BAH), which have been stayed during the resolution of the pending motion to dismiss considered herein.

opposition, ECF 47, to which Defendants responded, ECF 48.[2] All filings include memoranda of law, and Defendants' motion to dismiss includes several exhibits.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Defendants' motion to dismiss is **GRANTED**.

## I.    BACKGROUND

### A.    Approval for New Animal Drugs[4]

The federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321 et seq., prohibits the introduction into interstate commerce of new animal drugs that are not the subject of an approved new animal drug application ("NADA"). *See* ECF 31, at 11 ¶ 27. The Center for Veterinary

---

[2] Defendants "request that the Court disregard the Notice [of Supplemental Authority] because rather than just raise recent authority, the Notice advances substantive arguments and is effectively an improper surreply which 'is not permitted to [be filed] without permission of the court.'" ECF 48, at 1 (quoting *Cordish Companies, Inc. v. Affiliated FM Ins. Co.*, 573 F. Supp. 3d 977, 988–89 (D. Md. 2021)); *see also* Loc. R. 105.2(a) (D. Md. 2025). Plaintiffs' notice of supplemental authority was appropriate insofar as it brought a newly issued decision, *Levon v. CorMedix, Inc., et al.*, No. CV 21-14020 (JXN) (CLW), 2025 WL 2400346 (D.N.J. Aug. 19, 2025), to the Court's attention. *See* ECF 47. Moreover, Plaintiffs were entitled to provide this update because they'd previously advised the Court that the prior *Levon* decision originally cited in their opposition brief was subsequently withdrawn by the court that issued it, and Plaintiffs successfully sought permission to refile their opposition brief with all references to that case deleted. *See* ECF 41 (motion); ECF 42 (order). However, Defendants are correct that beyond identifying and describing the revised *Levon* decision, Plaintiffs' notice "escalated the matter by wading into the waters, addressing the merits of the case." *See Cordish*, 573 F. Supp. 3d at 990. Nevertheless, Defendants had and took the opportunity to respond to Plaintiffs' brief analysis in their response to the notice of supplemental authority. *See* ECF 48; *cf. Cordish*, 573 F. Supp. 3d at 990 (noting that defendants never offered merits analysis in their notices of supplemental authority). In the unique circumstances created by the withdrawn and reissued decision and noting that Defendants had an opportunity to respond, the Court will consider both ECF 47 and ECF 48.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] All references in this section are to the amended complaint because, in evaluating a motion to dismiss, the Court takes all well-pled facts in the operative complaint as true and in the light most favorable to Plaintiffs. *Versus Evil LLC v. PNC Bank, Nat'l Ass'n*, 613 F. Supp. 3d 916, 919 (D. Md. 2020) (citing *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017)). When necessary for clarity, the Court will also cite to other filings.

Medicine ("CVM"), a division of the United States Food and Drug Administration ("FDA"), regulates animal drugs and evaluates applications for their approval, including NADAs. *Id.* at 12–13 ¶ 30. To secure the approval of an NADA, the sponsor of the application must demonstrate that the product is safe, effective, and produced by a consistent method of manufacture. *Id.*

Specifically, CVM evaluates five "major" factors of an NADA: (1) target animal safety; (2) effectiveness; (3) human food safety; (4) chemistry, manufacturing, and controls; and (5) environmental impact. *Id.* at 13 ¶ 31. However, the categories of human food safety and environmental impact apply only to farm animal products. *See* ECF 37-1, at 14 n.2. "There are also two minor technical sections of a NADA: (1) 'All Other Information,' which includes all information about the drug that the sponsor did not submit as part of the major technical sections, and (2) labeling, which addresses all necessary information to use the drug safely and effectively and the risks associated with the drug." ECF 31, at 13 ¶ 32. "With respect to the target animal safety section, the sponsor of the NADA must show that the drug is safe to the target animal species . . . when it is used according to the label." *Id.* That process "involves establishing a margin of safety by testing the drug at higher-than-labeled doses for a longer-than-labeled time period." *Id.* at ¶ 31.

After an application is evaluated, CVM provides written comment on any apparent deficiencies. *Id.* at ¶ 33. "The NADA evaluation process generally involves numerous communications between the sponsor and CVM." *Id.*

### B.    Factual Allegations[5]

#### 1.   Zenrelia

"Elanco is an animal health company that develops, manufactures, and markets products to treat and prevent disease in pets and farm animals." ECF 31, at 4 ¶ 1. Simmons served as Elanco's president and chief executive officer at all times relevant to this case and has served in that position since July of 2018. *Id.* at 9 ¶ 17. Young has served as Elanco's executive vice president and chief financial officer since joining Elanco in November of 2018. *Id.* at 9 ¶ 18. Plaintiffs assert that Simmons and Young "possessed the power and authority to control the contents of Elanco's SEC filings, press releases, and other market communications" throughout the relevant class period, which Plaintiffs allege is between May 9, 2023, and June 26, 2024.[6] *Id.* at 4, at 9 ¶ 20.

Following a split from Eli Lilly and Company ("Lilly") in 2018,[7] Elanco allegedly placed a greater priority on its pet health business and "took steps to increase the proportion of [p]et

---

[5] Throughout this section, all alterations to quotations from the operative complaint have been added by the Court unless otherwise specified. Relatedly, Plaintiffs emphasize various statements throughout the amended complaint. *See generally* ECF 31. For purposes of this opinion, the Court has omitted all emphasis from quotations to the amended complaint unless otherwise indicated.

[6] Plaintiffs represent that "Elanco uses a fiscal year ending on December 31, with the first quarter of each fiscal year ('Q1') ending on March 30, the second quarter ('Q2') ending on June 30, the third quarter ('Q3') ending on September 30, and the fourth quarter ('Q4') ending on December 31." ECF 31, at 5 ¶ 2 n.3. The Court adopts these abbreviations to refer to those time periods where necessary.

[7] Elanco began as the Elanco Animal Health division of Lilly. ECF 31, at 10 ¶ 22. In July of 2018, Lilly announced that "it intended to spin off Elanco as a separate public company." *Id.* The initial public offering of Elanco's common stock took place in September of 2018. *See id.*

[h]ealth products in its 'portfolio mix.'"[8] *Id.* at 5 ¶ 1, at 9 ¶ 17, at 10 ¶ 23.[9] During the class period, Elanco's pet health portfolio was "focused on parasiticides, vaccines and therapeutics" for pets. *Id.* at 10 ¶ 24. "As a result, [p]et [h]ealth contributed an increasing share of revenues." *Id.* (describing an increase in the pet health products share of revenue from 32% in 2019 to 49% in 2021). However, Elanco's "constant currency revenue" declined by 3% from 2021 to 2022, "including a 5% decline in the [p]et [h]ealth business." *Id.* at 11 ¶ 25. Defendants allegedly attributed that performance to various factors, including COVID-19, supply chain disruptions, and economic slowdowns in the United States and Europe. *Id.*

On the heels of what Plaintiffs call "lackluster results in 2021 and 2022," Elanco sought to promote future growth through innovation, or the acquisition and development of new products. *Id.* at 11 ¶ 26. Specifically, Plaintiffs allege that Defendants "were eager to break into the canine dermatology market and compete with Zoetis, [Inc.]" ECF 31, at 14 ¶ 34. Zoetis sells "Apoquel," the first veterinary janus kinase ("JAK") inhibitor approved by the FDA "to treat pruritus [*i.e.*, itchiness] associated with allergic dermatitis and the control of atopic dermatitis in dogs." *Id.* at 15 ¶ 37. According to Plaintiffs, "Apoquel was the 'incumbent' when Elanco was developing Zenrelia." *Id.* at 14 ¶ 36. In a June 16, 2021 conference call, Simmons announced "new product initiatives," and Aaron Schacht, Elanco's executive vice president for innovation, regulatory and business development at the time, explained that one such initiative was Zenrelia, "an oral JAK inhibitor called ilunocitinib with a similar profile to the market incumbent[.]" *Id.* Schacht explained that "*[p]ivotal studies* are underway in both the U.S. and the EU," and stated that Elanco

---

[8] As opposed to its farm animal business, which Plaintiffs assert was Elanco's focus prior to the split. ECF 31, at 10 ¶ 23.

[9] In furtherance of this goal, Elanco apparently acquired two companies with portfolios made up of primarily pet health products in 2020 and 2021. ECF 31, at 10 ¶ 23.

was "targeting 2022 for initial technical section submissions likely in the latter part of the year [i.e., Q4 2022]." *Id.* at 11 ¶ 26 (emphasis in original).

Before marketing or selling an animal drug in the United States, Elanco was required to secure FDA approval by establishing that the drug is "safe, effective, and produced by a consistent method of manufacture." *Id.* at 13 ¶ 30; *see also id.* at 6 ¶ 5, at 13 ¶¶ 31–33. "Defendants initially submitted Zenrelia to the FDA for approval in Q4 2022 (i.e., between October 1, 2022, and December 31, 2022)." *Id.* at 16 ¶ 42.   During the submission process, the Company conducted field studies to demonstrate that Zenrelia was "effective at its intended use." *Id.* at 16 ¶ 42.   It also conducted a vaccine response study between April 20, 2021 and March 13, 2023 to evaluate how Zenrelia affects dogs' responses to vaccination, since the drug is an immunosuppressant.[10] *Id.* at 17 ¶ 43; *see also* ECF 37-1, at 15.

The vaccine response study involved "sixteen vaccine-naïve beagle dogs, approximately ten months old, that were raised in a biosecure facility" and "transported to a separate biosecure facility at which the study was conducted." ECF 31, at 17 ¶ 44.   "Four of these dogs received [a three times] dose of Zenrelia for 89 days; the other four comprised a control group that received a placebo" in order to evaluate the safety and effect of Zenrelia on canine vaccination. *Id.* ¶¶ 43–44; *see also* ECF 37-1, at 15.   "Following the initial 89-day period, there followed an 84-day recovery period during which no drug (either Zenrelia or a placebo) was administered." ECF 31, at 17 ¶ 44.   Plaintiffs allege that "[d]uring the study, two dogs had to be euthanized, others suffered severe health problems, and others demonstrated inadequate responses to vaccines, including a rabies vaccine." *Id.* at 6, ¶ 5.   The study was "completed on March 13, 2023, two months before

---

[10] Defendants note that this was "one of five studies submitted to the FDA in support of Zenrelia's approval, including two field studies to demonstrate efficacy, a laboratory margin of safety study, and a 6-month pilot safety study." ECF 37-1, at 15 (quoting ECF 37-38, at 2 (FOI summary)).

the start of the [c]lass [p]eriod." *Id.* at 6 ¶ 5. However, Plaintiffs allege that "Defendants did not disclose anything about the vaccine response study, *not even its existence*, during the" class period. *Id.* at 16–17 ¶ 42 (emphasis added). It is this alleged failure to timely disclose or address the results of the vaccine response study that lies at the core of Plaintiffs' complaint.

### 2. Defendants' Statements During the Class Period

When "presenting the Company's financial results for 2022," Defendants noted that in Q4 2022 they had submitted the "initial New Animal Drug Application ('NADA') to the FDA for regulatory approval of that 'JAK inhibitor' (i.e., Zenrelia) to control atopic dermatitis and pruritus (itching) associated with allergic dermatitis" in pets. *Id.* at 11–12 ¶ 27. Plaintiffs allege that Defendant further told investors Elanco "was '[p]reparing for a historic innovation launch window in '23 and '24,' highlighting the anticipated approval of Zenrelia in the first half of 2024." *Id.* at 12 ¶ 27. Defendants also "claimed that Zenrelia was a potential 'blockbuster' product, which Defendants indicated meant over $100 million in annual sales. *Id.* at 5 ¶ 2, at 12 ¶ 27.

Throughout the class period, Plaintiffs allege that "[i]nvestors were kept in the dark regarding the details of the Z[enrelia] submission process," all while Defendants apparently "assured the market regarding the progress of the Zenrelia submission." *Id.* at 5 ¶ 3. Plaintiffs identify 29 statements made in various contexts, including "[i]n every earnings call during the Class Period," *id.* at 20 ¶ 55, that they allege were materially false and misleading in violation of the Exchange Act. Further, Plaintiffs allege that these statements create a "strong inference" that Simmons and Young "were at least reckless as to the possibility of misleading investors." *Id.* at 50 ¶ 166. In support of their allegations of scienter, Plaintiffs point to Defendants' statements, *id.* at 50–51 ¶¶ 167–71, their knowledge of Elanco's preparation to launch Zenrelia, *id.* at 52–54 ¶¶ 172–76, and the completion timeline of the vaccine response study, *id.* at 54–56 ¶¶ 177–82. Plaintiffs also offer information from an alleged anonymous former employee of Elanco, referred

7

to in the amended complaint (and in this opinion) as "FE-1," to support the requisite mental state required for the violations alleged. *Id.* at 56–58 ¶¶ 183–88. Finally, Plaintiffs allege that Zenrelia constituted a core operation of Elanco, "given its central importance to [Elanco]'s prospects." *Id.* at 58 ¶ 189.

### i.    *Statements 1 and 2: May 9, 2023 Q1 2023 Earnings Call*

On May 9, 2023 (the first day of the class period), Simmons spoke in Elanco's "Q1 2023 earnings call" about new product development, noting that "[w]hile we expect macro factors to persist, Elanco is making the necessary disciplined decisions to stabilize the business and progress our innovation pipeline." *Id.* at 12 ¶ 28; *see also id.* at 29–30 ¶¶ 81–86. Plaintiffs take issue with two statements from this call. *See id.* at 29 ¶ 81–83. First, during scripted introductory remarks, "Simmons stated that '[e]ach of our potential blockbusters is progressing as planned with a path towards approval by the first half of 2024,' referring to, [among other products,] Zenrelia." *Id.* at 29 ¶ 82 ("Statement 1"). Second, Plaintiffs take issue with Simmons' response to a question later asked by an analyst. *See id.* at 29–30 ¶¶ 84–86. The analyst asked:

> As you think about the three companion animal blockbuster products in 2024 to the parasiticide and the derm launches, is the timeline still on track? Has there been any changes there? Is there any possibility of expediting those launches? And how are you thinking about your conversations with the FDA, just given delays across certain competitor products with the FDA specifically?

*Id.* at 29 ¶ 84. Simmons responded:

> It's the right question to ask relative to the timing. What I would say is kind of, as we step back and look at the pipeline position, I'd say the following things. And as I mentioned, we're controlling what we can control. First, I think quality of the team, what [Executive Vice President of Innovation and Regulatory Affairs] Ellen [de Brabander] has done with her and her team, the quality of our regulatory team. Second is the quality of the packages, which we're very confident in. The dialogue with the regulators. I can point to proof points. Three approvals here recently: parvo, USDA; Adtab, EU; and Varenzin, FDA[;] I think the track record and recent success is an example of this team and what they're capable of.

*Id.* at 29–30 ¶ 85 ("Statement 2") (first alteration added, other alterations in original). During this call, "Defendants did not disclose the Zenrelia vaccine response study, which had ended eight weeks before[.]" *Id.* at 20 ¶ 55. Neither were the results of that study disclosed in any of the subsequent contexts from which Plaintiffs pull statements, until the June 27, 2024 press release. *See id.* at 22–23 ¶ 63.

### ii.    Statement 3: June 1, 2023 Stifel Jaws and Paws Conference

On June 1, 2023, "Young appeared on behalf of the Company at the Stifel Jaws and Paws Conference." *Id.* at 30 ¶ 87. During that conference, an analyst observed that "the confidence that these products"—meaning Elanco's four new drug offerings, including "JAK"—"all get approved in 1H 2024" looked unlikely based on the results of other products and companies, such as Zoetis. *Id.* Accordingly, the analyst asked Young "to communicate to the investors why you have that level of confidence on those four [new drugs] getting across the goal line in 1H 2024 where, with the agency, some of these things just seem to be taking long." *Id.* (alterations added). Young responded that while Elanco couldn't "control the agencies," it could control "the quality of our package, the quality of the data. We're having good interactions with the agencies." *Id.* at ¶ 88. Young identified a few other instances in which products received approval faster than expected, and further stated "we've been clear to say we've got a path to first half approval, doesn't mean it's a guaranteed first half approval. But right now, we're still on that path based off [the] team and the milestones they're hitting. If that changes, we'll update you and the rest of the Street on timelines." *Id.* (collectively, "Statement 3").

### iii. Statement 4: June 12, 2023 Goldman Sachs Global Healthcare Conference

On June 12, 2023, Simmons appeared on behalf of Elanco at the Goldman Sachs Global Healthcare Conference. *Id.* at 31 ¶ 90. An analyst asked Simmons whether there were "feedback

9

or updates that you expect to get from the FDA between now and that [sic] your kind of goal for approval in the first half of 2024? And then, are there updates the investors should expect from the company during that period?" *Id.* Simmons first explained more about the FDA approval process, identifying that there are "three major submissions: efficacy, safety and CMNC [sic]. It's about a year. So, these are rolling iterative submissions and it's rolling in iterative and constant dialogue." *Id.* at ¶ 91. Then, Simmons stated "I would say that we've had good constructive dialogue, high-quality packages and we've got a predictable regulatory path. And that's what said that we've got a path to first half 2024." *Id.* ("Statement 4").

> #### iv.   *Statement 5: August 7, 2023 Q2 2023 Earnings Call*

On August 7, 2023, Elanco "held an earnings call regarding its Q2 2023 results" at which both "Simmons and Young spoke on behalf" of Elanco. *Id.* at 32 ¶ 93. An analyst on the call asked, in relevant part, whether Simmons and Young could "talk a little bit about when you have some of these new product launches in the first half of 2024, what are your expectations maybe around control launch periods? . . . When can they start to be kind of margin-accretive?" *Id.* In respond, Simmons stated that "[w]ith respect to the JAK inhibitor, we expect those to be higher margins at the start. . . . [O]verall, we're looking forward to getting these approved, getting them launched, and they'll be the big drivers over the next few years to increase margins, increase free cash flow and drive EBITDA higher." *Id.* at ¶ 94 ("Statement 5").

> #### v.   *Statement 6: September 11, 2023 Morgan Stanley Global Healthcare Conference*

On September 11, 2023, Simmons appeared on behalf of Elanco at the Morgan Stanley Global Healthcare Conference. *Id.* at 33 ¶ 96. There, an analyst asked "[W]hat about differentiation? How should we think about it? You mentioned effectiveness, for instance, as being one area that could be addressed. It could also be safety, particularly with the JAK in terms of what

10

shows up in Apoquel[.]" *Id.* Simmons responded that Elanco would not give "the specifics on our differentiation for competitive reasons until we get a little closer. But differentiation in our market either comes back to efficacy, safety, or administration. And again, I think this market opens up to that." *Id.* at ¶ 97. Simmons also noted that the "three blockbuster products" would "drive that inflection point to really drive increased growth and margins," including "a differentiated JAK inhibitor [i.e., Zenrelia] and atopic dermatitis and a $1.3 billion derm market." *Id.* at 12 ¶ 29 (alteration in original) (collectively, "Statement 6").

### vi.    *Statement 7: November 7, 2023 Q3 2023 Earnings Press Release*

On November 7, 2023, Elanco "issued a press release during pre-market hours announcing [Elanco]'s Q3 2023 results, which it also filed with the SEC as an exhibit to a Form 8-K." *Id.* at 33 ¶ 99. The press release quoted Simmons as saying, "Our innovation pipeline remains on track, with potential blockbuster products . . . and our differentiated JAK inhibitor for canine dermatology, which upon approval will be known as Zenrelia, . . . on a path toward U.S. approval in the first half of 2024." *Id.* ("Statement 7").

### vii.    *Statement 8: November 29, 2023 Evercore ISI HealthCONx Conference*

On November 29, 2023, Young appeared on behalf of Elanco at the Evercore ISI HealthCONx Conference. *Id.* at 34 ¶ 101. During the conference, an analyst told Young "I think if you look at Zoetis' Apoquel label, around 68% or 70% response rates with that JAK. I mean, is it so entrenched by this point such that when you – when Elanco's JAK comes to market, it'll be used second line you feel like[.]" *Id.* at ¶ 102. Young responded "I think we believe we can very much get first line." *Id.* at ¶ 103 ("Statement 8"). He further explained:

> It will obviously vary by vet. The question then becomes, all right, there's a lot of dogs that don't respond, right? 32% is not an insignificant amount. And then you get into, well, if dogs are responding better to our product, well, then maybe the vet

11

decides, well, let me go with that one because the hard to treat dogs have been responding better. I don't know that that'll be the case. That's obviously what we're hoping, is that we're responding to the higher level and that you get that kind of just efficacy benefit, but that will play out in the marketplace. But we're excited to get the product.

*Id.*

> *viii.* *Statements 9 and 10: January 9, 2024 J.P. Morgan Healthcare Conference*

On January 9, 2024, Simmons and Young both appeared on behalf of Elanco at the J.P. Morgan Healthcare Conference. *Id.* at 35 ¶ 105. An analyst identified that "[n]ew launches [were] obviously going to be a big, big focus for the company as you go through this year" and asked for "the latest around timing and confidence on some of these approvals," including whether there was "any update on the regulatory front of how the applications are progressing" and "any requests for additional data." *Id.* Simmons responded:

> [T]hrough 70 years and we've got 10 blockbusters, we are now looking at 6 in the making between the two that we have approved and through 2025. . . . Yes, the three that are submitted are under the FDA, two of them are under ADUFA.[11] So as we look at them, no new real news here. And that's good news. I mean, we have said it's rolling, it's iterative, the submissions are in. We're working on the regulatory side with them. It's a proactive and productive dialogue. So I think that's all moving forward. Again, we see a path to approval for these products in the first half of 2024.

*Id.* at ¶ 106 ("Statement 9"). Later in the conference, the same analyst asked "where can we think about gross margins going from here?" and whether "anything from a manufacturing optimization that still needs to be done"? *Id.* at ¶ 108. Young responded this time, stating in relevant part:

> And then the new products that we've been talking about as they scale, that has real value to margin from the positive mix component. So overall, we expect to continue to drive gross margin and operating profit higher over the next few years as we launch these big blockbuster products. We know big products in big profitable spaces like US cattle and US pet add real value to the bottom line.

---

[11] By "ADUFA," Simmons was referring to the "Animal Drug User Fee Act." ECF 31, at 31 ¶ 91.

*Id.* at 25–26 ¶ 109 ("Statement 10").

> ix.  *Statement 11: January 18, 2024 Mad Money Appearance*

On January 18, 2024, "Simmons appeared on the CNBC television show *Mad Money*, hosed by Jim Cramer, to discuss [Elanco]'s performance and prospects." *Id.* at 36 ¶ 111. On the show, Simmons stated, "This is our 70th year but I would say the most exciting pipeline. We're bringing six blockbusters over the next two years." *Id.* at ¶ 112. When Cramer asked Simmons to describe what a "blockbuster" means, "Simmons answered, 'a blockbuster in animal health can be over $100 million, in major markets.'" *Id.* "Later in the program, Simmons emphasized that 'these major blockbusters are higher margins, in big markets, faster growth rates, much higher mix.'" *Id.* at ¶ 113 (collectively, "Statement 11"). Simmons further stated that "[r]ight now in Elanco, back to the priority, six major blockbusters. . . . First . . . entry into the auto, you know, immune kind of market, excuse me, the derm market. That's going to be critical." *Id.* Plaintiffs allege that reference to entry into the auto-immune market was a reference to Zenrelia. *Id.*

> x.  *Statement 12: February 7, 2024 Floor Talk with Judy Shaw Appearance*

On February 7, 2024 Simmons appeared on the television program *Floor Talk with Judy Shaw*. *Id.* at 37 ¶ 115. "During the program, the host, Judy Shaw, asked Simmons, 'So tell me, how is Elanco approaching 2024 and what are the key components to your growth strategy?'" *Id.* In response, Simmons stated in relevant part that Elanco was "looking at probably the most exciting pipeline. Six blockbusters, that's over 100 million in animal health, over the next two years we're bringing to market." *Id.* at ¶ 116. When Ms. Shaw asked Simmons to elaborate on the blockbusters" further, Simmons stated "pets and farm animal. Four on the pet side, two on the farm animal." *Id.* at ¶ 117. With respect to Zenrelia, he noted:

> The other one's one of the fastest growing markets, derm. Why do people take pets
> to the market [sic]? The top reason is an itching dog. It's a $1.2 billion dollar

market, growing double digit, and vets don't have a lot of alternatives. We're bringing Zenrelia, a JAK1 inhibitor, it's a differentiated asset entering that market. We've got a path for an FDA approval the first half of this year.

*Id.* (collectively, "Statement 12").

> ### xi.  Statements 13–16: February 26, 2024 FY 2023 Press Release and Q4 2023 Earnings Call

"On February 26, 2024, Elanco issued a press release announcing [it]s Q4 and full year 2023 results." *Id.* at 38 ¶ 119. The release quoted Simmons as stating that "[w]e remain encouraged by our three late-stage pipeline products under regulatory review that have a path toward approval in the first half of 2024 and would be additive to our topline expectations in the second half of the year." *Id.* ("Statement 13"). Simmons was quoted as further explaining Defendants' "belie[f] that the investments we are making in 2024 will provide the foundation to enable sustained revenue growth over the medium and long term." *Id.*

Also on February 26, 2024, "Elanco hosted an earnings call with investors and analysts to discuss the [] Q4 2023 results." *Id.* at ¶ 120. During a scripted portion of the call, Simmons stated:

> On the late-stage pipeline, our three differentiated assets - Credelio Quattro, Zenrelia, and Bovaer are all progressing with the FDA. As we've shared previously, the regulatory process is rolling and iterative at this stage, and we are in ongoing productive dialog with the FDA's Center for Veterinary Medicine. These three potential blockbusters continue to have a path towards [U.S.] approval in the first half of 2024.

*Id.* ("Statement 14"). On that call, an analyst suggested "the ADUFA date for Zenrelia was in February," and asked whether Simmons could "discuss any high-level thoughts on what still remains to get done after any interaction with the agency" or whether he had "increased conviction with Zenrelia in 1H 2024 approval timeline." *Id.* at 39 ¶ 122. Simmons responded:

> [N]o update today on [the] Zenrelia timeline. We continue really with no change in terms of just a very productive dialog with the FDA. We believe that market adoption, as we know, will be driven on value and execution. But again, the dialogue with the FDA is going well. No change. When there is change, of course,

14

we'll be announcing approval, and if there's any change to that, we'll let you know. So, no – no change at all.

*Id.* at ¶ 123 ("Statement 15"). Finally, near the end of the call, an analyst noted that "as you get closer to an approval here in first half 2024 that you're reiterating, I think maybe I would have expected you could give a little bit more confidence or a little narrowing of the timeframe," and further asked, "am I over-reading that? Is there anything going on in conversations? Do you guys feel more confident as you're going through these discussions?" *Id.* at ¶ 125. Simmons replied:

I wouldn't read into anything. Our confidence remains. Our confidence in the differentiation remains. These are great assets. Our regulatory team is doing a great job, and we're in a very proactive productive dialogue with the CVM, and we'll update you if anything does change.

*Id.* at ¶ 126 ("Statement 16").

### xii.    Statement 17: February 29, 2024 Bank of America Securities Animal Health Summit

On February 29, 2024, Young attended the Bank of America Securities Animal Health Summit on behalf of Elanco. *Id.* at 40 ¶ 128. At the summit, an analyst observed that 2024 was "expected to be a major year for you" because "[y]ou've got Zenrelia, Credelio Quattro, Bovaer." *Id.* The analyst went on to ask "how much confidence" Young had "in that first half approval timing and the launch timing after that?" *Id.* Young responded:

As I think we've tried to represent here for a while, we feel good about our path to first half approval. We've put in packages that we feel the FDA can very much approve. And we're having really good dialog regarding all of the information in those packages with the FDA. It's regular dialog. This isn't, put something in and wait six months. It's regular. Good interaction to make sure we're tracking.

*Id.* at 41 ¶ 129 ("Statement 17").

### xiii.    Statement 18: March 4, 2024 TD Cowen Health Care Conference

On March 4, 2024, Simmons attended the TD Cowen Health Care Conference. *Id.* at 41 ¶ 131. During the conference, an analyst asked about the "new launches," stating, "could you

15

provide an update on the regulatory status of these products? And then in your experience, . . . the most common reasons filings could be delayed? And then just is there any upside to a delayed filing, maybe a strong label, maybe a more differentiated label with more data?" *Id.* at ¶ 132. Simmons responded in relevant part that if he were to "talk specifically about those assets in the US with the FDA, I think we're in a productive, proactive dialogue," and that "in these final phases, it's very rolling, it's very iterative" but if "there's anything significant that changes, we'll share that." *Id.* at ¶ 133 ("Statement 18").

### xiv. *Statement 19: March 12, 2024 Barclays Global Healthcare Conference*

On March 12, 2024, Young attended the Barclays Global Healthcare Conference. *Id.* at ¶ 135. In response to a question about Elanco's innovation pipeline, Young stated that "[a]ll three products . . . continue to have a path to first half approval," "contribution to revenue growth would be second half," and that there was "no change on that communication." *Id.* at 41–42 ¶ 136 ("Statement 19").

### xv. *Statements 20–25: May 8, 2024 Q1 2024 Press Release and Earnings Call*

Plaintiffs note that a "Morgan Stanley analyst report[] [sic] published on May 7, 2024,". one day before Elanco's Q1 2024 earnings call, "stated that '[a]ny update on [Elanco's] now late 1H approvals will dictate the stock reaction'" and that "timing and label details remain key variables." *Id.* at 22 ¶ 61. The Q1 2024 earnings call took place the next day, on May 8, 2024. *Id.* at 22 ¶ 62, at 43 ¶ 142. However, "before the market opened" that day, "Elanco issued a press release announcing its Q1 2024 results, which it also filed with the SEC as an attachment to a Form 8-K." *Id.* at 42 ¶ 138. The press release quoted Simmons as saying:

> We are encouraged by the strong progress of our late-stage pipeline, which has advanced significantly over the last several months. Based on our dialogue with the FDA and the status of packages submitted, we have increased certainty in the

> expected approval timing for [. . .] Zenrelia™ . . . . We continue to expect to bring differentiated products to the market, with revenue contribution expected from all three new products in the second half of 2024.

*Id.* ("Statement 20"). The press release further stated that "[f]or Zenrelia, a JAK Inhibitor targeting control of pruritus and atopic dermatitis in dogs, the company believes the FDA has all data necessary to complete its review," and "[a]ll technical sections, including the label, are expected to be approved before the end of June." *Id.* at ¶ 140 ("Statement 21"). The press release continued that "[f]ull approval" was "expected in the third quarter after an expected 60-day administrative review period," and it noted that Zenrelia had been "submitted in nine additional markets . . . with international approvals expected to begin in late 2024." *Id.* at 42–43 ¶ 140.

Later that day, "Elanco hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results." *Id.* at 43 ¶ 142. During a scripted portion of the call, Simmons stated:

> [B]oth Zenrelia and Credelio Quattro have progressed since February, and we believe the FDA has all the data necessary to complete its review of these products. For both products, we expect that all technical sections, including labels, will be approved by the FDA before the end of June. After the approval of all technical sections, each new animal drug application, or NADA, undergoes an expected 60-day final administrator review, putting our full approval expectations in Q3.

*Id.* ("Statement 22"). Simmons elaborated further on Zenrelia during the scripted portion of the call. *Id.* at ¶ 144. Specifically, he stated:

> Zenrelia is our JAK inhibitor targeting the control of pruritis and atopic dermatitis in dogs at least 12 months of age. We remain confident this product will be differentiated from the current market option. Our market research shows clear interest and desire for additional options as we will continue to prioritize the optimization of the label to provide the most meaningful differentiation. We expect to have a very efficient approval to launch window targeting product in the market before the end of the third quarter. Additionally, we expect approval for Zenrelia in several international markets starting late in 2024, our fastest globalization effort ever.

17

*Id.* at 43–44 ¶ 144 ("Statement 23").  The call also included a Q&A session, during which an analyst asked about "[Elanco]'s 'conversations with the FDA' and the timing of the Zenrelia submission." *Id.* at 44 ¶ 146.  Simmons stated that Elanco has been in "productive engagement" with the FDA and were "very pleased with the progress we've made . . . since February.  Actually, a lot of progress has happened, and that's driven our increased certainty as we move closer to the end of this approval process." *Id.*  Specifically, Simmons said:

> So what's changed and what has not changed since February?  What has changed is many sections and subsections of these submissions have been approved, both products have progressed.  Simply, though, the back-and-forth interactions have taken slightly more time than we estimated this path to first-half approval.  Thus, we're now moving the final 60 day administrative review into the third quarter. And I think, importantly, we have increased certainty in the timing from all of this interaction that you mentioned.
>
> I think it's also important to say what hasn't changed.  What hasn't changed is we continue to expect the products to be differentiated versus the current offering.  We still expect all technical inspections, including the label, to be approved in the first half or by the end of June.  And we expect that the revenue contribution is still expected in this second half for these two products, as well as Bovaer.  Again, importantly, we believe the FDA has what they need for the approvals and the launch planning, to your question on that, and the marketing is well underway.

*Id.* at 44–45 ¶ 146 (collectively "Statement 24").  Finally, Elanco also "published an investor presentation on its website in connection with the Q1 2024 earnings call" that day.  *Id.* at ¶ 148. "Simmons and Young guided attendees of the call through this presentation." *Id.*  Slide 6 of the presentation stated that "full approval" for Zenrelia was "expected in Q3 2024, peak sales expectations intact." *Id.* ("Statement 25").

   *xvi.* *Statement 26: May 29, 2024 Stifel Jaws and Paws Conference*

  On May 29, 2024, Young again attended the Stifel Jaws and Paws Conference on behalf of Elanco.  *Id.* at 46 ¶ 150.  During the conference, an analyst observed that Defendant had "to have some confidence that Zenrelia will ramp and ramp effectively" and asked "about the uptake for new dogs versus switchers" and "non-responders as well." *Id.*  Young stated in response:

> Overall, we're very excited to bring Zenrelia into the market. It's a JAK inhibitor product as we know, dermatology was not a big market until Zoetis created it with Apoquel and Cytopoint and it's grown to be a $1.5 billion market globally that's continuing to grow. It's the number one reason a pet owner goes into the vet is to address the itching dog. We're going to be the second company to bring a JAK to the market and we're excited about positive differentiation that we think will allow us to penetrate the market in a reasonable way. Overall, is that going to be new dogs, is it going to be switchers, is it going to be non-responders? I think we think all of those will be in play with the product we're going to bring, and that's going to be the opportunity to really penetrate the market.

*Id.* at ¶ 151 ("Statement 26").

> xvii. *Statements 27–29: June 11, 2024 Goldman Sachs Global Healthcare Conference*

On June 11, 2024, Simmons attended the Goldman Sachs Global Healthcare Conference. *Id.* at 47 ¶ 153. An analyst asked Simmons whether he could discuss the "level of confidence in the differentiation that you're bringing to market." *Id.* Simmons responded that they had "probably gone to another level of disclosure of the regulatory process in animal health, given where we are as a company," and noted that Elanco was "confident in the package that's based on the science and the data that's in the package." *Id.* at ¶ 154 ("Statement 27"). In an immediate follow-up question, the analyst asked whether Zenrelia and the other products would "follow the traditional [] launch curve that you see . . . ? Or is there any reason to believe that like these drugs could be different?" *Id.* at 47–48 ¶ 156. Simmons responded that he believed Elanco had "best-in-class type products," that there would be "no regrets," and that he saw "a typical kind of archetype and adoption from historical standards." *Id.* at 48 ¶ 157 ("Statement 28").

The analyst then posed a question specific to Zenrelia, asking what drove the market as to that product and "how do you think about . . . the factor that would influence the veterinarian adoption of a product like [] Zenrelia and what would influence . . . the consumers' decision to use that product or switch from the product they're currently using?" *Id.* at ¶ 159. Simmons responded:

19

Yes. So, I think the biggest thing, derm is an exciting, very different market. If you think about derm, it is one – it's probably the only way a dog can self-diagnose, right. An itching dog is the number one reason that they go into the vet clinic. We believe just as you look at the US and our market research, there's another 6 million dogs that are untreated that are out there. So, I think more awareness, more treatments and a growing market is kind of the fundamentals. It's about 60% in the US, 40% in international. And we see growth rates at or above the US internationally. So, we see globalization will be another factor that will drive us to $2 billion. I think the other is it's a market that it's a chronic problem. As an owner of two labs that have itching problems and some products work, some don't work, there's different kind of stages of this problem. And all of these things lead to vets wanting more options. We've never seen a greater than $1 billion market with only two products really in it. So, I think vets want options. They – on most every other category, they want two or three options on their shelves. And most labels don't have – only 65% respond. So, it's set up very nicely for the next generation of innovation and alternative options. So, Elanco is looking at derm as global, as a portfolio approach and we've got multiple things in our pipeline, not just Zenrelia, but any products to follow, starting with an IL-31 in 2025.

*Id.* at 48–49 ¶ 160 ("Statement 29").

### 3.    The Disclosure and Stock Decline

On June 27, 2024, before the market opened, Elanco "issued a press release providing an 'innovation update.'" *Id.* at 22 ¶ 63, at 49 ¶ 162. Elanco's press release disclosed a delay in the commercial launch of Zenrelia and stated that Zenrelia's label was expected to include a black box warning "based on the outcome of a trial with unvaccinated dogs dosed at 3x the label dose." *Id.* at 7 ¶ 8, at 19 ¶ 49, at 22–23 ¶ 63, at 49 ¶ 162.[12] Specifically, Defendants allegedly disclosed that:

For Zenrelia, the company has received confirmation from FDA that all major technical sections (Effectiveness, Safety and Chemistry, Manufacturing, and Controls (CMC)) are complete as of late June. For the Labeling minor technical section, earlier this week the Company aligned with FDA on the language and expects to receive the completion letter by mid-July. The 60-day final administrative review will follow, placing expected approval late in the third

---

[12] Details regarding the vaccine response study were apparently made public by the FDA after the class period in a "Freedom of Information ('FOI') Summary." ECF 31, at 16 ¶ 42. The summary stated that "it is not safe to administer vaccines in dogs concurrently receiving Zenrelia." *Id.* at 19 ¶ 50. Accordingly, the summary recommended that Zenrelia "be discontinued at least 28 days to 3 months prior to vaccination and should not be administered for at least 28 days after any vaccination." *Id.* at ¶ 51.

quarter of 2024. The company now anticipates a U.S. launch for Zenrelia in the fourth quarter of 2024.

*Id.* at 23 ¶ 64. Further, Defendants acknowledged that although they "remain[ed] confident in Zenrelia's blockbuster potential, we believe this warning will slow the product adoption curve in the U.S. and initially limit the number of expected treatment days by approximately 25%." *Id.* at 23 ¶ 66, at 49 ¶ 162. Plaintiffs contend that the press release "constituted the materialization of the undisclosed risks" throughout the class period. *Id.* at 50 ¶ 164.

Following the press release, a Barclays analyst report lowered its "Zenrelia revenue expectations by .50% across 2024-2027E (lowering FY27 Zenrelia revenues from $100M to $50M)." *Id.* at 23 ¶ 67. "Barclays further observed that 'the box warning is likely to provide an extended period of competitive advantage for ZTS' Apoquel[.]'" *Id.* A William Blair analyst report also concluded that although "moving the product forward is a positive, we believe the update on a label warning pushes Zenrelia updates to a net negative." *Id.* at 23–24 ¶ 67. Plaintiffs assert that "Elanco's stock price nosedived" on June 27, 2024, wiping out over $1.8 billion in market capitalization." *Id.* at 7 ¶ 10, at 24 ¶ 68. Specifically, Plaintiffs assert that the stock fell "20.59%, or $3.70 per share, from its June 26, 2024 closing price, to close at $14.27 per share on June 27, 2024." *Id.* at 24 ¶ 68, at 50 ¶ 165. According to Plaintiffs, this was "a statistically significant decline in [Elanco]'s stock price, which fell precipitously even as the S&P 500 increased 0.09% and the Nasdaq Biotechnology Index increased 0.06%." *Id.* at 50 ¶ 165.

On September 19, 2024, Zenrelia received FDA approval and launched that same month. *Id.* at 25 ¶ 72; *see also* ECF 37-1, at 9. The full language of the black box warning was released that day as well, ECF 31, at 25 ¶ 72, along with a "Dear Veterinarian" letter from the FDA instructing veterinarians to "read the entire package insert, including the boxed warning describing the risk of vaccine-induced disease and inadequate immune response to vaccines," *id.* at 25 ¶ 73.

21

### C.    Procedural History

Plaintiffs brought this federal securities class action on October 7, 2024, seeking to recover those losses on behalf of purchasers of common stock of Elanco during the class period. *See* ECF 1 (original complaint); ECF 31 (amended complaint). The Plaintiffs acquired Elanco common stock at allegedly "artificially inflated prices" during the class period, and they contend they were "damaged upon the disclosure of the true facts and the materialization of the risks concealed and misrepresented by Defendants" throughout that period. ECF 31, at 8 ¶ 15. Defendants' motion to dismiss this action, ECF 37, is now ripe for decision.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.,* 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's]

22

claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits."
*Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

**B.      Rule 9(b) and the PSLRA**

"Claims of violations of section 10(b) of the Securities and Exchange Act of 1934 and Rule
10b–5 promulgated thereunder are subject not only to the general Rule 12(b)(6) standard, but also
to the heightened pleading requirements established by Rule 9(b) and the Private Securities
Litigation Reform Act of 1995 ('PSLRA')." *Ortmann v. Aurinia Pharms., Inc.*, Civ. No. 22-1335-
BAH, 2024 WL 3784566, at *9 (D. Md. Aug. 13, 2024). "The Private Securities Litigation Reform
Act imposes a heightened pleading standard '[a]s a check against abusive litigation by private
parties' in securities fraud cases." *City of Southfield Gen. Employees' Ret. Sys. v. Advance Auto
Parts, Inc.*, 167 F.4th 637, 646 (4th Cir. 2026) (alteration in original) (quoting *Tellabs, Inc. v.
Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007)). The Court reviews both standards below.

"Rule 9(b) is a heightened pleading standard requiring a pleader to state 'with particularity
the circumstances constituting fraud.'" *Wood v. Blue Diamond Growers*, 722 F. Supp. 3d 554,
564 (D. Md. 2024) (quoting Fed. R. Civ. P. 9(b)). *Compare* Fed. R. Civ. P. Rule 9(b) ("In alleging
fraud or mistake, a party must state with particularity the circumstances constituting fraud or
mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged
generally."), *with* Fed. R. Civ. P. Rule 8(a)(2) ("A pleading that states a claim for relief must
contain . . . a short and plain statement of the claim showing that the pleader is entitled to
relief . . . ."). "To satisfy Rule 9(b)'s heightened pleading standard, a plaintiff must allege facts
establishing the 'who, what, when, where, and how' of the claimed fraud.'" *Proter v. Medifast,
Inc.*, Civ. No. GLR-11-720, 2013 WL 1316034, at *7 (D. Md. Mar. 28, 2013) (quoting *United
States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)). "Rule
9(b) addresses whether fraud is alleged in the complaint, not whether it is an element of the specific

claim at issue." *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525 (M.D.N.C. 2013) (citing *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008)). Thus, "[a]s almost every circuit court to examine the issue has held, Rule 9(b) applies to allegations under the Securities Act where those allegations sound in fraud." *Cozzarelli*, 549 F.3d at 629.

Further, "[t]he PSLRA sets forth specific standards for pleading the elements of misrepresentation and scienter, and thus supercedes Rule 9(b) to that extent." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th Cir. 2011). "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]'" *Tellabs, Inc.*, 551 U.S. at 321 (first quoting 15 U.S.C. § 78u–4(b)(1); and then quoting 15 U.S.C. § 78u-4(b)(2)). "The PSLRA, however, does not address the pleading standards applicable to the remaining elements of a § 10(b) claim, and so presumably the pleading standard of Rule 9(b) still applies to those elements." *Katyle*, 637 F.3d at 471 n.5; *see also In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 154 n.8 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022).

### C.    Defendants' Attached Exhibits

Generally, a court cannot consider documents outside of the pleadings without converting the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); *Reamer v. State*

*Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022).

However, "courts may consider the complaint's allegations, documents attached to the complaint, and 'such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a court may take judicial notice.'" *Leacock v. IonQ, Inc.*, Civ. No. DLB-22-1306, 2024 WL 3360647, at *12 n.8 (D. Md. July 10, 2024) (quoting *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 666–67 (D. Md. 2018)), *aff'd sub nom. Defeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation and emphasis omitted).

For example, "where a complaint in a fraud action references a document containing the alleged material misrepresentations, the referenced document may be considered part of the complaint." *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 611–13, 618 (4th Cir.1999)). "Similarly a newspaper article reporting allegedly fraudulent statements by a corporate officer may be considered part of the complaint in a securities fraud action,[] and an allegedly libelous magazine article referred to in a complaint may be considered part of the complaint in a libel action based on that article." *Walker*, 517 F. Supp. 2d at 806. To be clear, the Court may still consider an "integral" document when the parties dispute the facts contained therein, as was the case in each of the above cited examples, so long as "there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

Just as with documents attached to a complaint, where "a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alterations in original) (quoting *Phillips*, 190 F.3d at 618). Defendants have filed their motion to dismiss with 37 exhibits attached. *See* ECF 37-5 through ECF 37-41. Additionally, at ECF 37-4, Defendants attach a chart identifying each of the challenged statements in the amended complaint and purporting to provide the "reasons" why each is not actionable.

Defendants' exhibits are mostly documents or transcripts related to calls or appearances referenced in the amended complaint and on which the Plaintiffs' claims are based. *See generally* ECF 37-5 through ECF 37-41. Because these statements are the source of the claims in this case, the documents in which they are contained are integral to the amended complaint, even though they were not attached thereto. *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 512 (D. Md. 2022) (considering as integral to the complaint in a securities fraud case documents submitted by the defendant on a motion to dismiss containing "transcripts or exhibits containing the specific alleged actionable statements"); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 349 (D. Md. 2004) (quoting *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 813 (D. Md. 2002) ("In considering a motion to dismiss a securities fraud complaint, 'the Court is entitled to rely on public documents quoted by, relied upon, incorporated by reference or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment.'" (citation omitted)).

However, Plaintiffs argue that several of the exhibits attached to the motion to dismiss "should either be stricken or disregarded because they do not meet the requirements for

26

consideration" under either the doctrines of judicial notice or incorporation-by-reference. ECF 43, at 16–17. Specifically, Plaintiffs argue that Exhibits 3 (ECF 37-6 (the Q4 2022 earnings call transcript)), 4 (ECF 37-7 (Elanco FY 2022 Form 10-K)), 14 (ECF 37-17 (January 8, 2024 Form 8-K)), 34 (ECF 37-37 (September 19, 2024 press release)), 35 (ECF 37-38 (FOI Summary)), and 38 (ECF 37-41 (February 25, 2025 Form 8-K)) are not referenced in the amended complaint. ECF 43, at 17. Moreover, they observe that Exhibit 37 (ECF 37-40 (FY 2024)) is only cited as support for an ancillary fact in paragraph 13 of the amended complaint. *Id.* Plaintiffs do not appear to dispute the authenticity of any of the exhibits, but they argue that the Court should not accept the contents of Defendants' exhibits as true. *See* ECF 43, at 16–18.

Finally, with respect to the chart at ECF 37-4, Plaintiffs argue that it should be stricken or disregarded because "Defendants' chart does not summarize arguments already made in the brief, and instead asserts that numerous statements are inactionable for the specified reasons without any corresponding argument in the brief[.]" ECF 43, at 19–21. Plaintiffs assert this violates Local Rule 105.1, which provides that the memorandum attached to the motion shall contain "the reasoning and authorities in support of it and a proposed order," and such memoranda are limited to thirty pages "[u]nless otherwise ordered" pursuant to Local Rule 105.3. ECF 43, at 20.

Defendants respond that they have not attached the exhibits "for their truth," nor "are they attempting to contradict well-pleaded allegations in the complaint." ECF 46, at 18 (internal quotation marks and citation omitted). Defendants further argue in support of consideration that Exhibits 3, 4, 14, 34, 35, 37, and 38 are "publicly-available documents that are properly considered regardless of whether they are cited" in the complaint under the doctrine of judicial notice and pursuant to the requirements of the Exchange Act, which Defendants assert necessitates consideration of cautionary language that accompanied the oral forward-looking statements

27

alleged. ECF 46, at 17 (citing 15 U.S.C. § 78u-5(e)). Finally, with respect to its chart, Defendants reply that "[t]he chart advances no new arguments and is intended to be a helpful tool for the Court (and Plaintiffs) to sort through the numerous alleged statements and the grounds for dismissal advanced in the Motion." *Id.* at 19.

The Court first addresses Exhibits 3, 4, 14, 34, 35, 37, and 38. "[C]ourts at any stage of a proceeding may 'judicially notice a fact that is not subject to reasonable dispute,' provided that the fact is 'generally known within the court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (quoting Fed. R. Evid. 201). The decision to take judicial notice is committed to the district court's discretion. *See United States v. Perez*, 150 F.4th 237, 242 n.3 (4th Cir. 2025). The Fourth Circuit has before "take[n] judicial notice of the content of relevant SEC filings and other publicly available documents included in the record" in a Section 10(b) case. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014) (citing *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 & n.10 (4th Cir. 2005)).

As to Exhibit 3, the transcript of Elanco's Q4 2022 earnings call (ECF 37-6), the Court declines to take judicial notice of, or to otherwise consider, the exhibit in resolving the pending motion to dismiss. The document is nowhere referenced in the amended complaint, and none of the allegedly false statements are drawn from the call itself. Moreover, the call was held on February 21, 2023, ECF 37-6, at 2, a date that falls outside of the class period. For similar reasons, the Court declines to take judicial notice of, or to otherwise consider, Exhibit 34 (ECF 37-7), a September 19, 2024 press release which is not referenced in the amended complaint and similarly falls outside of the class period. However, the Court will take judicial notice of and consider Exhibits 4, 14, 35, 37, and 38. Exhibits 4 and 37 are Form 10-K filings with the SEC from FY

28

2022 and 2024, respectively, and Exhibits 14 and 38 are Form 8-K SEC filings. *See Yates*, 744 F.3d at 881. Moreover, Exhibit 35, which is a FOI summary for Zenrelia, appears to be referenced several times in the amended complaint, *see* ECF 31, at 19 ¶¶ 49–51. Accordingly, the Court will consider Exhibits 4, 14, 35, 37, and 38. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d at 349.

On the issue of Defendants' chart, EF 37-4, the Court agrees with other federal courts that have concluded such tables are generally "a helpful guide to the Court, not a devious attempt to avoid page limitations." *Edwards v. McDermott Int'l, Inc.*, No. 4:18-CV-04330, 2022 WL 3927828, at *5 n.3 (S.D. Tex. Aug. 30, 2022), *report and recommendation adopted*, No. 4:18-CV-04330H, 2022 WL 4454391 (S.D. Tex. Sept. 23, 2022); *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 212 (D. Mass. 2018) (rejecting plaintiffs' motion to strike defendants' comparable exhibits to their motion to dismiss because the Court did not view the tables "as argumentative in nature and, in any event, the exhibits are helpful to the Court, particularly because" of the length of the amended complaint). Plus, the Court notes that Defendants advance general arguments for dismissal concerning *all* of the statements alleged in the amended complaint, and thus the chart does not add additional arguments that were not otherwise raised in the body of Defendants' memorandum in support of the motion to dismiss. *See generally* ECF 37-1.

Accordingly, the Court will consider the attached exhibits, except those specified above, to the extent necessary to resolve the motion to dismiss and will do so without converting the motion into one for summary judgment. *See Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 581–82 (E.D. Va. 2006) (considering documents submitted by defendant as attachments to motion to dismiss when those documents contained the allegedly misleading statements in securities fraud action). The Court is mindful that "the content of a

29

noticed document may not be used to contradict well-pleaded allegations in the complaint."

*Tchatchou v. India Globalization Cap. Inc.*, Civ. No. PWG-18-3396, 2021 WL 307415, at *5 (D. Md. Jan. 29, 2021) (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018)). The Court also takes care to construe any facts considered from the judicially noticed exhibits, and any inferences flowing therefrom, in the light most favorable to Plaintiffs. *See Zak*, 780 F.3d at 607.

## III.    ANALYSIS

Plaintiffs bring two claims under the Exchange Act. *See* ECF 31, at 61–62. First, Plaintiffs claim that Defendants violated Section 10(b) of the Act (and SEC Rule 10b-5) by making materially false or misleading statements regarding Zenrelia before the product launched. *Id.* at 61–62 ¶¶ 200–08. Second, Plaintiffs bring a claim for derivative control person liability under Section 20(a) of the Exchange Act, premised on the same violations related to statements about Zenrelia. *Id.* at 62–63 ¶¶ 209–11.

### A.    Section 10(b) and Rule 10b-5

"Section 10(b) of the Securities Exchange Act makes it unlawful for any person to 'use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 15 U.S.C. § 78j(b)). The Supreme Court has "implied a private cause of action from the text and purpose of § 10(b)." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)). "SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"

*Id.* (quoting 17 CFR § 240.10b-5(b)). "Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct." *S.E.C. v. Pirate Inv. LLC*, 580 F.3d 233, 240 (4th Cir. 2009) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008)).

To prevail on a claim that Defendants "made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5," Plaintiffs "must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Id.* at 37–38 (quoting *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157). "These substantive elements of a securities fraud claim are demanding." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008). Defendants challenge the first two elements, contending that Plaintiffs have failed "to adequately plead (a) any actionable misstatement or omission; and (b) scienter, each of which is an independent reason to dismiss the Section 10(b) claim." ECF 37-1, at 19. The Court addresses each challenge in turn.

## B.   Misstatement or Omission

Plaintiffs challenge several of Defendants' statements concerning the expected timing of Zenrelia's FDA approval, Zenrelia's prospects to clear the FDA approval process without incident, and the likelihood of Zenrelia's future commercial success. *See* ECF 31, at 29–47; ECF 37-1, at 19. Though the amended complaint specifically states that the identified statements addressing these topics were generally "false and misleading," ECF 31, at 10, it is more accurate to summarize Plaintiffs' claims as alleging that "the challenged statements were misleading because Defendants failed to disclose the vaccine response study and alleged risks related thereto." ECF 37-1, at 19; *see also* ECF 31, at 9-10 ("Because of their positions at Elanco, and their access to material information available to them but not to the public, the Individual Defendants knew that the

31

adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.").

Defendants argue that Plaintiffs have failed "to plead any contemporaneous facts supporting their claim that the vaccine response study was 'likely' to negatively impact Zenrelia's FDA approval or commercial prospects or any other contemporaneous information that contradicted [Elanco]'s statements." *Id.* Moreover, Defendants contend that "Defendants never made any promises concerning timing, approval, or Zenrelia's future prospects" and instead "repeatedly cautioned that they could make no specific representations on any of those topics." *Id.* at 19–20. Moreover, Defendants argue that the statements "are all either (i) inactionable corporate puffery; (ii) forward-looking and protected by the PSLRA safe harbor; and/or (iii) statements of opinion that Plaintiffs fail to plead are actionable." *Id.* at 20.

Plaintiffs respond that "Defendants' failure to disclose the vaccine study's adverse results rendered three types of Class Period statements misleading:" statements about there being no updates or news ("News Statements"); "statements about how Elanco would differentiate Zenrelia from Apoquel" ("Differentiation Statements"), and "statements about the extent to which Zenrelia would boost Elanco's revenue and margins" ("Revenue/Margin Statements"). ECF 43, at 22. Plaintiffs specifically highlight one News Statement,[13] eight Differentiation Statements,[14] and five Revenue/Margin Statements.[15] *See id.*

---

[13] Statement 9.

[14] Statements 4, 7, 12, 14, 16, 20, 23, and 26. As relevant to these eight statements, Plaintiffs also highlight Defendants' statement regarding the three bases for differentiation: "efficacy, safety, or administration." ECF 31, at 33 ¶ 97 (Statement 6).

[15] Statements 5, 10, 11, 13, and 25.

"To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc.*, 563 U.S. at 38 (emphasis in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Id.* (quoting *Basic Inc.*, 485 U.S. at 231–32); *see also Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir. 1999) ("[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.").

However, when it comes to misrepresentation through omission, the Supreme Court has emphasized "that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc.*, 563 U.S. at 44; *Ortmann*, 2024 WL 3784566, at *10. Rather, "[d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (first quoting 17 C.F.R. § 240.10b-5(b); and then citing *Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.")). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc.*, 563 U.S. at 45.[16]

---

[16] A defendant also "cannot be liable for misrepresentation based on a theory of omission when the defendant did, indeed, disclose the allegedly omitted information." *Ortmann*, 2024 WL 3784566, at *10 (citing *Smith v. Cir. City Stores, Inc.*, 286 F. Supp. 2d 707, 721 (E.D. Va. 2003)). Defendants do not contend that information related to the vaccine response study was made available to Plaintiffs prior to or during the class period.

33

The Court addresses the alleged statements based on Plaintiffs' proposed categories in addition to evaluating statements regarding the timing of FDA approval. In general, the Court finds that Defendants' decision not to disclose any information about the vaccine response study or other studies throughout the class period was not "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Further, the vast majority of challenged statements constitute puffery or forward-looking statements that cannot serve as the basis of a federal securities claim. *See San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 241 n.9 (4th Cir. 2023) ("[F]orward-looking statements and puffery are often non-actionable under the Securities Exchange Act."); *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 676 (D. Md. 2018) ("Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity." (quoting *In re Neustar Sec.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015)).

1. Duty to Disclose

As discussed above, "[a] company's duty to disclose all material information may emerge when it 'chooses to speak about a material subject to investors.'" *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 383 (4th Cir. 2023) (internal quotation marks omitted) (quoting *In re Amarin Corp. PLC Sec. Litig.*, Civ. No. 21-2071, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022)); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). The key question presented here is whether the information Defendants provided to their investors over the course of a class period triggered a duty under the Exchange Act to concurrently disclose

34

information related to the vaccine response study. Or, stated differently, the question is whether the "Defendants' written and oral statements . . . put the trial's . . . results 'in play'" such that disclosure was necessary. *Id.* at 383.

*Singer v. Reali* offers an example of a case in which shareholders successfully alleged violations of the Exchange Act based on material omissions. 883 F.3d 425 (4th Cir. 2018); *see also Sinnathurai*, 645 F. Supp. 3d at 518–19. There, the shareholders alleged material omissions based on the company's failure to disclose that it was coaching surgeons to enter an incorrect billing code in order to fraudulently obtain reimbursement from insurers and government-funded healthcare programs for the use of the company's system for conducting surgery to treat degenerative disc disease. *See Singer*, 883 F.3d at 428–29. The defendant in *Singer* had made public statements to investment analysts that it was assisting surgeons in obtaining "appropriate reimbursement" for its procedure and that there would not be "any significant headwind" associated with the procedure codes. *Id.* at 432. Accordingly, the Fourth Circuit held that "by choosing to speak about its reimbursement practices, the company possessed a duty to disclose its alleged illegal conduct" related to those practices. *Id.* at 442.

Conversely, in *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, the Fourth Circuit upheld a district court's dismissal of a Section 10(b) case "after concluding that Plaintiffs had failed to sufficiently allege any actionable misrepresentations or omissions that would give rise to Defendants' duty to disclose." 61 F.4th at 375. There, the Fourth Circuit considered whether a biopharmaceutical company, its chief executive officer, and its chief financial officer had a duty to disclose to investors a more robust picture than they did of interim trial results of a new treatment for metastatic breast cancer. *Id.* at 375–76, 383. The Fourth Circuit specifically considered whether statements related to a trial's positive "PFS" results

35

triggered a duty to similarly disclose potentially negative aspects related to the trial's "interim OS results," thereby creating a duty to disclose a particular graph. *Id.* at 384. The defendants did eventually present the negative information at a conference by sharing the graph reflecting a far less rosy outlook for the treatment than they had previously disclosed. *Id.* at 380. When their "stock plummeted . . . nearly 22%" in just two days, the plaintiffs sued and asserted similar claims to those raised here. *Id.*

Ultimately, the Fourth Circuit held that the defendants "did not have a duty to disclose the interim OS results because their written and oral statements . . . did not 'speak' about the OS data." *Id.* at 383. Rather, the defendants' statements focused on the "trial's success in reaching its first PFS endpoint," and "[a]ny language concerning the OS endpoint was preliminary and focused on the ongoing nature of the OS data's accumulation." *Id.* Defendants' statements about the ongoing nature of the OS data "clearly indicated to all reasonable investors that . . . one could not (and should not) draw a conclusion on the OS data's performance as MacroGenics continued to track OS performance." *Id.* at 384. The plaintiffs there also attempted to argue that the title of a press release defendants had issued, announcing "positive results" from the trial, "put *all*" of the trial's "results in play." *Id.* (emphasis in original). The Fourth Circuit reasoned that although the title of the press release "did not qualify that the positive results were specifically related to" the trial's earlier negative results, "that much was delineated by the text of the press release." *Id.* (citing *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (holding that "given the context of the statements, no reasonable investor could have understood the headline to mean anything other than the positive subgroup results")). "Even more, a company's mere *reference* to full trial data in a discussion of top-line results 'does not trigger a duty to disclose the full results of a study.'" *Id.* (quoting *In re Amarin Corp. PLC Sec. Litig.*, No. 3:19-cv-06601, 2021 WL 1171669,

36

at *15 (D.N.J. Mar. 29, 2021)). The Fourth Circuit thus reached the conclusion that the defendants' "reference to the accumulation" of certain data "when announcing the PFS top-line results did not put this interim information in play." *Id.*

Here, the amended complaint references only one statement in which Defendants referenced the studies they were undertaking with respect to Zenrelia—a statement made before the class period began. *See* ECF 31, at 17 ¶ 43. Specifically, on a June 16, 2021 conference call with analysts, Elanco leadership "made reference to '[p]ivotal studies . . . underway' with respect to Zenrelia." *Id.* (alterations in original). "One of the Zenrelia studies underway at that time was the vaccine response study, which started less than two months earlier, and ran from April 20, 2021, to March 13, 2023." *Id.* But reference to a study being "underway," like reference to a portion of a trial being "ongoing," did not put the results of the study in play over the duration of the following class period. *See MacroGenics, Inc.*, 61 F.4th at 383–84. Of course, "Defendants did not disclose the existence, let alone the results, of the vaccine response study during the [entire] Class Period." ECF 31, at 19 ¶ 49 (alteration added). Although Plaintiffs allege that this omission rendered broad statements related to expected revenue, differentiation, and FDA approval of Zenrelia misleading, Defendants never used the vaccine results study, or any other study for that matter, to tout successful research, safety differentiation, or otherwise guarantee regulatory approval. *See In re Celgene Corp. Sec. Litig.*, Civ. No. 18-4772, 2019 WL 6909463 (D.N.J. Dec. 19, 2019) (holding that telling investors of "positive clinical study results but fail[ing] to disclose the Metabolite discovery" in a new drug's development "was misleading" where extensive FDA guidance existed on identifying metabolites early on and conducting extensive safety testing, meaning the drug "was dead on arrival"); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016) ("Defendants may not have had a duty to disclose the Rat Study had they not been

37

representing that animal studies supported lorcaserin's safety and therefore its likelihood of being approved. . . . [But] 'once defendants chose to tout [lorcaserin's likely approval by referencing allegedly positive animal and preclinical studies], they were bound to do so in a manner that wouldn't mislead investors as to [potentially negative information within their possession].'" (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008))).[17]

This Court's decision in *In re Human Genome Sciences Inc. Securities Litigation*, 933 F. Supp. 2d 751 (D. Md. 2013), illustrates this key point well.[18] There, Judge Titus considered statements made by executives of a defendant biopharmaceutical company developing a

---

[17] In *Schueneman*, the Ninth Circuit observed that defendants "went ahead and told investors about their confidence in lorcaserin's approval being based on 'the *preclinical* studies that [were] done, [and] *all the animal studies that have been completed.*'" 840 F.3d at 707 (emphasis in original). "The public was assured that lorcaserin's 'long-term safety and efficacy' (and thus the likelihood of its imminent approval) were 'demonstrated' through 'long-term preclinical toxicity and carcinogenicity studies.'" *Id.* To make matters worse, at the time such statements were made, the defendant "knew that the animal studies were *the* sticking point with the FDA." *Id.* at 708 (emphasis added). Although the defendant "was free to express confidence in FDA approval," it could not "express confidence by claiming that all of the data was running in lorcaserin's favor." *Id.* Here, Defendants did not express any specifics about the data they collected from the studies related to Zenrelia during the period at issue and in the statements alleged. Stated differently, the public could not be assured about Zenrelia's safety or approval based on studies on which they had no detailed information about.

[18] The Court observes that *In re Human Genome Sciences Inc. Securities Litigation* was primarily a decision about scienter, as are some other cases in the Fourth Circuit and beyond which discuss when a duty to disclose arises under Section 10(b). *See* 933 F. Supp. 2d at 760; *see also Zak*, 780 F.3d at 608–09; *Schueneman*, 840 F.3d at 707–08. As the Fourth Circuit has explained, the allegations related to misleading statements or omissions may include "conduct sufficient to engender the mandatory strong inference of scienter may be conduct that, inter alia, 'is so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Singer*, 883 F.3d at 443 (internal quotation marks omitted) (quoting *Zak*, 780 F.3d at 606). So although the presence or absence of a duty to disclose is necessarily relevant to whether the defendants acted in such a way that fell "within the coverage of the statute," where the deceptive act is premised on an omission, *see Pirate Inv. LLC*, 580 F.3d at 239–40, it may also be relevant to a discussion of scienter. *But see Singer*, 883 F.3d at 442–43 (discussing duty to disclose before turning to the issue of scienter).

"breakthrough lupus drug." 933 F. Supp 2d. at 753. At issue were "three passing references to a nameless study that is possibly the LBSL99 study," which was the title of a previous "unblinded" research study of the drug during which "one patient committed suicide and two more attempted suicide." *Id.* at 753-54. The defendant characterized the nameless study's outcomes as "similar" to prior studies, noted that the study "had produced 'a very positive safety profile,'" and that it "suggested that the drug [was] safe and well-tolerated over time." *Id.* at 761. The Court observed that the defendants "never even mentioned the unblinded LBSL99 study by name, or gave any concrete details about its results." *Id.* The Court concluded that the defendants "had no duty to disclose any information about unblinded study LBSL99, such that their failure to do so yields an inference of deliberate wrongdoing." *Id.* In so holding, the Court emphasized that Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information," and "[i]nstead, [] imposes only a duty to avoid certain omissions when an incomplete statement might mislead the public." *Id.* (citations omitted). Thus, the Court reasoned, since the defendants "never even mentioned the unblinded LBSL99 study by name, or gave any concrete details about its results[,] . . . the non-disclosure of the suicides during that study is hardly a misleading omission arising from an incomplete presentation of information about the study." *Id.*

So too here. Defendants did not make passing reference to the specific study during the class period, let alone seek to characterize its results in relation to other studies. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17. Certainly, a reasonable investor may have "consider[ed] the" results of the vaccine response study "important in deciding whether to buy or sell the security." *Longman*, 197 F.3d at 682–83. After all, the study led to the black box warning for Zenrelia, which limited the products' scope of use to some extent. *See* ECF 31, at 23 ¶ 64. But "[e]ven with respect to information that a reasonable investor might

39

consider material, companies can control what they have to disclose under [Section 10(b)] by controlling what they say to the market." *Matrixx Initiatives, Inc.*, 563 U.S. at 45. Because Defendants "never even mentioned the [vaccine response] study by name, or gave any concrete details about its results," the Court cannot conclude that Defendants caused a misleading omission arising from an incomplete presentation of information about the study. *See In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d at 761.

Plaintiffs attempt to analogize their case to *Levon v. CorMedix Inc.*, 797 F. Supp. 3d 381 (D.N.J. 2025). There, the trial judge considered a Section 10(b) claim brought against "a publicly traded biopharmaceutical company . . . focused on the development and commercialization of products for the prevention and treatment of infectious diseases." *Id.* at 396. Specifically, the allegations in *Levon* concerned the FDA approval process related to a new drug "designed to reduce catheter related infections." *Id.* An audit of the defendant's choice of manufacturer for their new drug resulted in a finding that the manufacturer "would never be able to pass an FDA inspection." *Id.* at 397. The "[d]efendants allegedly concealed these findings from the public, despite commenting on their ability to manage the manufacture of [the new drug] through [the manufacturer who was the subject of the negative audit]." *Id.* Ultimately, the FDA found the manufacturer to be inadequate and the defendant's stock price dropped "approximately 57 percent" once it disclosed this news. *Id.* at 400.

Importantly, the *Levon* court held that plaintiffs alleged several statements which put "specific issues 'in play,'" including statements discussing the new drug's "manufacturing readiness," the FDA's first complete response letter (a formal notice explaining why an application is inadequate), and the FDA's general concerns about the manufacturing process. *Id.* at 406. For example, the defendants told investors that a "drug product manufacturer . . . is in place and

processes have been established and appropriate validation testing completed to enable manufacture of launch quantities." *Id.* at 405. Defendants also stated that the new drug had "[s]uccessfully concluded . . . validation of the drug product manufacturing process, which [ ] enabled production at 2 different manufacturing locations" and that "[l]aunch quantities are already in production." *Id.* Further, Defendants asserted that they "and the manufacturer ha[d] adequately addressed concerns" the FDA identified in its first complete response letter. *Id.* Specific assertions of that nature, such as those related to the Zenrelia vaccine response study and its effect on safety differentiation, are wholly absent from the statements Plaintiffs' complaint takes issue with here. Accordingly, Defendants have not put the vaccine response study "in play" as the defendants' statements put non-public information "in play" in *Levon.*

Nevertheless, the Court is mindful that despite the Supreme Court's pronouncement in *Matrixx* that "companies can control what they have to disclose . . . by controlling what they say to the market," 563 U.S. at 45, failure to disclose based on the lack of an independent, affirmative duty "must be viewed under Section 10(b) and Rule 10b–5(b) in the context of the statements that they affirmatively elected to make." *Zak,* 780 F.3d at 609. Accordingly, the Court considers the particular statements complained of and their alleged relationship to the vaccine response study in more detail below, along with other arguments Defendants advance as to why such statements are inactionable.

### 2. Opinions and Puffery

Defendants also contend that the statements invoked by Plaintiffs constitute opinion or "inactionable corporate puffery." *See, e.g.,* ECF 37-1, at 20. "While opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman,* 197 F.3d at 683. Starting with the latter, puffery is a "genre of 'immaterial boasting and exaggerations' [that] will generally not constitute fraud." *Boykin v. K12, Inc.,* 54 F.4th 175, 183

41

(4th Cir. 2022) (quoting *Xia Bi v. McAuliffe*, 927 F.3d 177, 183 (4th Cir. 2019)); *see also Sinnathurai*, 645 F. Supp. 3d at 522 (defining puffery as "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available"). "An enterprise in the process of raising capital will naturally seek to present itself in a positive light," and Rule 10b-5 does not "exist to 'purge the market of all optimism.'" *Boykin*, 54 F.4th at 183 (quoting *Xia Bi*, 927 F.3d at 183). "The relevant standard is whether 'a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision.'" *Id.* (quoting *In re Marriott Int'l, Inc.*, 31 F.4th 898, 902 (4th Cir. 2022)).

An opinion, on the other hand, "is subject to reasonable disputation in a way that a false statement of fact is not," although "the line between opinion and fact is not invariably clear." *Boykin*, 54 F.4th at 183. "The prefatory 'I believe' or 'I think,' for example, conveys that a speaker is sharing a personal belief, not warranting facts." *Id.* "The 'reasonable investor is expected to understand' such a statement 'in its full context.'" *Id.* (quoting *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019)). "Liability only attaches if the opinion contains 'embedded' false facts or omits material facts 'that cannot be squared.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184–85 (2015)); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) ("Such statements, often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading."); *In re James River Grp. Holdings, Ltd. Sec. Litig.*, No. 3:21CV444 (DJN), 2023 WL 5538218, at *7 (E.D. Va. Aug. 28,

2023) (internal quotation marks omitted) (quoting *Boykin*, 54 F.4th at 183). "Opinions, of course, often contain puffery as well." *Boykin*, 54 F.4th at 183–84.

Defendants argue that "[n]early all of the challenged statements reflect Defendants' beliefs about the potential timing for FDA approval and prospects of Zenrelia" and thus are non-actionable opinion statements. ECF 37, at 29–30. Defendants argue that "Plaintiffs plead no contemporaneous information that contradicts Defendants' stated beliefs about the timing, progress and potential future performance of Zenrelia" *Id.* at 31. Moreover, Defendants argue that "Plaintiffs fail to allege any particularized contemporaneous facts" that would render such opinions misleading with respect to the omission of the vaccine response study, apart from "their bare conclusion that the vaccine response study was 'likely to negatively impact' Zenrelia's FDA approval." *Id.*

Plaintiffs advance counterarguments by category of statement, which the Court examines in greater detail below. Plaintiffs argue that "to the extent the Differentiation and Revenue/Margin Statements are not prefaced by qualifiers such as 'we believe' or 'we think,' and instead convey a sense of certainty, they are not statements of opinion." ECF 43, at 32. Even if all such statements are opinions, Plaintiffs further contend that they are actionable, first because "Defendants could not have sincerely held the opinion that Zenrelia was positively differentiated, and that Zenrelia would boost sales and margins . . . given their knowledge of the vaccine study's adverse results," *id.*, and second because "the vaccine study's adverse results showed that Zenrelia was negatively differentiated as to safety—which would foreseeably diminish sales, and reduce margins"— rendering the opinions misleading when they were not accompanied by information about the vaccine response study, *id.* at 32–33.

### 3. Forward-Looking Safe Harbor

Defendants also contend that the forward-looking nature of several of the statements alleged offers another ground for the Court's dismissal of the amended complaint. *See, e.g.*, ECF 37-1, at 26. The PSLRA defines a "forward-looking statement" as, among other things, "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," "a statement of future economic performance," and "any statement of the assumptions underlying or relating to" those statements. 15 U.S.C. § 78u-5. The PSLRA's forward-looking safe harbor provides that "in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading," a person will not be liable "with respect to any forward-looking statement, whether written or oral, if and to the extent that" the statement (1) "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) is "immaterial." *Id.* § 78u-5(c)(1)(A)(i)–(ii). Additionally, a forward-looking statement not "made with actual knowledge . . . that the statement was false or misleading" is not actionable under the safe harbor provision. *Id.* § 78u-5(c)(1)(B)(i); *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 787 (E.D. Va. 2015).

Generally, "boilerplate warnings will not suffice as meaningful cautionary statements." *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 551 (M.D.N.C. 2013) (quoting H.R. Conf. Rep. No. 104–369, at 43, 1995 U.S.C.C.A.N. 730, 742 (1995)). "While strong cautionary language undermines securities fraud claims, district courts in the Fourth Circuit have hesitated to rule on the adequacy of cautionary language at the motion to dismiss stage." *In re James River Grp. Holdings, Ltd. Sec. Litig.*, No. 3:21CV444 (DJN), 2023 WL 5538218, at *16 (E.D. Va. Aug. 28, 2023) (collecting cases); *see also Lefkoe v. Jos. A. Bank Clothiers*, Civ. No.

44

WMN-06-1892, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007) ("[T]he adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss." (citing *Blatt v. Corn Products Intern., Inc.*, Civ. No. 05-3033, 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006))).

Defendants contend that "[n]early every challenged statement" in the amended complaint is forward-looking. ECF 37-1, at 26. Defendants further argue that many of those statements "were identified as such, and were accompanied by meaningful cautionary language." ECF 37-1, at 27. Plaintiffs counter that none of the Differentiation and Revenue/Margin Statements qualify as forward-looking under the safe harbor because (1) "the issue here is not what those statements affirmatively conveyed, but what Defendants failed to disclose that rendered those statements misleading" and (2) the statements were "of present fact concerning the state of Zenrelia's differentiation," or at least a mixed present and future statement. ECF 43, at 29–30. Further, Plaintiffs argue that "to the extent any statements qualify as forward-looking, any accompanying cautionary language was not meaningful because Defendants already knew before the start of the Class Period that it was 'not safe to administer vaccines in dogs concurrently receiving Zenrelia,' and thus the risks disclosed had already materialized." ECF 43, at 30 (citation omitted). Plaintiffs also point out that "Defendants did not issue any cautionary language at industry conferences (e.g., ¶150) or during media appearances (e.g., ¶111)." ECF 43, at 31.

### 4. Analysis of Categories of Statements Made by Defendants

#### i. *Timing of FDA Approval*

Noticeably absent from the categories of statements Plaintiffs identify—News Statements, Differentiation Statements, and Revenue/Margin Statements—is a category focused on the

timeline regarding FDA approval.[19]    That stands in contrast to the amended complaint, which emphasizes portions of several statements related to Defendants' expected timeline for the FDA's approval of Zenrelia, including:

- Statement 2: "[W]e've got a path to first half approval, doesn't mean it's a guaranteed first half approval. But right now, we're still on that path based off Ellen's team and the milestones they're hitting. If that changes, we'll update you and the rest of the Street on timelines." ECF 31, at 30 ¶ 88.

- Statement 4: "And that's what said that we've got a path to first half 2024." *Id.* at 31 ¶ 91.

- Statement 7: "Zenrelia . . . [is] on a path toward U.S. approval in the first half of 2024." *Id.* at 33 ¶ 99.

- Statement 12: "We've got a path for an FDA approval the first half of this year." *Id.* at 37 ¶ 117.

- Statement 13: "[O]ur three late-stage pipeline products under regulatory review . . . . have a path toward approval in the first half of 2024[.]" *Id.* at 38 ¶ 119.

- Statement 14: "These three potential blockbusters continue to have a path towards [U.S.] approval in the first half of 2024." *Id.* at ¶ 120.

- Statement 17: "[W]e feel good about our path to first half approval." *Id.* at 40 ¶ 129.

- Statement 19: "All three products we continue to have a path to first half approval." *Id.* at 41 ¶ 136.

- Statement 20: "[W]e have increased certainty in the expected approval timing for [. . .] Zenrelia™[.]" *Id.* at 42 ¶ 128.

- Statement 24: "Simply, though, the back-and-forth interactions have taken slightly more time than we estimated this path to first-half approval. Thus, we're now moving the final 60 day administrative review into the third quarter. . . . We still expect all technical inspections, including the label, to be approved in the first half or by the end of June." *Id.* at 44 ¶ 146.

- Statement 25: "Zenrelia™ . . . full approval expected in Q3 2024[.]" *Id.* at 46 ¶ 148.

---

[19] Plaintiffs do not attempt to argue that expression related to possible approval alone are actionable, nor could they. "Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable." *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 964 (D. Md. 1995).

The amended complaint does not allege specifically that the results of the vaccine response study caused the delay in the approval process. Although it alleges that "the administration of a second vaccine had to be delayed from day 56 to day 60 of the study 'due to [the] suboptimal health of the dogs administered Zenrelia,'" ECF 31, at 55 ¶ 179, it does not expressly assert that the delay within the context of the study, which was completed in March of 2023, and submitted with the remainder of the Zenrelia package to the FDA, attributed to the delay in approval. The amended complaint further identifies Defendants' statements that "the back-and-forth interactions have taken slightly more time than we estimated this path to first-half approval," ECF 31, at 44 ¶ 146, although that statement, made in May of 2024, does not on its own implicate the vaccine response study, *see id.*

However, Defendants own statements in the June 27, 2024 press release, as alleged in the amended complaint, generate a reasonable inference that the labeling (which corresponded with the FDA's review of the results of the vaccine response study) was at least one cause of the delay. *See* ECF 31, at 49 ¶ 162. Specifically, the June 27, 2024 press release stated that "[f]or the Labeling minor technical section, earlier this week the Company aligned with FDA on the language and expects to receive the completion letter by mid-July. The 60-day final administrative review will follow, placing expected approval late in the third quarter of 2024." *Id.*; *see also id.* ("[W]e expect the U.S. label will include a boxed warning on safety based on the outcome of a trial with unvaccinated dogs dosed at 3x the label dose[.]").

Even so, all of Defendants statements related to the timing of FDA approval for Zenrelia sound in inactionable opinion. Defendants spoke consistently of their expectations and estimations, ECF 31, at 42 ¶ 128, at 44 ¶ 146, and that there was a "path" to approval in the first half of 2024, *id.* at 30 ¶ 88, at 31 ¶ 91, at 33 ¶ 99, at 37 ¶ 117, at 38 ¶ 119, at 40 ¶ 129, at 41 ¶ 136.

And early on in the class period, in June of 2023, Defendants cautioned that their statements did not "mean it's a guaranteed first half approval." *Id.* at 30 ¶ 88. Those statements, couched in "prefatory" language, are "subject to reasonable disputation in a way that a false statement of fact is not," and "convey[] that [the] speaker [was] sharing a personal belief, not warranting facts." *Boykin*, 54 F.4th at 183.[20]

Additionally, Plaintiffs have not pointed to factual allegations that support their otherwise conclusory assertion that Defendants did not sincerely hold the beliefs expressed regarding the predicted timeline, and Plaintiffs point to no false fact provided with, or embedded in, the opinion. *See in re Aratana Therapeutics*, 315 F. Supp. 3d at 758. The question, then, is whether the omission of information related to the vaccine response study rendered the opinions misleading. An opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90. "Moreover, whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 190 (analyzing registrations statements, "a class are formal documents" which investors "do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments"). Thus, "omitted facts must 'conflict

---

[20] Additionally, where statements "do no more than place a 'positive spin on developments in the [FDA approval] process,'" courts have also held that statements are non-actionable puffery which are "too general to cause a reasonable investor to rely upon them." *In re Aratana Therapeutics*, 315 F. Supp. 3d at 757–58 (collecting cases) (first quoting *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015); then quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

with what a reasonable investor would take from the statement itself.'" *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 189).

Other than perhaps the result (that there was, in fact, a delay in approval), nothing in the complaint alleges that the study results would affect a change in the timeline for FDA approval. *See Johnson v. Pozen Inc.*, No. 1:07CV599, 2009 WL 426235, at *20 (M.D.N.C. Feb. 19, 2009) ("Plaintiffs allege no facts to support their allegation that because of the CHO test results it was highly unlikely that the FDA would approve Trexima in August 2007."), *report and recommendation adopted*, No. 1:07CV599, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009); *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *18 (pointing to specific FDA guidance stating that the omitted information could cause a delay or prevent approval to support the conclusion that the omission rendered the statements misleading). Defendants need not have disclosed the vaccine response study and its results "merely because it tended to cut against their projections—Plaintiffs were not entitled to so much information as might have been desired to make their own determination about the likelihood of FDA approval by a particular date." *See Tongue*, 816 F.3d at 212. "[A]n allegation that the statements were misleading for failure to include a fact that would have potentially undermined Defendants' optimistic projections" is not enough, *id.*, and with respect to the FDA approval timeline, that is all Plaintiffs have alleged here. Moreover, the statements were made in the context of calls, press releases, and a TV show appearance. That context is more informal than something akin to a registration statement, and thus the context is not one which strongly supports the conclusion that a reasonable investor would interpret Defendants' opinions regarding the timeline for approval in a way that was inconsistent with the existence of the omitted fact—*i.e.*, the existence and results of the vaccine response study.

Defendants also argue that Plaintiffs' opposition "fails to address, and thus abandons, . . . statements concerning the expected timing of FDA approval and all but one of the statements regarding the FDA approval process." ECF 46, at 6. The Court agrees that Plaintiffs have effectively conceded that these statements are not actionable, insofar as they relate to timing and procedure, by failing to respond to Defendants' arguments regarding their dismissal. *See Fanucchi v. Enviva Inc.*, Civ. No. DKC 22-2844, 2024 WL 3302564, at *8 (D. Md. July 3, 2024) ("Plaintiff does not respond to this argument in his opposition and has therefore conceded the point."). Thus, for that reason as well, Plaintiffs have not stated a claim with regard to the statements concerning the likelihood of, or timeline for, FDA approval for Zenrelia.

### ii. Revenue/Margin Statements

Plaintiffs try to characterize the Revenue/Margin Statements as "statements of present fact because rather than providing specific numeric forecasts about the projected amount of Zenrelia sales or margins, they conveyed Defendants' present expectations and beliefs that Zenrelia sales would be additive to revenue, and drive higher margins." ECF 43, at 30. And if such statements are opinions, Plaintiffs argue that "Defendants could not have sincerely held the opinion that Zenrelia was positively differentiated, and that Zenrelia would boost sales and margins (with 'faster growth rates,' ¶ 113, and 'higher margins at the start,' ¶ 94), given their knowledge of the vaccine study's adverse results." ECF 43, at 32.

The Revenue/Margin Statements sound in opinion or puffery and are forward-looking specifically because they concern a vaguely optimistic "projection of revenues" and "future economic performance," 15 U.S.C. § 78u-5(i)(1)(A), (B). *See, e.g.*, Statement 5 ("With respect to the JAK inhibitor, we expect those to be higher margins at the start. . . . [O]verall, we're looking forward to getting these approved, getting them launched, and they'll be the big drivers over the next few years to increase margins, increase free cash flow and drive EBITDA higher."); Statement

50

10 ("So overall, we expect to continue to drive gross margin and operating profit higher over the next few years as we launch these big blockbuster products."). "'[A]s opposed to simple representations of historic fact,' an optimistic prediction of future growth, profit, or success 'presents more subjective issues.'" *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1229 (S.D. Cal. 2010) (alteration in original) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).

It is true that Defendants used the term "blockbuster" in their statements about the new products they were launching, including Zenrelia, and explained "blockbuster" to refer to a product that "can be over $100 million, in major markets" in animal health. *See* Statement 11. However, Defendants couched their comments with words like "expect" and "potential." *See* Statement 1 ("Each of our potential blockbusters is progressing as planned with a path towards approval by the first half of 2024[.]"); Statement 7 ("Our innovation pipeline remains on track, with potential blockbuster products . . . ."); Statement 9 ("[W]e've got 10 blockbusters, we are now looking at 6 in the making between the two that we have approved and through 2025."); Statement 10 ("So overall, we expect to continue to drive gross margin and operating profit higher over the next few years as we launch these big blockbuster products."); Statement 12 ("Six blockbusters, that's over 100 million in animal health, over the next two years we're bringing to market."); Statement 14 ("These three potential blockbusters continue to have a path towards [U.S.] approval in the first half of 2024."). *Cf. In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557–58 (S.D.N.Y. 2004) (noting that statements about a drug as having "real blockbuster potential" and having "the potential to be one of the most exciting, if not the most exciting, oncology compound introduced over the next several years" were "plainly opinions, not guarantees").

51

Accordingly, Defendants Revenue/Margin Statements are actionable only if the Defendants did not actually hold the belief they professed about Zenrelia's potential for revenue-generation, supplied an untrue supporting fact, or omitted information rendering the statement misleading. *See In re Aratana Therapeutics*, 315 F. Supp. 3d at 758. Plaintiffs first argue that Defendants could not actually hold the belief they professed—that Zenrelia would be commercially successfully or a "blockbuster"—based on the results of the vaccine response study. *See* ECF 43, at 32. However, beyond that conclusory assertion, Plaintiffs have failed to allege why that would be the case. The amended complaint alleges that the vaccine response study effectively marked Zenrelia as a product unsafe to administer to dogs concurrently receiving a vaccine. *See* ECF 31, at 19 ¶ 50, at 24 ¶ 72. But Plaintiffs have not alleged why this fact is incompatible with success on the market, nor do they allege why it renders the product unusable or functions as a prerequisite to FDA approval, such that Defendants could not have genuinely believed in Zenrelia's "blockbuster potential." Additionally, Simmons explained in Statement 29 that "[w]e've never seen a greater than $1 billion market with only two products really in it." *Id.* at 48 ¶ 160. That logic exemplifies the objectively reasonable basis for the belief that Zenrelia, even with its vaccine restraint, could generate significant revenue for Elanco.

Second, Plaintiffs argue that the omission of the vaccine response study amidst the Revenue/Margin Statements rendered such statements misleading. In *Matrixx Initiatives, Inc. v. Siracusano*, the Supreme Court considered a securities action that "principally [arose] out of statements that Matrixx made during the class period relating to revenues and product safety." 563 U.S. at 31. Specifically, defendants had expressed their "expectation that revenues would 'be up in excess of 50% and that earnings, per share for the full year [would] be in the 25 to 30 cent range.'" *Id.* at 33; *see also id.* at 34 ("In January 2004, Matrixx raised its revenue guidance,

predicting an increase in revenues of 80 percent and earnings per share in the 33–to–38–cent range."). The Supreme Court determined that disclosure of materially adverse facts was "required where a manufacturer informed the market of specific revenue projections and was cognizant of, but denied, the causal link between defendant's drug and the significant risk of losing the sense of smell." *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.,* 61 F.4th 369, 385 (4th Cir. 2023). The Fourth Circuit, distinguishing *Matrixx,* declined to find disclosure of the interim results of a trial required under Section 10(b) where defendants, among other things, "did not offer any specific revenue projections." *Id.* at 385.

Here, too, Defendants did not offer any specific revenue projections. Moreover, Plaintiffs have not alleged why Defendants' revenue projections, which in several of the statements referred to the launch of more than just Zenrelia, *see, e.g.,* Statement 12, would "conflict with what a reasonable investor would take from the statement itself." *Tongue,* 816 F.3d at 211 (citation omitted). Additionally, Defendants warned Plaintiffs that "[w]e cannot predict whether any products, once launched, will be commercially successful or will achieve revenue that is consistent with our expectations." ECF 37-20, at 18 (Exhibit 17 (FY 2023 Form 10-K)); *see also* ECF 37-7, at 27 (Exhibit 4). Although this language is fairly general, it adds to the context of what information the reasonable investor had access to. "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,* 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) (quoting *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir. 2010)). Accordingly, "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years' have been held unactionable as mere puffery." *Id.* (quoting *In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 355 F. Supp.

53

2d 1069, 1087 (N.D. Cal. 2005)). The predictions regarding Elanco's future profitability and the "blockbuster potential" of their new products are no different and thus are inactionable.

### iii.   Differentiation Statements

Several of Defendants' statements regarding differentiation are also forward-looking, referring to the speaker's confidence, expectations, and excitement for future differentiation as a general matter. *See* Statement 16 ("Our confidence in the differentiation remains."); Statement 20 ("[W]e continue to expect to bring differentiated products to the market[.]"); Statement 23 ("We remain confident this product will be differentiated from the current market option."); Statement 24 ("What hasn't changed is we continue to expect the products to be differentiated versus the current offering."); Statement 26 ("[W]e're excited about positive differentiation that we think will allow us to penetrate the market in a reasonable way."). These were statements "whose truth or falsity [was] discernible only after it is made" and thus are necessarily forward-looking. *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 722 (E.D. Va. 2003).[21]

Defendants provided cautionary statements with respect to future differentiation during the class period, including that Simmons would not give "the specifics on our differentiation for competitive reasons until we get a little closer," Statement 6, and that "[w]e believe these assets are differentiated, [b]ut until you have the final label and until you have the final product in the

---

[21] To the extent these statements might also be examined as opinions about differentiation, they were likewise inactionable. Plaintiffs have not alleged Defendants did not subjectively believe in the prospect of differentiation, and Plaintiffs have not plausibly alleged that the results of the vaccine response study destroyed any and all hope of Zenrelia's differentiation such that the opinion embedded or implied an untrue fact. *See Omnicare*, 575 U.S. at 189–90 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."); *Boykin*, 54 F.4th at 182 (applying *Omnicare* to Section 10(b) claims); *cf. In re Pivotal Sec. Litig.*, No. 3:19-CV-03589-CRB, 2020 WL 4193384, at *13 (N.D. Cal. July 21, 2020) (concluding that the statement "[w]e think there is a lot of differentiation there, but there's also a lot of emerging technologies in the market" was an inactionable opinion).

market, that differentiation is still being defined," ECF 37-24, at 3 (Exhibit 21 (TD Cowen Health Care Conference transcript)). Those statements were "substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge" because they identified that the final product, and specifically the label, would be relevant to determining differentiation, and whether it was positive. *See City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prods. Co.,* 827 F.Supp.2d 559, 575 (D.S.C.2011) (citations and internal quotation marks omitted). Accordingly, Defendants' forward-looking statements about differentiation, where accompanied by cautionary statements, fall under the PSLRA's safe harbor.

However, Plaintiffs point to statements where Defendants identified Zenrelia as "differentiated," rather than potentially so, which Plaintiffs contend is "a statement[] of present fact concerning the state of Zenrelia's differentiation." ECF 43, at 30; Statement 7 ("[O]ur differentiated JAK inhibitor for canine dermatology . . . ."); Statement 12 ("We're bringing Zenrelia, a JAK1 inhibitor, it's a differentiated asset entering that market."); Statement 14 ("On the late-stage pipeline, our three differentiated assets - Credelio Quattro, Zenrelia, and Bovaer . . . ."). The Court agrees that these statements may present a closer call as to whether they are opinion or more akin to a factual assertion, since "whether Zenrelia was positively differentiated from Apoquel on any of the three relevant attributes— efficacy, safety, or administration—was a factual question that could be proven true or false." ECF 43, at 27.

Plaintiffs argue that calling Zenrelia "differentiated" without disclosing the vaccine response study results was misleading because Defendants identified "safety" as "a key differentiating attribute." *See* ECF 43, at 12, 13. Thus, Plaintiffs contend, making exclusively positive statements as to present-tense differentiation during the class period rendered the omission of the vaccine response study misleading. *See id.* Because "Apoquel . . . did not have a black box

warning," ECF 31, at 44 ¶ 145, and because the study's results led to such a warning, *id.* at 23 ¶ 66, Plaintiffs sufficiently allege that the vaccine response study made positive differentiation with respect to safety less likely. However, Defendants did not make statements about differentiation that were specific to safety, but rather generally identified the product as "differentiated." *See* Statements 7, 12, and 14. That Zenrelia would not be positively differentiated in the category of safety from Apoquel does not mean that it could not be generally differentiated from Apoquel in other respects. As Young stated at the May 29, 2024 Stifel Jaws and Paws Conference, "positive differentiation" could come in a variety of respects, such as through "new dogs," "switchers" and "non-responders"—the latter category presumably referring to those dogs that did not respond to Apoquel but would respond to Zenrelia. *See* ECF 31, at 46 ¶ 151. In other words, Defendants' general view on differentiation was not made misleading by the omission of a study which Plaintiffs do not allege had publicly or privately informed the basis for that view, and which did not necessarily undermine statements about differentiation as a factual matter.

#### iv.    *News Statements*

Plaintiffs only emphasize one News Statement in their opposition. *See* Statement 9 ("[W]e are now looking at 6 in the making between the two that we have approved and through 2025. . . . So as we look at them, no new real news here. And that's good news. I mean, we have said it's rolling, it's iterative, the submissions are in."). For the sake of being thorough, however, the Court also observes that other statements regarding updates on Zenrelia are identified in the amended complaint. *See* Statement 3 ("But right now, we're still on that path based off [the] team and the milestones they're hitting. If that changes, we'll update you and the rest of the Street on timelines."); Statement 15 ("[N]o update today on [the] Zenrelia timeline. We continue really with no change in terms of just a very productive dialog with the FDA. We believe that market adoption, as we know, will be driven on value and execution. But again, the dialogue with the FDA is going

well. No change. When there is change, of course, we'll be announcing approval, and if there's any change to that, we'll let you know. So, no – no change at all."); Statement 16 ("Our regulatory team is doing a great job, and we're in a very proactive productive dialogue with the CVM, and we'll update you if anything does change.").

Plaintiffs point out that "because the News Statement is so black-and-white, Defendants do not challenge it anywhere in their brief as puffery, forward-looking, or an opinion." ECF 43, at 23. While the Court agrees that the News Statement was not forward-looking, the question of whether the News Statement is an opinion is more difficult. Simmons' remark that no real news was "good news" necessarily sounds in opinion. However, whether there was an update or news to share may be "subject to reasonable disputation in a way that a false statement of fact is not." *Boykin*, 54 F.4th at 183. Moreover, the statement should be understood in the context of the analyst's question at the conference in which it was made. *Id.* ("[T]he 'reasonable investor is expected to understand' such a statement 'in its full context.'" (quoting *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019))). Prior to Simmons making Statement 9, an analyst asked: "So I guess any update on the regulatory front of how the applications are progressing, any requests for additional data? I'm just trying to get a sense of like how confident are you on the first half approval timelines?" ECF 31, at 35 ¶ 105.

Regardless of whether the News Statement—or any statement regarding updates on Zenrelia—is opinion, Plaintiffs are obligated to allege *why* it was false or misleading. *See Tongue*, 816 F.3d at 211. With respect to falsity, the earliest of the above-mentioned statements, and the one Plaintiffs emphasize, Statement 9, was made on January 9, 2024, several months after the completion of the vaccine response study on March 13, 2023. *See* ECF 31, at 35. Because of the context in which Statement 9 was made—*i.e.*, in response to a question focused on "requests for

additional data" and "approval timelines"— the Court cannot accept Plaintiffs contention that the vaccine response study's omission from the discussion rendered the update that Simmons had "no new real news" misleading. It bears repeating that the vaccine response study was completed before the class period and the amended complaint contains no allegations specifying the timeline on which the FDA communicated with Elanco about labeling matters prior to the June 27, 2024 press release. Thus, these statements are not actionable because, at the time and in the context they were made, it is undisputed that Simmons had, as he said, submitted the application and had no "news" to share. Accordingly, the news statements are not actionable.

## C. Scienter

The PLSRA provides that in a private action "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The scienter element of a Section 10(b) claim "requires Plaintiffs to establish that Defendants intentionally or recklessly misled them." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 240 (4th Cir. 2023) (citing *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003)); *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751 (D. Md. 2013) ("The Supreme Court has defined 'scienter' as 'a mental state embracing intent to deceive, manipulate, or defraud.'" (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.2 (1976))). The Fourth Circuit has made "clear that '[r]eckless conduct sufficient to establish a strong inference of scienter" must be "'severe,' or 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 594 (D. Md. 2017)

58

(alteration in original) (internal citation omitted) (first quoting *Ottmann*, 353 F.3d at 344; and then quoting *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)).

Applying the heightened pleading standard to the scienter element "is a comparative, two-step process." *San Antonio Fire & Police Pension Fund*, 75 F.4th at 241 (citing *Tellabs, Inc.*, 551 U.S. at 314). The Court must "first consider the 'inferences [of scienter] urged by the plaintiff.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 314). The Court then must "weigh those inferences against 'competing inferences rationally drawn from the facts alleged,' giving each only 'the inferential weight warranted by context and common sense.'" *Id.* (first quoting *Tellabs, Inc.*, 551 U.S. at 314; and then quoting *Matrix Cap. Mgmt. Fund, LP*, 576 F.3d at 183). "In the end, '[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 324). However, the Court is mindful that its "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. Thus, the Court must compare the inference of scienter and any opposing inference only after "the allegations are accepted as true and taken *collectively*." *Id.* (emphasis added).

As the Fourth Circuit recently observed, "if the more compelling inference is that the defendants acted innocently—or even negligently" in an Exchange Act case, the element of scienter is not adequately pled. *See City of Southfield Gen. Employees' Ret. Sys. v. Advance Auto Parts*, Inc., 167 F.4th 637, 646 (4th Cir. 2026). Although the Court must ultimately evaluate Plaintiffs' allegations holistically with respect to scienter, the Court begins by assessing allegations individually. *See id.* at 647 ("Although we ultimately evaluate Southfield's allegations holistically, we begin by assessing them individually.").

59

1. Statements

Plaintiffs point to several "public statements of Simmons and Young during the Class Period on earnings calls and at conferences indicating that they" had knowledge of the vaccine study results. ECF 43, at 34–35; *see also* ECF 31, at 50–56. The amended complaint specifically alleges that "[t]hroughout the Class Period," the Defendants "spoke repeatedly and in detail regarding the regulatory approval process for Zenrelia, establishing that they closely followed that process and had access to internal information about it." ECF 31, at 50 ¶ 167. For example, "Simmons stated that he was 'confident' in the 'quality of the package[]' submitted to the FDA regarding Zenrelia, as well as the 'dialogue with the regulators.'" *Id.* at 51 ¶ 168 (alteration in original). Plaintiffs also emphasize the June 16, 2021 conference call, prior to the start of the class period, in which Elanco leadership referenced "[p]ivotal studies . . . underway" related to Zenrelia. *Id.* at 54 ¶ 177.

The Fourth Circuit recently emphasized that a plaintiff in these kinds of cases must allege the defendants had reason to know the information they were sharing was inaccurate or misleading when they shared it. *Advance Auto Parts, Inc.*, 167 F.4th at 647. In that case, a defendant company (Advanced Auto Parts, Inc.) "announced aggressive financial goals that exceeded investors' expectations" and "increased the company's stock price." *Id.* at 642. But after the company "significantly reduced those estimates and corrected a series of accounting errors," its stock price plummeted, and a large investor sued, alleging that "Advance Auto and several former officers committed securities fraud by manipulating the company's accounting." *Id.* In affirming the trial court's dismissal of the lawsuit, the Fourth Circuit held that the plaintiff had not alleged "that defendants 'had reason to know that the company's financial information was inaccurate' when they published Advance Auto's financial results." *Id.* (citing *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188 (4th Cir. 2009)). In part because the plaintiff "fail[ed] to

60

allege facts about when, or how, defendants learned about the accounting errors," "the stronger inference [was] that defendants based the financial statements on internal data they believed was correct at the time, but which they later learned was wrong." *Id.* at 647–48 (alterations added).

The general statements Plaintiffs allege may suggest a plausible inference that Defendants had knowledge of the vaccine response study. But plausibility "won't do." *Advance Auto, Inc.*, 167 F.4th at 651 (citing *Tellabs*, 551 U.S. at 314). Plaintiffs do not point to any statements which indicate more than a plausible inference about Simmons' or Young's knowledge of the vaccine response study and its results *prior to or during* the class period. Moreover, even assuming that knowledge, it does not necessarily follow that the Defendants knew what the effect of the results would be on the commercial launch of Zenrelia and its labeling at the time of statements made prior to the June 27, 2024 press release. *Cf. Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 425–26 (S.D.N.Y. 2023) ("Even if they had such knowledge, it does not follow that they knew that UKONIQ was unsafe (or were reckless with respect to its safety). Adverse events during clinical trials are raw data. A certain number of such events are to be expected[.]"). Plaintiffs do not point to any alleged communications or other evidence that suggest Defendants knew about likely downstream effects of the vaccine response study on Zenrelia's approval and labeling.

### 2. Anonymous Former Employee

Plaintiffs also argue that the allegations of FE-1, "a former Elanco employee who worked at Elanco while the vaccine study was underway," further support a strong inference of scienter. ECF 43, at 34. "Generally, plaintiffs are free to use the allegations of confidential witnesses to support an inference of scienter." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021). "However, such allegations will only be afforded the weight they are due given their indicia of reliability, and any '[o]missions and ambiguities count against an inference of scienter.'"

*Id.* (internal quotation marks omitted) (quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885–86 (4th Cir. 2014)).

According to the complaint, FE-1 stated that "there was a project head for each drug development program, and they would communicate unexpected results 'up the food chain.'" ECF 31, at 57 ¶ 187. FE-1 also stated that "the CEO and CFO of Elanco had a 'whole platoon around them and their whole business is making sure they are exposed' to information regarding the Company, including drugs and development." *Id.* "'When there is an unexpected development that has a material impact, it is reported to that team,' who then inform the CEO and CFO, according to FE-1." *Id.* Plaintiffs contend that these allegations support a strong inference that Defendants knew about the vaccine response study's results, and they invoke *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 525 (D. Md. 2022), for support.

In *Sinnathurai*, this Court found that scienter was sufficiently alleged where information "was communicated up to senior management" and a former senior director of clinical operations "reported that manufacturing issues were generally brought to the attention" of a defendant. *See* ECF 43, at 34–35. As the Court there observed, "a demonstration that the relevant information generally flowed to senior company officials making the public statements provides some evidence of scienter." *Sinnathurai*, 645 F. Supp. 3d at 526 (collecting cases). However, the Court reasoned that the plaintiffs' allegations in *Sinnathurai* about the flow of information "provide[d] only circumstantial evidence that [a defendant] was aware of the information about contamination and other manufacturing problems" and so were "not alone sufficient to establish a strong inference of scienter." *Id.*

Defendants argue that FE-1 "offers no support" for scienter because "FE-1 admittedly left Elanco in Q1 2022 before the Class Period and admittedly had no knowledge of Zenrelia, its

development, the vaccine study, its FDA application process or Elanco's public disclosure." ECF 37-1, at 35. Defendants invoke *In re Conventry Healthcare, Inc. Sec. Litig.*, Civ. No. 08:09- 2337-AW, 2011 WL 1230998 (D. Md. Mar. 30, 2011), for support. ECF 37-1, at 35. There, the Court disregarded allegations made by a confidential witness where it was not alleged in the amended complaint that the witness "had direct knowledge of what Defendants in this matter knew or recklessly disregarded or that this confidential witness had any direct contact with the Defendants." *In re Conventry Healthcare*, 2011 WL 1230998, at *6. Plaintiffs respond that "*Conventry* failed to consider the admonition in *Tellabs* that 'smoking gun' evidence is not required to establish a strong inference of scienter." ECF 43, at 35 n.9 (citing *Tellabs*, 551 U.S. at 32).

"When a plaintiff 'chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations.'" *Carlucci v. Han*, 886 F. Supp. 2d 497, 519 (E.D. Va. 2012) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007)). Here, the amended complaint explains that "FE-1 worked at Elanco for approximately six years, ending in Q1 2022, in a series of increasingly senior research and development positions." ECF 31, at 56. "As a result," Plaintiffs allege that "FE-1 has knowledge regarding Elanco's practices regarding drug development, including communicating to senior management about issues arising in such development." *Id. Cf. Carlucci*, 886 F. Supp. 2d at 519–20 ("There are no allegations that the [confidential source] attended any meetings, reviewed any documents, spoke with anyone at Petrobas, or spoke with [the defendant] himself.").

The Court concludes that little weight is due to the anonymous source invoked by Plaintiffs. FE-1 had no "direct knowledge of what Defendants in this matter knew," did not have "any direct

contact with the Defendants" about Zenrelia or its studies, *see In re Conventry Healthcare*, 2011 WL 1230998, at *6, and left the company in Q1 2022, before the vaccine response study was underway, ECF 31, at 56 ¶ 183. In *Advance Auto Parts, Inc.*, the Fourth Circuit gave "little weight" to an anonymous witness under similar circumstances, where the employee left the company "well before the start of the class period" and there was no "indication that the employee 'passed their concerns on to [the individual defendants] or that the individual [d]efendants were otherwise aware of the problems alleged.'" 167 F.4th at 649 (quoting *KBC Asset Mgmt. NV*, 19 F.4th at 609). An "employee's mere belief that the rest of the senior management team knew about the issue is too speculative to support scienter." *Id.* As in *Advanced Auto Parts, Inc.*, the confidential witness here provides little more than the belief about such knowledge and was absent prior to the commencement of the study at issue, thus the Court does not afford FE-1's allegations much weight.

### 3. Core Operations

Plaintiffs additionally argue that the core operations doctrine also supports a finding of scienter. ECF 43, at 36. "Although not sufficient to establish scienter by itself, the fact that the subject of the alleged fraud was a core business or operation of the company is relevant to the analysis of scienter because under such circumstances it would be fair to infer that the company officers responsible for public statements were aware of facts relating to that activity." *Sinnathurai*, 645 F. Supp. 3d at 527 (collecting cases). Defendants argue that this doctrine does not apply to this case because "Plaintiffs do not allege Zenrelia—one of 200 brands and 6 'potential blockbuster' drugs in development in 2024—was a 'core operation'" of Elanco. ECF 37-1, at 36.

When applying the core operations doctrine, "courts have required that the operation in question constitute nearly all of a company's business before finding scienter." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 234 (S.D.N.Y. 2023) (quoting *Frankfurt-Tr. Inv.*

64

*Lux. AG v. United Techs. Corp.,* 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018)); *see also Knurr v. Orbital ATK Inc.,* 272 F. Supp. 3d 784, 800 n.21 (E.D. Va. 2017) (observing that even accepting plaintiffs' allegations as true that "Lake City Contract was the company's largest and most important contract, it is not even clear if these allegations are enough to establish that the contract was one of the company's core operations"). Plaintiffs have not alleged that the approval and study of Zenrelia, or the roll-out and sale of Zenrelia generally, constituted nearly all of Elanco's business. Accordingly, the Court does not find that the core operations doctrine supports the inference of Defendants' knowledge of the vaccine response study.

### 4.  Holistic Analysis

Even though none of Plaintiffs' allegations support a strong inference of scienter alone, the Court must "consider whether, 'evaluating the complaint holistically, the combined allegations can do what their individual parts failed to do.'" *Advance Auto Parts, Inc.,* 167 F.4th at 651. "[A]llegations of scienter that would not independently create a strong inference of scienter might compliment each other to create an inference of sufficient strength to satisfy the PSLRA." *Matrix Cap. Mgmt. Fund, LP,* 576 F.3d at 187–88.

"Plaintiffs must create a strong inference that Defendants intended to mislead investors— or else recklessly disregarded the risk that they might do so—when they gave their projections without the extra information." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.,* 658 F. Supp. 3d at 241. "Establishing this '*why*' requires first showing that Defendants knew the missing information." *Id.* (emphasis in original). "It also requires showing that Defendants knew that the information was relevant for evaluating their projections." *Id.* "And it requires showing that Defendants went ahead and left the information out anyway, with the intent to mislead Plaintiffs— or at least with a reckless disregard for the risk that leaving the information out would make their projections misleading." *Id.* at 241–42. Failure to "put forward any plausible motive for why

Defendants sought to defraud investors . . . 'weighs heavily' against [Plaintiffs] in the scienter analysis." *Id.* at 242 (quoting *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021)).

To overcome the absence of an alleged motive, "circumstantial evidence of fraud must be correspondingly greater." *Id.* (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010)). Plaintiffs have not alleged a motive to commit fraud here. *See* ECF 43, at 37 ("But motive is *not* required to establish scienter." (emphasis in original)). Accordingly, other circumstantial evidence must bear more of the burden in achieving the heightened showing.

"In securities litigation cases premised upon a drug company's partial non-disclosure of drug trials to the investing public, the key inquiry is whether the non-disclosure at issue results in a suspiciously incomplete data set that yields a strong inference of scienter." *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d at 760. The Third Circuit, for example, "found scienter even though the defendant drug company eventually disclosed adverse test results to the FDA" because the defendant "selectively disclose[d] the favorable aspects of its drug trials while completely omitting the unfavorable aspects." *Id.* (citing *Alaska Electrical Pension Fund v. Pharmacia Corp.*, 554 F.3d 342 (3d Cir. 2009)). In that case, the defendant "misled The Journal of the American Medical Association, as well as the investment community, by submitting incomplete data with respect to a particular trial and using it as a basis for publishing information about that trial in the national journal." *Id.* (same); *see also City of Livonia Employees' Retirement System v. Wyeth*, Civ. No. 07-10329, 2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010) (finding scienter even though the defendant drug company submitted the complete results of a specific phase of a drug trial to the FDA, because the defendant simultaneously disclosed only favorable portions of that drug trial to the public).

In contrast to those cases, and as discussed above, Defendants here only made one passing reference to "[p]ivotal studies" before the June 27, 2024 disclosure related to the vaccine response study—a reference which itself fell outside of the class period. ECF 31, at 554 ¶ 177. This Court has before held that even where factually accurate statements are made about a study, "albeit with a positive spin," "scienter would have to be inferred from the company's omission of more specific details about the study." *In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d at 761. Here, however, Defendants did not make statements about the vaccine response study during the class period until they disclosed that study's existence and results, and Plaintiffs do not allege that the contents of that disclosure violated the Exchange Act.

Plaintiffs attempt to invoke *Zak v. Chelsea Therapeutics International, Ltd.*, a case in which the Fourth Circuit held that a "strong inference of intentional or reckless conduct is supported by the plaintiffs' allegations that material, non-public information known to the defendants about the status of the new drug application and required efficacy studies conflicted with the defendants' public statements on those subjects." 780 F.3d 597, 609 (4th Cir. 2015); *see also* ECF 43, at 34. The *Zak* Court acknowledged that the defendants "lacked an independent, affirmative duty to disclose the adverse FDA staff recommendation and the shortcomings of [defendants'] evidence of efficacy," but observed that "the defendants' failure to do so must be viewed . . . in the context of the statements that they affirmatively elected to make." *Id.* at 609; *see also In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) ("[A]s a general proposition, had no duty to report its ongoing discussions with FDA during the review process.").

In *Zak*, the plaintiffs alleged that defendants "knew that the FDA expected two successful efficacy studies demonstrating durability of effect to support regulatory approval" of the drug at issue, even though "none of the defendants' statements to investors addressed this critical

expectation." 780 F.3d at 609. Nevertheless, the defendants "informed investors that the FDA had 'agreed'" they could "submit" the "new drug application . . . 'without the need for any further efficacy studies.'" *Id.* Those public statements, among others, outright "conflicted" with the "material, non-public information known to the defendants about the status of the new drug application and required efficacy studies." *Id.* Not so here. As the Court has explained, Defendants did not discuss how the vaccine response study played into the FDA approval process at all—indeed, Defendants did not publicly discuss the study until it had a definitive impact on the FDA's labeling of Zenrelia. *See* ECF 31, at 23 ¶ 64. Suffice to say, the statements at issue did not expressly conflict with any information known to defendants about the vaccine response study, and they do not support a strong inference of intentional or reckless conduct.

"Taken together," the facts alleged here "may support a plausible inference of scienter." *Advance Auto Parts, Inc.*, 167 F.4th at 651. But "[e]ven though there may be 'some reason to believe [d]efendants acted with the requisite intent . . . there is not enough to create a *strong* inference of scienter.'" *Id.* (quoting *KBC Asset Mgmt. NV*, 19 F.4th at 613) (emphasis in *KBC Asset Mgmt. NV*). While it is *possible* to infer that Defendants deliberately omitted facts about the vaccine response study in order to mislead investors, the more compelling inference raised by the allegations here is that Defendants only offered vague reference to studies being underway and nothing more because they did not know or believe that the vaccine response study results would negatively impact FDA approval or affect the commercial launch of Zenrelia. *See* ECF 46, at 6.

### D. Section 20(a)

"Section 20(a) provides for derivative liability for those who control others found to be primarily liable under the Exchange Act." *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 523 (D. Md. 2021). Specifically, under Section 20(a), "[e]very person who, directly or indirectly,

controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Thus, 'the liability of a control person under section 20(a) is derivative of—and dependent upon—liability of a controlled person under Section 10(b).'" *Leacock v. IonQ, Inc.*, Civ. No. DLB-22-1306, 2024 WL 3360647, at *19 (D. Md. July 10, 2024) (first quoting *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018); and then citing *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d at 523), *aff'd sub nom. Defeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025); *see also In re Under Armour Sec. Litig.*, 540 F. Supp. 3d at 523 ("A claim of control person liability must allege a predicate violation of Section 10(b)."). "Section 20(a) confers a private right of action on buyers and sellers of securities who trade 'contemporaneously' with an insider in possession of material nonpublic information." *Id.* (citing 15 U.S.C. § 78t-1(a)).

Because the Court concludes that Plaintiffs have failed to state a claim under Section 10(b) and Rule 10b-5, Plaintiff's allegations under Section 20(a) necessarily fail. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014) ("Section 20(a) liability is derivative of § 10(b). Because the complaint is legally insufficient with respect to the § 10(b) claim, the § 20(a) claim must also fail."); *see also Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) ("Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act are derivative of their Section 10(b) and Rule 10b–5 claims, so the 20(a) and 20A claims were properly dismissed as well."); *Advance Auto Parts, Inc.*, 167 F.4th at 651 ("And because Southfield's § 10(b) claim fails, so does its claim for vicarious liability under § 20(a)." (citing *Karp v. First Connecticut Bancorp, Inc.*, 69 F.4th 223, 236 (4th Cir. 2023))).

### E.   Leave to Amend

In the event that the Court grants Defendants' motion to dismiss, Plaintiffs informally seek leave to amend their complaint. *See* ECF 43, at 37. The decision to allow leave to amend rests in the Court's discretion. *See Cozzarelli*, 549 F.3d at 630. The Court observes that Plaintiffs have not "filed a motion for leave to amend before the district court, nor [have] they present[ed] the [] court with a proposed amended complaint." *Id.* Instead, Plaintiffs have requested leave to amend, in a single sentence, at the end of their opposition memorandum, without explaining how they would amend the operative complaint. *See* ECF 43, at 37. This type of request does "not qualify as [a] motion[] for leave to amend[.]" *Cozzarelli*, 549 F.3d at 630 (citing Fed. R. Civ. P. 7(b), 15(a)). In such circumstances, the Fourth Circuit has held that "we cannot say that the district court abused its discretion by declining to grant a motion that was never properly made." *Id.* at 630–31 (citing *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004)). Regardless, the Court notes that had such a motion been properly made, an amendment to the complaint would likely be futile, in light of the reasons explained above. *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 391 (4th Cir. 2005) ("Leave to amend need not be given when amendment would be futile.").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. A separate implementing order will issue.

Dated: <u>March 26, 2026</u>

_____/s/_____
Brendan A. Hurson
United States District Judge
